# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| KENNETH P. SILVERMAN, ESQ., THE CHAPTER 7 TRUSTEE OF THE JOINTLY ADMINISTERED ESTATES OF NATIONAL EVENTS HOLDINGS, LLC, AND ITS AFFILIATED DEBTORS, | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| CITIBANK, N.A., | ) ) |
| Defendant. | ) ) ) ) ) |

Index No.:

**SUMMONS**

Plaintiffs designate County of New York as the place of trial pursuant to CPLR § 509.

Venue is proper pursuant to CPLR § 501 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in New York County.

TO THE ABOVE-NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer on Plaintiff's attorneys within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York.  In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:        New York, New York
              June 1, 2022

                              KASOWITZ BENSON TORRES LLP

                              By: */s/ Howard W. Schub*
                              Howard W. Schub (hschub@kasowitz.com)
                              Michele L. Angell (mangell@kasowitz.com)
                              1633 Broadway
                              New York, New York 10019
                              Telephone: (212) 506-1700
                              Facsimile: (212) 506-1800

                              *Special Litigation Counsel to*
                              *Kenneth P. Silverman, Esq., Chapter 7*
                              *Trustee*

**To:**

CITIBANK, N.A.
c/o Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022

Case 1:22-cv-05211-GHW   Document 1-1   Filed 06/21/22   Page 4 of 53

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| KENNETH P. SILVERMAN, ESQ., THE CHAPTER 7 TRUSTEE OF THE JOINTLY ADMINISTERED ESTATES OF NATIONAL EVENTS HOLDINGS, LLC, AND ITS AFFILIATED DEBTORS, | ) ) ) ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITIBANK, N.A., | ) |
| | ) |
| Defendant. | ) ) ) |

Index No:

**COMPLAINT**

**Jury trial demanded**

Kenneth P. Silverman, Esq., the chapter 7 trustee (the "Trustee" or "Plaintiff") of the jointly administered chapter 7 bankruptcy estates of National Events Holdings, LLC ("NEH"); National Events Intermediate, LLC; National Event Company II, LLC; National Event Company III, LLC; World Events Group, LLC; National Events of America, Inc. ("NEA"); and New World Events Group Inc. (collectively, the "Company"),[1] in the Company's jointly administered chapter 7 bankruptcy cases (the "Bankruptcy Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), by his special litigation counsel, Kasowitz Benson Torres LLP ("Kasowitz"), (i) on behalf of the Company's bankruptcy estates, and (ii) as assignee of Falcon Strategic Partners IV, LP and FMP Agency Services, LLC (together, "Falcon"), Taly USA Holdings Inc. and SLL USA Holdings, LLC (together, "Taly"), and Hutton Ventures LLC ("Hutton"), for his complaint (the "Complaint") against Citibank, N.A. ("Citibank" or "Defendant") alleges as follows:

---

[1]     National Events Holdings, LLC, National Event Company II, LLC, National Event Company III, LLC, National Events Intermediate, LLC, and World Events Group, LLC are collectively referred to herein as the "LLC Entities."

## NATURE OF THE ACTION[2]

1.      This action seeks to hold Citibank responsible for aiding and abetting a massive $70 million fraud perpetrated by Jason Nissen, the former CEO of National Events of America, Inc. and its affiliates.  The Company was a relatively small ticket brokerage business that Nissen used as a front for a Ponzi scheme from at least 2015 through May 2017.  Nissen raised money from a slew of investors – including several reported criminals – to keep the Ponzi scheme going and laundered all the money in a concerted effort to cover his tracks.

2.      But Citibank figured out that Nissen was engaged in fraud long before he was arrested in May 2017 and later pled guilty.  From the days Nissen opened up his and the Company's accounts at Citibank, ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ("██") .

3.      ████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████ made an affirmative determination to close Nissen's and the Company's accounts.  ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████

---

National Events of America. Inc. and New World Events Group Inc., are together referred to herein as the "Corporate Entities."

[2]      Capitalized terms used in this "Nature of the Action" section but not defined therein have the meanings assigned to them in the body of this Complaint.

2

Case 1:22-cv-05211-GHW   Document 1-1   Filed 06/21/22   Page 6 of 53

4.     Citibank knew Nissen was engaged in a Ponzi scheme.  ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

5.     Citibank also knew that Nissen was ████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████.

6.     As a result of ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████.

7.     However, █████████████████████████████████████████████ may

have been the result of systemic failures in Citibank's banking practices (for which Citibank has been

fined nearly $500 million by the Office of the Comptroller of the Currency) and/or nefarious conduct

by Nissen's relationship manager Jack Crowley and small business banker and/or relationship manager

Joshua Santana, who successfully stalled █████████████ to close the accounts.  From day one,

Crowley and Santana substantially assisted Nissen with his fraudulent scheme by, among other things,

████████████████████████ and actively stalling ██████████████████, and enabling

3

the fraud to expand – all in their capacity as employees of Citibank. Crowley's and Santana's knowing assistance, together with that of other Citibank employees, was critical to the Ponzi scheme's survival.

8.      Because Nissen undisputedly committed fraud, and Citibank had actual knowledge of his Ponzi scheme and substantially assisted it, Citibank is liable for damages and prejudgment interest in an amount to be proven at trial, but in no event less than $100,000,000.

## THE PARTIES AND RELEVANT NON-PARTIES

9.      Plaintiff is the chapter 7 trustee of the Company's jointly administered chapter 7 Bankruptcy Cases, and brings this action (i) in his capacity as Trustee on behalf of the Company's bankruptcy estates, and (ii) in his capacity as the assignee of Falcon's, Taly's and Hutton's direct claims against Citibank.

10.     At all times relevant, Defendant Citibank is and was a national bank with a principal place of business and headquarters in New York, New York.

11.     At all times relevant, Nissen was a natural person residing within the State of New York.

12.     Hutton is a limited liability company organized under the laws of Delaware with a principal place of business in New York, New York. Hutton assigned its claim against Citibank for aiding and abetting Nissen's fraud, that is the subject of this Complaint, to the Trustee. Additionally, Hutton filed a proof of claim in the Bankruptcy Cases against the Company in the amount of $9,356,616.62.

13.     Taly USA Holdings Inc. is a New York corporation with an office at 580 Fifth Avenue, New York, New York 10036. SLL USA Holdings, LLC is a wholly-owned subsidiary of Taly USA Holdings Inc. with an office at 580 Fifth Avenue, New York, New York 10036. Taly assigned its claim against Citibank for aiding and abetting Nissen's fraud, that is the subject of this Complaint, to the

4

Trustee.  Additionally, Taly filed a proof of claim in the Bankruptcy Cases against the Company for $25,135,303.53.

14.     Falcon Strategic Partners IV, LP is a limited partnership organized under the laws of Delaware, with a principal place of business in New York, New York.  FMP Agency Services, LLC is a limited liability company organized under the laws of Delaware with a principal place of business in New York, New York.  Falcon assigned its claims against Citibank for aiding and abetting Nissen's fraud, that are the subject of this Complaint, to the Trustee.  Additionally, FMP Agency Services, LLC (for itself and on behalf of Falcon Strategic Partners IV, LP, as lender) filed a proof of claim in the Bankruptcy Cases against the Company for at least $47,154,737.60.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this case pursuant to CPLR § 301 because Citibank is domiciled in the State of New York.

16.     Alternatively, this Court has jurisdiction over this case pursuant to CPLR § 302, because Citibank regularly transacts business in the State of New York.

17.     Venue is proper in this Court pursuant to CPLR § 503 because a substantial part of the events giving rise to the claim occurred in New York County and Citibank's principal office is located in New York County.

## FACTUAL ALLEGATIONS

A.     **The Company's Business**

18.     National Events Company II, LLC, and NEA were each formed in July 2006.

19.     The Company's primary business was ticket brokerage and the sale of event tickets on the secondary market for concert, theater, and sporting events, as well as the sale and promotion of "VIP" hospitality packages providing exclusive access to big name events, with those packages including hotel accommodations, celebrity "meet and greet" events and exclusive parties.

20.     The secondary market constitutes the marketplace from which individuals and entities purchase event tickets when the primary marketplace, such as Ticketmaster, Telecharge, or the teams or event venues are sold out of or do not offer the type of ticket desired.

21.     Initially, the Company would purchase tickets for resale on the secondary marketplace through Ticketmaster and through "non-traditional" channels.  Later, the Company apparently purchased tickets directly from sports teams and sports leagues in bulk.

22.     The Company also offered fan travel and corporate hospitality for major events, including the Super Bowl, the National Collegiate Athletic Association ("NCAA") Final Four, the Masters Golf Tournament and the Kentucky Derby.

23.     Historically, the Company's business appeared to be funded by financing provided via trusted relationships with "friends and family" third parties who financed ticket purchases to major events such as the World Cup and the Super Bowl on the condition that those "friends" receive an outsized percentage of gross profit margin on the "deals" they had funded.

**B.     Falcon's Investment in the Company**

24.     In or about April of 2015, Falcon provided Nissen with a financing proposal, subject to due diligence, whereby Falcon would arrange for up to $60 million of financing in the LLC Entities.

25.     Thereafter, Falcon entered into a purchase agreement dated July 6, 2015 (the "Falcon Purchase Agreement"), and related documentation, including a credit agreement (the "Falcon Credit Agreement"), with the LLC Entities, whereby Falcon agreed to purchase from the LLC Entities: (i) up to $25,000,000.00 of 11% Senior Secured Notes due 2020 (the "Secured Loan"), (ii) up to $15,000,000.00 of 8% Senior Unsecured PIK Notes due 2022 (the "Unsecured Loan"), and (iii) Class A Units representing membership interests (the "Falcon Equity") in NEH.

26.     The LLC Entities granted to Falcon security interests in substantially all of the LLC Entities' assets as collateral for the Secured Loan.

6

27.     Thereafter, Falcon loaned to the LLC Entities the sum of $29,000,000.00 as a Secured Loan, and $15,000,000.00 as an Unsecured Loan.

28.     As of June 5, 2017, the date the LLC Entities eventually filed for bankruptcy protection, the LLC Entities owed Falcon nearly $30,000,000.00 on the Secured Loan and more than $17,000,000.00 on the Unsecured Loan.

29.     Prior to the infusion of funds by Falcon, Nissen owned 100% of NEA and 100% of World Events Group, Inc.  In turn, NEA had owned 100% of National Events Company II, LLC and 100% of National Events Company III, LLC.  World Events Group, Inc. owned 100% of Ultimatefan.com.

30.     After the Falcon transaction, the ownership structure of the LLC Entities and of the Corporate Entities was as follows:

   a. World Events Group, Inc. merged into World Events Group II, LLC, and a new entity, New World Events Group Inc. (owned 100% by Nissen) was formed;
   b. Falcon (24%), NEA (75%), and New World Events Group Inc. (1%) owned 100% of NEH;
   c. NEH owned 100% of National Events Intermediate, LLC; and
   d. National Events Intermediate, LLC owned (i) 100% of National Event Company II, LLC (which owned 40% of Concierge Live, LLC), (ii) 100% of National Event Company III, LLC, (iii) 50% of Winter Music Festivals, LLC, and (iv) 100% of World Events Group II, LLC (which owned 100% of the Ultimate Fan.com).

## C.     Nissen's Ponzi Scheme

31.     Both before and after the Falcon transaction, Nissen was the chief executive officer ("CEO") and president of each of the Corporate Entities, and the managing member of each of the LLC Entities.  In those capacities, he ran the Company's daily operations and handled all of its bank accounts.

32.     From at least in or about 2015, to in or about May 2017, Nissen defrauded multiple lenders of tens of millions of dollars through the Company.  Such lenders included Falcon, Taly and Hutton.  Nissen represented to these lenders that he would use money lent to him, to the Company, and to his other companies by the lenders to purchase bulk quantities of premium tickets to sporting and

7

entertainment events such as the Super Bowl, the World Cup, the U.S. Open, and the Broadway musical Hamilton, and then resell the tickets at a profit. However, in truth and in fact, Nissen used the lenders' money in large part to repay other lenders and to enrich himself.

**D.** **Falcon, Taly and Hutton Loans to the Company Between June 2016 and April 2017**

    **1.** **Taly's Event-Specific Loans**

33.    Beginning in June of 2016, Taly made a series of event-specific investments with NEA through the Company's Citibank accounts. The total amount of these investments was $32,358,921.00. In keeping with the Ponzi scheme, Nissen arranged for the Company to repay some of these investments to Taly, but far from all. From mid-2016 through May of 2017 (when the Ponzi scheme imploded), the Company repaid Taly $16,223,617.47. However, the Company failed to repay Taly $16,135,303.53 of its capital plus over $9,000,000.00 in guaranteed profits.

34.    On June 2, 2016, Taly wired to NEA the sum of $750,000.00 to be used to purchase tickets for the Major League Baseball All Star Events.

35.    On June 16, 2016, Taly wired to NEA the sum of $600,000.00 to be used to purchase tickets for the U.S. Open.

36.    On June 29, 2016, Taly wired to NEA the sum of $1,000,000.00 to be used to purchase tickets to Hamilton.

37.    On July 8, 2016, Taly wired to NEA the sum of $900,000.00 to be used to purchase tickets for the U.S. Open.

38.    On July 28, 2016, Taly wired to NEA the sum of $1,584,000.00 to be used to purchase tickets for the singer Adele's 2016 World Tour.

39.    On August 9, 2016, Taly wired to NEA the sum of $765,000.00 to be used to purchase tickets for Adele's 2016 World Tour.

40.    On August 31, 2016, Taly wired to NEA the sum of $675,000.00 to be used to purchase

8

New York Mets tickets.

41.     On September 13, 2016, Taly wired to NEA the sum of $1,120,000.00 to be used to purchase Mets tickets.

42.     On October 6, 2016, Taly wired to NEA the sum of $1,921,750.00 to be used to purchase tickets to the Ultimate Fighting Championship 205 at Madison Square Garden in New York.

43.     On October 20, 2016, Taly wired to NEA the sum of $350,000.00 to be used to purchase tickets to the 2016 World Series games.

44.     On October 21, 2016, Taly wired to NEA the sum of $200,000.00 to be used to purchase tickets to the 2016 World Series games.

45.     On October 24, 2016, Taly wired to NEA the sum of $505,000.00 to be used to purchase tickets to the 2016 World Series games.

46.     On October 26, 2016, Taly wired to NEA the sum of $200,000.00 to be used to purchase 2017 Super Bowl tickets.

47.     On November 10, 2016, Taly wired to NEA the sum of $1,200,000.00 to be used to purchase suites at the Super Bowl.

48.     On November 22, 2016, Taly wired to NEA the sum of $1,188,721.00 to be used to purchase Super Bowl tickets.

49.     On November 28, 2016, Taly wired to NEA the sum of $1,500,000.00 to be used to purchase college football playoff games tickets.

50.     On November 30, 2016, Taly wired to NEA the sum of $51,200.00 to be used to purchase college football playoff games tickets.

51.     On December 27, 2016, Taly wired to NEA the sum of $3,200,000.00 to be used to purchase Super Bowl tickets.

52.     On December 29, 2016, Taly wired to NEA the sum of $1,000,000.00 to be used to

9

purchase Super Bowl tickets.

53. On December 30, 2016, Taly wired to NEA the sum of $1,300,000.00 to be used to purchase Super Bowl tickets.

54. On January 9, 2017, Taly wired to NEA the sum of $2,278,000.00 plus $150,000.00 to be used to purchase Super Bowl tickets.

55. On March 1, 2017, Taly wired to NEA the sum of $670,000.00 to be used to purchase NCAA tickets.

56. On March 3, 2017, Taly wired to NEA the sum of $140,000.00 to be used to purchase NCAA tickets.

57. On March 13, 2017, Taly wired to NEA the sum of $800,000.00 to be used to purchase NCAA tickets.

58. On March 15, 2017, Taly wired to NEA the sum of $950,000.00 to be used to purchase NCAA tickets.

59. On April 5, 2017, Taly wired NEA the sum of $1,200,000.00.

60. Starting sometime in early 2017, Nissen began to roll-over Taly's investments from one event to another without Taly's consent. At some point the loan roll-overs caused Taly to become increasingly concerned over the Corporate Entities' creditworthiness and ability to repay Taly. Taly began to request detailed financial information and bank statements, which were things they had not asked for previously.

**2.  Hutton**

61. On July 6, 2016, Hutton entered into a loan and credit agreement, promissory note, and pledge agreement with Nissen and NEA for $3,000,000.00 (the "Hutton Credit Agreement").

62. On August 1, 2016, Hutton entered into an amendment to the Hutton Credit Agreement, increasing its facility cap to $5,000,000.00.

10

**3. Falcon**

63.     In April 2017, Falcon made a $4,000,000.00 bridge loan to one or more of the Company entities to purchase U.S. Open tickets, structured as an amendment to the Falcon Credit Agreement.

**E.     Citibank's Actual Knowledge of, and Substantial Assistance with, Nissan's Ponzi Scheme**

**1.     The Company and Nissen Begin Banking at Citibank with Crowley and Santana**

64.     Nissen could not have executed his Ponzi scheme without the knowing and substantial assistance of his and the Company's primary banking institution, Citibank.

65.     National Event Company III, LLC had a bank account at Citibank commencing in or around June of 2013.

66.     Nissen had a bank account at Citibank commencing in or around December of 2014.

67.     However, prior to mid-2015, Nissen and the Company used Wells Fargo Bank, N.A. ("Wells Fargo") as their primary banking institution.

68.     In or around the summer of 2015, the Company moved its accounts to Citibank as per the Falcon Purchase Agreement, to accommodate Falcon's "DACA" requirement which Wells Fargo could not or would not open.

69.     Commencing in or around July of 2015, through the summer of 2017 after Nissen's confession and arrest, Citibank was Nissen's and the Company's primary banking institution, as follows:

11

| Entity | Acct. No. | Start Date | End Date |
| --- | --- | --- | --- |
| Go Highlander, LLC | 4993919289 | 2015-06-17 | 2017-06-21 |
| Jason Nissen | 4979786002 | 2016-08-24 | 2017-06-30 |
| Jason Nissen | 4990497834 | 2014-12-11 | 2017-06-30 |
| National Event Company II, LLC | 4995568419 | 2015-07-17 | 2017-07-06 |
| National Event Company II, LLC | 4996897492 | 2015-10-09 | 2017-07-11 |
| National Event Company II, LLC | 4998157092 | 2016-02-22 | 2017-06-20 |
| National Event Company III LLC | 4979187384 | 2013-06-27 | 2015-11-27 |
| National Events Intermediate, LLC | 4997501891 | 2016-03-01 | 2017-07-18 |
| National Events of America, Inc. | 4995558376 | 2015-07-23 | 2017-06-02 |
| New World Events Group Inc. | 4995558421 | 2015-07-23 | 2017-06-02 |
| Winter Music Festival | 4997501875 | 2016-01-27 | 2017-06-16 |
| World Events Group, LLC / World Events Group II, LLC | 4995568806 | 2015-07-17 | 2017-07-06 |

70.     Santana was at all relevant times a small business banker and/or a business banker and/or a relationship manager ("RM") with Citibank Global Consumer Banking ("GCB").

71.     Upon information and belief, Santana had a personal relationship with Nissen at the time Nissen and the Company opened their Citibank accounts.  On January 13, 2016, Santana ███████████████████████████████████████████████████████.  On October 6, 2016, Nissen ███████████████████████████████.

72.     Crowley was at all relevant times a senior vice president with Citi Commercial Bank ("CCB").  CCB serves mid-sized companies.

73.     At all times from the summer of 2015, through and including the closure of Nissen's and the Company's accounts in the summer of 2017, Crowley served as Nissen's and the Company's RM and Santana served as Nissen's and the Company's small business banker and/or business banker and/or RM.  In those capacities, Crowley and Santana were responsible, among other things, for retaining and/or expanding Citibank's relationship with Nissen and the Company.

74.     ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

12

████████████████████████████████████████████████████████

████████████████.

**2.**   ████████████████████████████

75.   ██████████████████████████████████████

████████████████████████████████████████████.

76.   ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████   Posen ultimately

settled charges with the U.S. Commodity Futures Trading Commission for engaging in "spoofing" in

futures contracts.

77.   ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████.

78.   ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████.

79.   ██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████.

80.   ██████████████████████████████████████████

13

████████████████████████████████████████████████████████

████████.

### 3.   Nissen Frequently Transacts in Large Amounts of Cash

81.   Citibank employees knew soon after Nissen's and the Company's accounts were opened that Nissen frequently transacted in large amounts of cash.

82.   ████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

### 4.   ████████████████████████

83.   ████████████████████████████████████████████████████

██████████████████

84.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

85.   ████████████████████████████████████████

86.   ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

14

███████████████████████

87.  ████████████████████████████████████

████████████████████████████████████

████████████████████.

88.  Nissen's and the Company's ██████████████████████

██████████████ Citibank finally closed the accounts almost a year later.

**5.  The FBI Commences Investigating Nissen in 2016, and FIU** ██████████████████
██████████████████████████████

89.  In 2016, the Federal Bureau of Investigation (the "<u>FBI</u>") commenced investigating

Nissen for financial crimes and fraud.

90.  ██████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████████.

91.  ██████████████████████████████

████████████████████████████████████████

█████████████████████████████████████.

92.  ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████.

15

Case 1:22-cv-05211-GHW   Document 1-1   Filed 06/21/22   Page 19 of 53



93.

94.

95.

96.

3



17

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███ .

101. ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

102. ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████

103. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████ (the "██████████████████████").

104. ██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

105. ██████████████████████████████████████████

████████████

**6.**     **Citibank** ████████████████████████

106. ██████████████████████████████████████████

████████████████████████████████████████████

████████████

107. ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████

108. ██████████████████████████ issued a ██████ closeout recommendation

memorandum (the "Closeout Recommendation Memo") ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

109.     The Closeout Recommendation Memo was ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

19

████████ Rechnitz pled guilty to honest services wire fraud in 2016 in a case that involved the alleged bribery of public and union officials.

110.    The Closeout Recommendation Memo provided:



111.    The Closeout Recommendation Memo further stated that ████████



112.    Ultimately, ██████ concluded:



20

113.    Notwithstanding Crowley's and Santana's efforts to keep Nissen's and the Company's

Citibank accounts open, pled *infra*, ███████████████████████████ the accounts

should be closed, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

**7.    ████████████████████████████ Citibank Knew in Real
Time that Nissen and the Company were Operating a Ponzi Scheme**

114.    ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

115.    ███████████████████████████████ Laura

Huberfeld, who was involved in securities fraud and a $1,200,000 Ponzi scheme; Aminov Radion, aka

Radion Y. Aminov, who was indicted on and pled guilty to charges of conspiracy to commit health care

and mail fraud; and Murray Huberfeld, who consented to judgment for violating securities laws and

and was ordered to pay a civil penalty, jointly pay disgorgement, and was barred from partaking in the

affairs of any depository institution, and who was later arrested and charged with committing honest

services wire fraud for paying a bribe.

116.    Additionally, ██████████████████████████████████

███████████████████████████████████████████ Hutton was an asset-

based lender, offered an alternative to traditional bank financing in the specialty finance space with a

---

5       Upon information and belief, the ████████████████████████████████
████████████████████████████████████████████ as alleged *infra*.

capability of evaluating and investing in collateral that banks and other traditional lenders typically did not finance, and helped organizations obtain needed liquidity by using an asset-backed approach rather than a traditional credit approach to originating new loans.

117. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████

- ████████████████████████████████████████

- █████████████████████████████████████████

- ███████████████████████████████████

- ████████████████████████████

- ████████████████████████████████████

- ████████████████████████████████████████

118. Because Nissen's and the Company's ██████████████████████████ ████████████████████████████████████ Crowley and Santana ████████

stalled closure (as alleged in detail *infra*), ████████████████████████████████

███████████████████████████████████████████

████████████████████████████

119. ███████████████████████████████████████ Citibank's

actual knowledge that Nissen was engaged in fraud, and ████████████████████████

███████████████████████████████████████████

████████████████████████████████████

120. On ██████████████████████████████████

121. On ██████████████████████████████

122. The ████████████████████████████████

████: Laura Huberfeld; Posen; Aminov; Edward Ting, who was associated with operating a $100,000,000 illegal gambling business with ties to the Russian mafia; Adventure Entertainment Promotions LLC, which was associated with involvement in a fraudulent sports advertising kickback scheme; and Ticket Town Inc., which was associated with fraudulent ticket sales.

123. The ███████████████████████ Hutton and Falcon were Nissen's counterparties and that ████████████████████████████████

124. The ████████████████████████████

- The ████████████████████████████.

- Nissen ██████████████████████

- Additional 

- In

- Nissen

- The

125. For example, ████████████████████ that on August 9, 2016, NEA received a wire from Taly in the amount of $765,000.00. On the same day, NEA transferred $500,000.00 of those funds to I and I Realty Group, LLC.

126. By means of another example, on September 2, 2016, NEA received a wire from I and I Realty Group, LLC in the amount of $300,000.00. On the same day, NEA transferred $390,000.00 to Capital 7.

127. In another example, on October 6, 2016, NEA received a wire from Taly in the amount of $1,921,750.00. On the same day, Nissen transferred $1,500,025.00 to Hutton.

128. As another example, on March 13, 2017, New World Events Group Inc. received a wire from Taly in the amount of $800,000.00. On the same day, New World Events Group Inc. transferred $800,000.00 to Hutton.

129. The 

130. ████████████████████████████████
████████████████████████████████████
████████████████████████

131. On ████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████.

132. The ██████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████.

133. On ████████████████████████████
████████████████████████████████████
██████████████████████████████

134. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████



Case 1:22-cv-05211-GHW   Document 1-1   Filed 06/21/22   Page 29 of 53



135. The

136. The

137. The

•

•

•

•

138.                                                     negative
news associated with the client.  Jason Nissen is currently accused of running a multi-million dollar
Ponzi scheme revolving around ticket sales to sporting and theater events.  Nissen is alleged to promise
investors high rates on return based on purchasing bulk event tickets and reselling at a significantly
higher price.

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████

139.    Likewise, ███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████."

**8.    Citibank's** ██████████████████████████

140.    From the moment their Citibank accounts were opened in or around July of 2015,

Nissen and the Company consistently maintained low, zero, or negative balances in the accounts.

141.    Despite this, on February 1, 2016, Santana issued a letter on Citibank letterhead "to

whom it may concern," attesting that Nissen was a high value client of Citibank and that "Jason Nissen

accounts have always been in good standing and [*sic*] maintain a balance of over $2.5 million in his

accounts."

142.    Moreover, █████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████.

143.    ███████████████████████████████████████████

████████████████████████████████████████

---

[6]    ██████████████████████████████████████ Taly is not a shareholder of
the Company.



144. ███████████████████████████████

███████████████████████████████████

███████████████████

145. For example, on ████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████.

146.     On June 13, 2016, Santana issued a letter to NEA on Citibank letterhead stating that Citibank's inability to pay a $750,000 check was purportedly due to a Citibank error, and that "funds were transferred into the account to cover all checks but this item unfortunately was missed for payment by our processing department."

147.     Throughout the ████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

█████

148.     For example, on ████████████████████

██████████████████████████████████

███████████████████████████████████

██████████████████████████████████

28

149.  Likewise, on ████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████.

150.  But for this █████████████████████████████

████████████████████████████████████████

███████████████████ and the Ponzi scheme would have collapsed.

151.  ████████████████████████ the accounts were routinely overdrawn

and had negative average balances almost every month.  For example, on ███████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████.

152.  On ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

153.  On ████████████████████████████████

██████████████████

154.  On ████████████████████████████████

████████████████████████████████████████

Case 1:22-cv-05211-GHW   Document 1-1   Filed 06/21/22   Page 33 of 53

██████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

155.   On ████████████████████████████████████

███████████████████████████████████████████

████████████████████ alarmingly:



156.   ██████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

████████████████

157.   On ████████████████████████████████████

███████████████████████████████████

158. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████, as alleged *infra*, ██████████████████████

██████████████████████ Crowley and Santana ████████ stalled closure.

**9.    Crowley and Santana ██████████ Stall ██ From Closing the Accounts Until After Nissen Confesses, and Santana Lies to Taly for Nissen**

159.    Meanwhile, from the moment ████████████████████████████

██████████████████ through and including mid-May of 2017 until after Nissen confessed,

Crowley and Santana substantially assisted Nissen and the Company with engaging in ████████

██████████████████████████████, by stalling ████████████████████

██████████████ closure recommendations knowing they had no legitimate basis to do so.

160.    After ████████████████████████████████████████ the

Closeout Recommendation Memo ██████████████████████████████

and stalled closure of Nissen's and the Company's Citibank accounts, with the actual knowledge that

they had no legitimate basis to do so.

161.    Crowley and Santana accomplished this by ██████████████████████

████████████████████████████████

████████████████████████████████████ for

Nissen so that he could operate his Ponzi scheme through his Citibank accounts.

162.    But for Crowley's and Santana's substantial assistance in this regard, Nissen could not

have run his Ponzi scheme and his and the Company's Citibank accounts would have been closed

months earlier than they were.

163.    ████████████████████████████████████████



▬▬▬ Nissen's and the Company's accounts remained open for ▬▬▬ after ▬▬▬ issued the Closeout Recommendation Memo.

164.    On ▬▬▬ the Closeout Recommendation Memo, ▬▬▬

▬▬▬

▬▬▬

165.    ▬▬▬

▬▬▬

▬▬▬

166.    The next day, on ▬▬▬

▬▬▬.

167.    On ▬▬▬

▬▬▬

▬▬▬.

168.    On ▬▬▬

▬▬▬

▬▬▬

169.    On ▬▬▬

▬▬▬

▬▬▬

170.    On ▬▬▬

32

Case 1:22-cv-05211-GHW   Document 1-1   Filed 06/21/22   Page 36 of 53

171.    On ██████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████

172.    Despite that, on ████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ (the "Org Chart").

173.    Nissen provided Santana and Crowley with the Org Chart that same day.  The Org Chart patently stated that Falcon was a 24% owner of NEH.

174.    However, Nissen did not, and could not, provide Santana and Crowley with any invoices to or from any third parties at that point, because none existed to substantiate any of the ███████████████ in the Closeout Recommendation Memo.

175.    Also, despite having received no ███████████████████████████, on

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████.

33

176. ██████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████ all

while Nissen continued to run his Ponzi scheme through Citibank accounts.

177. ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████.

178. ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

179.    On January 24, 2017, Crowley asked Nissen about the Company's partners besides

Falcon.  Nissen responded to Crowley that Taly and Hutton were the companies with which NEA did

"partnerships."

180.    On ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

34



181. ███████████████████████████████████████

182. But ███████████████████████████████████████ ████████████████ In purported support of his ████████████████, Nissen forwarded Santana, under the subject line, "Hutton Payments," inter-Company invoices from "National Events of America" as vendor, to "National Event Company" as buyer, and claimed they were purchase orders for college football playoffs. █████████████████████████████████████████.

183. It did not help. ███████████████████████

184. On ███████████████████████████████████████ ████████████████ Thereafter, █████████████████████████



185.    On January 27, 2017, Nissen transmitted to Crowley what he claimed were "the purchase orders from National Events of America which show why we transfer the money to pay for purchases." Crowley ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ These purported purchase orders were patently from "National Events of America" to "National Event Company," not to, or from, any third party.

186.    On January 27, 2017, Nissen also provided to Crowley and Santana several invoices he claimed were from third parties. However, those so-called invoices were the Company's own, purportedly billing Ticketsnow.com, Stubhub, Quintessentially New York and Vivid Seats Ltd. Nissen provided Crowley with no documentation that any of those entities actually paid the Company, because none existed. Crowley ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ nonetheless.

187.    On January 27, 2017, Nissen additionally emailed Crowley and Santana purported purchase orders he claimed were for a Cleveland Browns check that was paid and other payments for sponsorships. Crowley ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Again, the attached so-called purchase orders were from "National Events of America" and "World Events Group" to "National Event Company" – not to, or from, any third party.

188.    On ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

36



189.   On ████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

190.   On ████████████████████████████████████████

But on ██████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████, all while Crowley and Santana stalled ██

and Nissen continued running the Ponzi scheme through his and the Company's Citibank accounts.

191.   On February 6, 2017, Crowley asked Nissen for a call with himself and Santana.  The

next day, ██████████████████████████████████████████████████

████████████████████████████████.

192.   On February 7, 2017, Crowley emailed Nissen a description of three July 2016

incoming wires from Hutton and Taly which ███████████████████████████████████

███████, and told Nissen to "see what you can get" for them.  Crowley then listed five July 6, 2016

withdrawals and inter-Company transfers and directed Nissen to explain if any of them had anything to

do with the three prior Hutton and Taly wires and the flow of funds.  Nissen never explained.

193.   On February 14, 2017, Nissen provided Crowley and Santana with a letter agreement

relating to the Hutton Credit Agreement (the "Hutton Letter"), claiming it was a joint venture letter on

the first two deals into which Crowley had inquired, and claimed to be working on "minimizing the

paperwork" to supposedly show sales for his U.S Open deal.  Nissen stated that he hoped to have that

information to Crowley the next day.  In fact, Nissen did not have it the next day.  Crowley reminded

Nissen to keep information coming.

194.   Three days later, having still received nothing more, Crowley wrote to Nissen not to

forget to get him and Santana "the rest of the stuff" because Crowley needed to look it over before he

37

could schedule any conference call.  Upon information and belief, at that point if not earlier, Crowley ██████████████████ informed Nissen that his banking relationship was under investigation.

195. On ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████.

196. ████████████████████████████████████████████

███████████████████████████████████

197. On ████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████

198. On ████████████████████████████████████

████████████████████████████████████████████

199. Crowley stalled, ███████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████

200. On March 14, 2017, Nissen transmitted to Crowley and Santana so-called purchase order reports (the "Unidentified Purchase Order Reports") which he claimed were purchase orders for the U.S. Open, in which he said Hutton had invested.  The Unidentified Purchase Order Reports constituted mere lists of purported invoice numbers, tickets sold and dollar amounts, and were not printed on any company's header, annexed to more inter-Company purchase orders.

201. On ████████████████████████████████████████████

██████████████████████████████████████████████████████

38

Case 1:22-cv-05211-GHW   Document 1-1   Filed 06/21/22   Page 42 of 53

202.     Crowley stalled ███████████████████████████████████████

██████████████"

203.     On ████████████████████████████████████████████████████

████████████████████████████ (the "█████████████").  On the same day –

unable to procure any legitimate supporting documentation from Nissen, and with the actual

knowledge that he could not, because none existed – Crowley ████████████████████

████████████████████████████████████████████

██████████████████████████████████████████.

204.     ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████.  Crowley and Santana had actual knowledge that no such documentation existed because

Nissen was running a Ponzi scheme.

205.     On ████████████████████████████████████████

████████████████████████████████████████████████ the Closeout

Recommendation Memo.  Citibank's ████████████████████████████

██████████████

206.     Upon information and belief, at least the following Citibank employees ███████████

████████████████████████████████████████████████

207.     Upon information and belief, on the ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

39



. Crowley continued to stall ███████████████████████████████

███████████████████████, but he never did, because none existed.

208.    On ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

209.    On ██████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████

210.    █████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

211.    On ████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

212.    Crowley stalled yet again, ████████████████████████████████

██████████████████████████. A couple of hours later, Crowley emailed Nissen, copying Santana:

"We really need to get the info you said you would send us ASAP."

213.    On April 10, 2017, Nissen sent Crowley and Santana an incoherent Excel spreadsheet

listing dates and types and amounts of purported transactions, account numbers, and notes next to each

row (the "April 10 Spreadsheet"). Upon information and belief, the April 10 Spreadsheet constituted

Nissen's work product. Nissen annotated listed transactions with notes such as: "Supposed to be for Olympics," "Cannot Find This Transaction," and "bank check to replace bounced check [] for same amount."

214.  Yet, Nissen told Crowley and Santana that the April 10 Spreadsheet was "a preliminary" of what he was "doing" to make sure it made sense before he finished and provided the rest that night or the next day. Crowley responded: "Yes. Are this [*sic*] the cash transactions. If so I like how you are explaining." Upon information and belief, Nissen provided nothing more.

215.  Meanwhile, Taly had been expecting two wire transfers for loan repayment from the Corporate Entities in late April 2017. Only one transfer was received, causing Taly greater concern regarding the chances of default. Taly made inquiries with Nissen as to the whereabouts of the second transfer. Nissen falsely advised Taly that Citibank had mistakenly wired the funds to someone else when in truth and in fact, Nissen never sent the second wire to Taly.

216.  Taly demanded a letter from Citibank confirming Nissen's statement. Nissen forged a letter from Citibank to show to Taly to verify his assertion. After reviewing the letter, Taly remained suspicious of Nissen's explanation and the letter and demanded to meet with a representative of Citibank in person, in order to get firsthand confirmation from Citibank that the second wire did in fact go out to the wrong transferee in error.

217.  Santana, Nissen and a Taly executive met during the last week of April 2017 (the "April 2017 Meeting"). Prior to the April 2017 Meeting, Nissen requested that Santana inform the Taly executive that there was a problem with the second wire. During the April 2017 Meeting, Santana in fact told the Taly executive that there was a problem with the wire, supporting what Nissen's forged Citibank letter had stated. Upon information and belief, Santana had actual knowledge that this statement was false at the time he made it during the April 2017 Meeting.

41

218. On ███████████████████████████████████████████ to substantially assist Nissen's Ponzi scheme, despite the fact that ██████████ ███████████████████████████████████████████ ████.

219. On ████████████████████████████████████████ ███████████████████████████████████████████

220. On ████████████████████████████████████████ ████████████████████████████████████████

221. In ████████████████████████████████████████ ███████████████████████████████████████ For example, when ████████████████████████████████ ███████████████████████████████████████████



## F.  Nissen Confesses, the Company Files for Bankruptcy, and Citibank Finally Closes the Accounts

222. On or about May 7, 2017, unable to obtain more financing to continue his scheme through existing or new lenders, Nissen admitted to Taly that he had been operating a Ponzi scheme.

223. The next day, on or about May 8, 2017, Nissen met with executives and associates of Taly and confessed his fraud to them in detail.

224. On ████████████████████████████████████ ███████████████████████████████████████████ █████████████████████.

225. A few hours later on May 8, 2017, Crowley emailed Nissen and Santana as follows: "Do you have the info you were going to send over.  I cant [*sic*] stall them anymore."

226.     On or about May 10, 2017, Nissen confessed to Falcon that he had been committing fraud, and that the income numbers of the Company that he had been reporting to Falcon were fabricated.

227.     On May 11, 2017, Santana informed DeMartino that Nissen would need to sign a GDR resolution.  DeMartino responded: "Due to some improprieties we are not permitted to contact him any longer," and informed Santana that Nissen had been terminated from the Company.

228.     On ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

229.     On May 31, 2017, Nissen was arrested and charged by the FBI with allegedly defrauding victims of at least $70,000,000.00 through a Ponzi scheme.

230.     On June 1, 2017, victims of Nissen's scheme commenced state court litigation which resulted in the appointment of Edward J. LoBello, Esq. as receiver (the "Receiver"), on June 5, 2017, of the Corporate Entities.

231.     On June 5, 2017, the LLC Entities filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court.

232.     On June 13, 2017, the Bankruptcy Court entered an order granting the joint administration of the LLC Entities' estates.

233.     On June 28, 2017, the Receiver filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Corporate Entities.

234.     On August 1, 2017, Nissen was charged in the United States District Court for the Southern District of New York (the "District Court") with wire fraud in violation of 18 U.S.C § 1343.

43

235.   On August 7, 2017, the LLC Entities' chapter 11 cases were converted to liquidation proceedings under chapter 7 of the Bankruptcy Code, and the Trustee was appointed as interim trustee in those chapter 7 cases.

236.   On September 20, 2017, the Receiver was appointed estate fiduciary of the Corporate Entities in their jointly administered chapter 11 bankruptcy cases.

237.   On February 11, 2019, the Bankruptcy Court entered an order, *inter alia*: converting the Corporate Entities' chapter 11 cases to chapter 7 liquidation cases; providing for the appointment of the Trustee in the Corporate Entities' bankruptcy cases; and directing the joint administration of all the Company's entities' chapter 7 Bankruptcy Cases.

238.   On May 18, 2018, Nissen pled guilty to wire fraud in connection with the charges brought against him.

239.   On September 6, 2019, the District Court sentenced Nissen to, principally, 27 months' imprisonment.

240.   On June 3, 2021, the Bankruptcy Court granted the Trustee's application to retain Kasowitz as special litigation counsel to pursue and prosecute potential claims against financial institutions, including Citibank, used by Nissen and the Company under Nissen's control (the "Bank Litigation").

241.   On August 9, 2021, the Trustee filed an application with the Bankruptcy Court pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, seeking discovery from Citibank in connection with the Bank Litigation, which the Bankruptcy Court granted on September 9, 2021 (the "Rule 2004 Order").

242.   On September 10, 2021, Kasowitz issued subpoenas to Citibank as authorized by the Rule 2004 Order (the "Subpoenas").

243.    Despite his diligent efforts, the Trustee has not had a full or fair opportunity to investigate the estates' or Falcon's, Taly's, and Hutton's claims against Citibank, because Citibank failed to fully comply with the Rule 2004 Order and Subpoenas.  Citibank's prior counsel refused to produce any witnesses, withheld responsive documents, and excessively redacted documents it selectively turned over.  Citibank's new counsel, retained in April 2022, first corrected certain redactions in May 2022 and offered a single witness for deposition (████) on May 27, 2022. Citibank did not make Crowley, Santana, ████ or others available for deposition and produced only some, but not nearly all, documents responsive to the Trustee's document requests.

244.    Nissen's fraud was unknown to anyone besides Nissen and Citibank (and potentially law enforcement authorities and other financial institutions Nissen and the Company utilized) prior to May 2017.  Thus, the claims asserted in this Complaint are timely under New York law because this Complaint has been filed within six years of accrual of the causes of action asserted herein.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Aiding and Abetting Fraud)

245.    Plaintiff restates and realleges the allegations of paragraphs 1 through 245, which are incorporated by reference as if set forth fully herein.

246.    From at least in or about 2015, to in or about May 2017, Nissen defrauded multiple lenders and/or investors of tens of millions of dollars.  Such lenders and investors included Falcon, Taly and Hutton.

247.    Nissen falsely represented to lenders and investors that he would use money lent to him and the Company to purchase bulk quantities of premium tickets to sporting and entertainment events such as the Super Bowl (football), the World Cup (soccer), the U.S. Open (tennis), and "Hamilton" (Broadway musical), and then resell the tickets at a profit.  However, in truth and in fact, Nissen used the victims' money in large part to repay other victims and to enrich himself.

248.    Nissen defrauded victims of more than $70 million.

45

249.     On May 18, 2018, Nissen pled guilty to wire fraud.

250.     At all relevant times, Citibank had actual knowledge that Nissen was committing fraud.

By ████████, if not earlier, Citibank knew and understood that ████████████████████

████████████████████████████████████████████████

Citibank concluded that ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████     Citibank also knew and understood that ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

251.     By virtue of the facts, circumstances and the conduct alleged herein, Citibank aided and

abetted the foregoing fraudulent conduct by substantially assisting in such conduct with knowledge of

its unlawfulness.  Citibank's substantial assistance included but was not limited to (i) ████████████

████████████████████████████████████ enabling Nissen to conceal the Ponzi scheme;

(ii) ████████ and actively stalling Citibank's ████████████ and enabling the fraud to expand; and

(iii) permitting Nissen to run his Ponzi scheme through his and the Company's Citibank accounts after

████████████████████████████████████████████████

████████████████████████.

252.     In pursuing a fraudulent course of conduct, Nissen was a faithless and disloyal fiduciary

of the Company and acted in a manner that was completely adverse to the interests of the Company.

Nissen totally abandoned the Company's interests and acted entirely in his own interest.  Nissen looted

the Company of over $27,500,000 in the years leading up to his arrest and prolonged the Company's

existence so that he could continue to loot from it.  In addition to the looting of funds, Nissen also

46

Case 1:22-cv-05211-GHW    Document 1-1    Filed 06/21/22    Page 50 of 53

harmed the Company by increasing its losses. The Company was harmed, not benefitted, by Nissen's fraud.

253.    Not only did Citibank know of Nissen's fraudulent course of conduct, but it knowingly assisted in that course of conduct and provided Nissen the ability to loot the Company's funds in connection with his fraud for his own personal benefit.

254.    Nissen was not the "sole actor" with respect to the Company. Rather, DeMartino, the Company's executive vice president and CFO, David Cirinelli, the Company's vice president and controller, and the Company's Board of Managers would have brought the fraudulent activities of Nissen to an abrupt halt had they been properly and timely advised by Citibank of Nissen's criminal conduct. In fact, the Company learned of Nissen's fraudulent activities on or about May 10, 2017, and Nissen was terminated on that date.

255.    Citibank chose instead to substantially assist the fraud in an effort to reap the substantial pecuniary gains it made through their transaction fees and their continued relationship with the Company and Nissen.

256.    By reason of the foregoing, the Company has been damaged in the amount of at least $70,000,000 plus prejudgment interest for total damages in excess of $100,000,000.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Aiding and Abetting Fraud)

257.    Plaintiff restates and realleges the allegations of paragraphs 1 through 245, which are incorporated by reference as if set forth fully herein.

258.    For the sake of efficiency and administrative convenience, Taly, Falcon, and Hutton have assigned to the Trustee for the benefit of the Company's estates and its creditors any and all claims they possess against Citibank for aiding and abetting Nissen's fraud.

47

259.     From at least in or about 2015, to in or about May 2017, Nissen defrauded multiple lenders and/or investors of tens of millions of dollars.  Such lenders and investors included Falcon, Taly and Hutton.

260.     Nissen falsely represented to lenders and investors, including Falcon, Taly and Hutton, that he would use money lent to him and the Company to purchase bulk quantities of premium tickets to sporting and entertainment events such as the Super Bowl (football), the World Cup (soccer), the U.S. Open (tennis), and "Hamilton" (Broadway musical), and then resell the tickets at a profit. However, in truth and in fact, Nissen used the victims' money in large part to repay other victims and to enrich himself.

261.     The lenders and investors who were defrauded by Nissen reasonably relied on his misrepresentations to their detriment.  Nissen defrauded the lenders and investors of more than $70 million.

262.     On May 18, 2018, Nissen pled guilty to wire fraud.

263.     At all relevant times, Citibank had actual knowledge that Nissen was committing fraud. By ██████, if not earlier, Citibank knew and understood that ████████████████████ ██████████████████████████████████████████████.

Citibank concluded that ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

██████████████ Citibank also knew and understood that ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████

264. By virtue of the facts, circumstances and the conduct alleged herein, Citibank aided and abetted the foregoing fraudulent conduct by substantially assisting in such conduct with knowledge of its unlawfulness. Citibank's substantial assistance included but was not limited to (i) ███████ ███████████████████████████████, and enabling Nissen to conceal the Ponzi scheme; (ii) ███ to and actively stalling Citibank's ███████████ and enabling the fraud to expand; and (iii) permitting Nissen to run his Ponzi scheme through his and the Company's Citibank accounts after ████████████████████████████████████████████████ ████████████████████.

265. As a result of Nissen's fraudulent conduct, the Company's creditors and investors suffered financial damages. Hutton suffered losses in the amount of $9,356,616.62. Taly suffered losses in the amount of $25,135,303.53. Falcon suffered losses in the amount of $47,154,737.60.

266. By reason of the foregoing, the Company's creditors have been damaged in the amount of at least $70,000,000 plus prejudgment interest for total damages in excess of $100,000,000.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests that the Court enter as follows:

(1) On the first cause of action, in favor of Plaintiff and against Citibank for aiding and abetting fraud, damages in an amount to be determined at trial, but no less than $100,000,000;

(2) On the second cause of action, in favor of Plaintiff and against Citibank for aiding and abetting fraud, damages in an amount to be determined at trial, but no less than $100,000,000;

(3) An award of Plaintiff's costs, interest, and attorneys' fees; and

(4) Such other and further relief as the Court may deem just and appropriate.

Case 1:22-cv-05211-GHW   Document 1-1   Filed 06/21/22   Page 53 of 53

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a trial by jury.


Dated: June 1, 2022
       New York, New York

                 KASOWITZ BENSON TORRES LLP

                 By: */s/ Howard W. Schub*
                 Howard W. Schub (hschub@kasowitz.com)
                 Michele L. Angell (mangell@kasowitz.com)
                 1633 Broadway
                 New York, New York 10019
                 Telephone: (212) 506-1700
                 Facsimile: (212) 506-1800

                 *Special Litigation Counsel to*
                 *Kenneth P. Silverman, Esq., Chapter 7 Trustee*