**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Kenneth P. Silverman, Esq., The Chapter 7 Trustee of the Jointly Administered Estates of National Events Holdings, LLC, and Its Affiliated Debtors, | : : : : | Case No. 1:22-cv-05211-GHW |
| Plaintiff, | : : | |
| -against- | : : | |
| Citibank, N.A., | : : | |
| Defendant. | : : : | |

 

**DEFENDANT CITIBANK, N.A.'S MEMORANDUM OF LAW**
**<u>IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT</u>**

 

Adam S. Hakki
John Gueli
Katherine J. Stoller
Randall Martin
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY  10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

*Attorneys for Defendant Citibank, N.A.*

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ................................................................................................. 3

    A.  The Debtors Were Operating A Legitimate Business But Over Time Began
        Using Investments For Unauthorized Purposes ............................................................ 3

    B.  Citibank's FIU Investigates Nissen And The Debtors And Decides To Close
        Their Accounts ............................................................................................................. 4

    C.  Nissen's Arrest, The Debtors' Bankruptcy, And This Lawsuit ................................... 6

ARGUMENT ......................................................................................................................... 7

  I.  The Complaint Does Not Allege Aiding And Abetting Fraud With The
     Particularity Demanded By Rule 9(b) ......................................................................... 7

    A.  The Complaint Does Not Plead "Specific Facts" Demonstrating That Citibank
        Had Actual Knowledge Of Nissen's Fraud ................................................................ 8

       1.  The Allegations About Citibank's Compliance Professionals Do Not
           Demonstrate Actual Knowledge Of Nissen's Fraud ........................................... 8

          a.  Citibank's Compliance Professionals Deemed Certain Transactions To
              Be "Suspicious" or "Unusual," Not "Fraudulent" Or Evidence Of A
              Ponzi Scheme ............................................................................................... 9

          b.  None Of The Complaint's Allegations Or Findings By Citibank's
              Compliance Professionals Show Actual Knowledge Of Nissen's
              Fraudulent Scheme ..................................................................................... 11

       2.  The Allegations About Citibank's Bankers Do Not Demonstrate Actual
           Knowledge Of Nissen's Fraud .......................................................................... 17

    B.  The Complaint Does Not Plead Particularized Facts Demonstrating That
        Citibank Substantially Assisted Nissen's Fraud ....................................................... 20

  II.  Plaintiff's Claim On Behalf Of The Debtors Should Be Dismissed On *In Pari
     Delicto* And/Or Standing Grounds ........................................................................... 22

CONCLUSION .................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Agape Litig.*,
    681 F. Supp. 2d 352 (E.D.N.Y. 2010) .....................................................................21

*In re Agape Litig.*,
    773 F. Supp. 2d 298 (E.D.N.Y. 2011) ........................................................... *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................................3

*Berdeaux v. OneCoin Ltd.*,
    561 F. Supp. 3d 379 (S.D.N.Y. 2021)............................................................ *passim*

*Berman v. Morgan Keegan & Co., Inc.*,
    455 F. App'x 92 (2d Cir. 2012) ........................................................................8, 13, 20

*In re Bernard L. Madoff Inv. Sec. LLC*,
    721 F.3d 54 (2d Cir. 2013).......................................................................................23, 24

*Boykins v. Lopez*,
    2022 WL 2307684 (S.D.N.Y June 27, 2022) .........................................................3

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001).......................................................17, 21, 22

*In re Dreier LLP*,
    453 B.R. 499 (Bankr. S.D.N.Y. 2011) ................................................................25

*Filler v. Hanvit Bank*,
    339 F. Supp. 2d 553 (S.D.N.Y. 2004), *aff'd*,
    156 F. App'x 413 (2d Cir. 2005) ................................................................8, 15, 16

*Heinert v. Bank of America N.A.*,
    835 F. App'x 627 (2d Cir. 2020) ........................................................................12

*Heinert v. Bank of America, N.A.*,
    410 F. Supp. 3d 544 (W.D.N.Y. 2019), *aff'd*,
    835 F. App'x 627 (2d Cir. 2020) ......................................................................14, 19

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)...........................................................................23, 24

*In re ICP Strategic Credit Income Fund, Ltd.*,
    568 B.R. 596 (S.D.N.Y. 2017), *aff'd*,
    730 F. App'x 78 (2d Cir. 2018) .................................................................................25

*Kirschner v. Bennett*,
    648 F. Supp. 2d 525 (S.D.N.Y. 2009) ....................................................................15

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) .............................................................................23, 24, 25

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991)......................................................................................3

*Krys v. Pigott*,
    749 F.3d 117 (2d Cir. 2014)...........................................................................7, 8, 15, 16

*In re Lehr Constr. Corp.*,
    551 B.R. 732 (S.D.N.Y. 2016), *aff'd*,
    666 F. App'x 66 (2d Cir. 2016) ...........................................................................23, 24

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)...........................................................................7, 8, 15, 20

*Liu Yao-Yi v. Wilmington Trust Co.*,
    301 F. Supp. 3d 403 (W.D.N.Y. 2017) ................................................................13, 17

*MLSMK Inv. v. JP Morgan Chase & Co.*,
    431 F. App'x 17 (2d Cir. 2011) ...............................................................................8, 20

*Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank, N.A.*,
    261 F.R.D. 13 (S.D.N.Y. 2009) .............................................................................18, 21

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006)........................................................................22

*PetEdge, Inc. v. Garg*,
    234 F. Supp. 3d 477 (S.D.N.Y. 2017)........................................................................18

*Renner v. Chase Manhattan Bank, N.A.*,
    85 F. App'x 782 (2d Cir. 2004) ..................................................................................8

*Renner v. Chase Manhattan Bank*,
    2000 WL 781081 (S.D.N.Y. June 16, 2000), *aff'd*,
    85 F. App'x 782 (2d Cir. 2004) ...........................................................................7, 17, 20, 22

*Rosner v. Bank of China*,
    349 F. App'x 637 (2d Cir. 2009) ...................................................................15

*Rosner v. Bank of China*,
    2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008), *aff'd*,
    349 F. App'x 637 (2d Cir. 2009) ........................................................... *passim*

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)...........................................................................3

*Ryan v. Hunton & Williams*,
    2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ......................................... *passim*

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991).................................................................23, 24

*Trahan v. Lazar*,
    457 F. Supp. 3d 323 (S.D.N.Y. 2020)............................................................3

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    2019 WL 284807 (S.D.N.Y. Jan. 23, 2019) ..............................................25

*Vasquez v. Hong Kong and Shanghai Banking Corp. Ltd.*,
    2019 WL 2327810 (S.D.N.Y. May 30, 2019) .....................................16, 20, 21, 22

*Williams v. Bank Leumi Trust Co. of New York*,
    1997 WL 289865 (S.D.N.Y. May 30, 1997) ......................................................8, 20

*Wright v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000)..........................................................................23

*Zamora v. JPMorgan Chase Bank, N.A.*,
    2015 WL 4653234 (S.D.N.Y. July 31, 2015) ................................................20

*Zhao v. JPMorgan Chase & Co.*,
    2019 WL 1173010 (S.D.N.Y. Mar. 13, 2019) ...............................................12, 21

Defendant Citibank, N.A. ("Citibank") respectfully submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 9(b), 12(b)(1), and 12(b)(6), to dismiss the Complaint in its entirety, and with prejudice.[1]

## PRELIMINARY STATEMENT

Plaintiff points to Citibank's compliance practices to allege it knowingly assisted crimes carried out in secret by its customer.  Plaintiff is the bankruptcy trustee for National Events Holdings, LLC and its affiliated entities (the "Debtors").  The Debtors were ticket brokers that used Citibank for ordinary-course commercial banking.  As alleged, Citibank opened an investigation of the Debtors' accounts in August 2016.  In December 2016, Citibank decided to close the accounts based on "suspicious" activity (not fraud), but had not completed that process when the Debtors' former President and CEO, Jason Nissen, was arrested in May 2017 and the Debtors filed for bankruptcy days later.

In March 2018, Nissen pleaded guilty to defrauding lenders and investors by representing to them, as CEO of the National Events business, that he would use their funds for specific event ticket purchases and instead using their funds for other, unauthorized purposes.  Plaintiff now seeks to hold Citibank liable for allegedly aiding and abetting Nissen's "Ponzi scheme."  To do so, he conclusorily alleges that, based on its investigation of the Debtors' accounts, Citibank must have "figured out" that Nissen was misusing lenders' and investors' funds.  (Compl. ¶ 2.) Plaintiff is unable, however, to point to a single fact demonstrating Citibank knew of Nissen's scheme, or in any way assisted it.

Even after a year-long investigation by special litigation counsel and with the benefit of

---

[1] Citations to "Ex. ___" refer to exhibits to the August 23, 2022 Declaration of John Gueli in support of Citibank's motion to dismiss.

substantial pre-suit discovery, Plaintiff does no more than presume that in fulfilling its regulatory obligations Citibank was somehow closer to the underlying fraud than anyone at National Events or the lenders and investors who had extensive ties to Nissen.  But banks are not insurers against their customers' misdeeds.  That is why courts rigorously enforce — at the pleading stage — both prerequisites to aiding and abetting liability under New York law: the defendant must have (1) had *actual knowledge* of the *underlying fraud* and (2) provided *substantial* assistance to the commission of the fraud that *proximately* caused the plaintiff's claimed loss.  Plaintiff's Complaint does not plead either of these elements with the particularity demanded by Rule 9(b).

*First*, the Complaint does not sufficiently allege that Citibank knew of the underlying fraud.  It is firmly established that a bank's identification of transactions as "suspicious" or "unusual" does not support the necessary "strong inference" of actual knowledge of the underlying fraud.  Put another way, it is not enough that the defendant may have identified suspicious activity; instead, the plaintiff must plead "specific facts" showing that the defendant knew of the particular misconduct that allegedly harmed the plaintiff.

The Complaint pleads no "specific facts" that Citibank knew (1) of any statements that induced lenders or investors to provide funds to the Debtors, (2) the terms pursuant to which such funds were provided, or (3) that the Debtors were misusing those funds for unauthorized purposes.  To the contrary, the Complaint explains that Citibank could not ascertain or substantiate — in other words, did not know — either the source of the Debtors' funds or the reasons for their transactions.  (*See, e.g.*, Compl. ¶¶ 97, 110, 112, 117, 124.)  And although Plaintiff characterizes Nissen's using lenders' and investors' funds for unauthorized purposes as a "Ponzi scheme," Nissen nevertheless used those funds for business-related purposes.  In the criminal case against Nissen, the Court found Nissen was operating "a legitimate business" and

2

used his victims' funds overwhelmingly (94%) for business-related purposes.  (Ex. 11 at 6:10–7:17, 12:16–23.)  Plaintiff does not explain how Citibank could have "known" of Nissen's scheme when victims' funds were used almost entirely for business-related purposes.

*Second*, the Complaint fails to allege substantial assistance.  It is well-established that a fraudster's use of accounts at a bank does not constitute substantial assistance by the bank that renders it liable as an aider and abettor.  Plaintiff does not allege Citibank owed any duty to Nissen's victims or provided Nissen and the Debtors with anything other than standard banking services such as cashing checks and transferring funds.  Thus, criticizing Citibank for not acting sooner to close their accounts does not allege substantial assistance.  Indeed, the Complaint does not even purport to explain, as is necessary to state an aiding and abetting claim, how Citibank (as opposed to Nissen) was the proximate cause of lenders' and investors' claimed losses.

Independent of all the above, the Complaint's first claim for relief (on behalf of the Debtors), is subject to dismissal under the *in pari delicto* doctrine and/or the "*Wagoner* rule." Nissen's misconduct is imputed to the Debtors, and Plaintiff stands in the Debtors' shoes. Plaintiff cannot sue Citibank for aiding and abetting Plaintiff's own fraud.

## FACTUAL BACKGROUND[2]

A.    **The Debtors Were Operating A Legitimate Business But Over Time Began Using Investments For Unauthorized Purposes**

Established in 2006, the Debtors were ticket brokers and sold tickets on the secondary

---

[2] The Complaint's well-pleaded factual allegations (but not its legal conclusions) are accepted as true solely for purposes of this motion.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In assessing the Complaint's sufficiency, the Court may consider matters subject to judicial notice, such as other court filings, *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991); *Boykins v. Lopez*, 2022 WL 2307684, at *4–5 (S.D.N.Y June 27, 2022), as well as documents the Complaint incorporates by reference or which Plaintiff possessed and relied upon in bringing suit, *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).  Where the Complaint's allegations are contradicted by documents relied upon by Plaintiff, "the documents control, and the Court need not accept the allegations contained within the complaint as true."  *Trahan v. Lazar*, 457 F. Supp. 3d 323, 341 (S.D.N.Y. 2020).

market for concert, theater, and sporting events.  (Compl. ¶¶ 18-20.)  As Judge Engelmayer found in connection with Nissen's sentencing (and the Department of Justice agreed), the Debtors operated "a legitimate business."  (Ex. 11 at 12:16–23.)  Prior to bankruptcy, the Debtors had one of the nation's largest revolving inventories for premium tickets and offered fan travel and corporate hospitality for major events such as the Super Bowl, the NCAA Final Four, and the Kentucky Derby.  (*See* Compl. ¶¶ 21–22; Ex. 8 ¶¶ 6–8, 11–12.)  Citibank's Commercial Bank, which assists mid-sized companies with their banking needs, first onboarded a National Events entity in 2013, and Nissen opened an account at Citibank in 2014 (Compl. ¶ 65–66), before he is alleged to have engaged in any misconduct.

Historically, and including when Nissen and the Debtors became Citibank clients, the Debtors' business was funded by "friends and family" financings, pursuant to which third parties who financed ticket purchases for major events would receive a percentage of the profits earned on the deals they funded.  (*Id.* ¶ 23.)  However, "[o]ver time, the Debtors' repayment obligations on financing arrangements became unsustainable."  (Ex. 9 ¶ 26.)  From that time, beginning in or about 2015, Nissen began defrauding multiple parties in his role as the Debtors' CEO by causing the Debtors to use new investments that had been made for the purchase of tickets to specified events (*e.g.*, Hamilton, the U.S. Open, the World Series) for purposes not authorized by the investors' contracts — but which were nevertheless business-related — including "to satisfy antecedent debts" (*id.* ¶ 26) and "repay other lenders" (Ex. 8 ¶¶ 24–26; *see* Compl. ¶¶ 32–63).

**B.    Citibank's FIU Investigates Nissen And The Debtors And Decides To Close Their Accounts**

Citibank's Financial Intelligence Unit ("FIU") investigates potentially suspicious account activity consistent with Citibank's regulatory obligations.  (*See* Compl. ¶ 2.)  In July 2016, three years after the Debtors had opened an account at Citibank, ████████████████████

4

██████████████████████████████████, as per standard practice, FIU analyst

Zachary D████ was assigned to review Nissen's and the Debtors' account activity.  (*Id.* ¶ 90.)

D████ documented his analyses and conclusions in a detailed memorandum dated August 10,

2016 (the "D████ Memo").  (*Id.* ¶ 95.)[3]  The D████ Memo concluded the Debtors were

"operating a legitimate ticket selling company" (Ex. 1 at 26; *see id.* at 7) and that the "volume of

cash also appears commensurate with the focus' profile" (*id.* at 2), and identified no negative

news concerning Nissen or the Debtors (*id.* at 6–10).  Account closure was recommended,

however, based on "suspicious activity indicative of rapid movement of funds," "layering among

(7) accounts," and because ████████████████████████████████████

██████████████████████ (*Id.* at 3.)[4]

In December 2016, FIU issued a "Closeout Recommendation Memo" that largely echoed

D████'s analyses and conclusions.  (Compl. ¶ 108; *see* Ex. 2.)  The Closeout Memo noted that

National Events ████████████████████████████████████████████

██████████████████████████ (Ex. 2 at 10–11) and ████████████████████████

██████████████████████ (*id.* at 2).  Account closure was thus recommended because the

Debtors' transactions "present[ed] AML concern."  (*Id.* at 11; *see* Compl. ¶ 112.)

As per its standard account closure process, Citibank solicited the views and assistance of

two bankers responsible for handling Nissen's accounts, Jack Crowley and Joshua Santana.  (*See*

Compl. ¶¶ 103–04, 164.)  Based on their oft-stated understanding that Nissen ran a legitimate

---

[3] Like all the other Citibank documents relied upon in the Complaint, Citibank produced the D████ Memo to
Plaintiff pursuant to Rule 2004 in connection with the Debtors' bankruptcy proceedings.

[4] As the Complaint explains, layering is a process to make the source of funds "*as difficult to detect as possible …
and involves moving funds around in the financial system in order to conceal the origin of the funds.*"  (Compl. ¶ 97
n.4, emphasis added.)

and cash-intensive business (*see id.* ¶¶ 78, 82, 87, 91, 102; Ex. 1 at 20; Ex. 2 at 3), they initially contested account closure, while working with Nissen and FIU to obtain information from Nissen to address FIU's concerns.  (*See, e.g.*, Compl. ¶¶ 164–68.)  Upon being informed by National Events' CFO of (unspecified) "improprieties" respecting Nissen and his resulting termination from the Debtors, and before Nissen was arrested and the Debtors filed for bankruptcy, Crowley and Santana agreed the accounts should be closed.  (*See id.* ¶¶ 227–28.)

### C.    Nissen's Arrest, The Debtors' Bankruptcy, And This Lawsuit

The "improprieties" mentioned to Citibank on May 11, 2017 related to Nissen having confessed earlier that week to defrauding lenders and investors.  (*See* Compl. ¶¶ 222–23, 226.)[5] Shortly thereafter, on May 31, 2017, Nissen was arrested.  (*Id.* ¶ 229.)  The next day, Taly filed suit against Nissen and certain of the Debtors, alleging that from June 2016 Nissen had induced Taly to make event-specific investments under false pretenses and did not use Taly's funds as represented.  (Ex. 5 ¶¶ 2–6; *see* Ex. 8 ¶¶ 30–31; Compl. ¶¶ 33–58.)  Taly had surreptitiously recorded conversations with Nissen which served as the principal evidentiary basis for his arrest.  (Ex. 8 ¶ 29; *see* Ex. 6.)  The Debtors filed bankruptcy in June 2017.  (Compl. ¶¶ 231–33.)

In September 2017 — months after Nissen's arrest, the Debtors' bankruptcy, and Citibank's closure of the accounts (*see id.* ¶ 228) — FIU observed *for the first time* that "Nissen appeared to have been conducting a traditional Ponzi scheme."  (*Id.* ¶¶ 133–39.)  It was also not until September 2017 that the Debtors' lenders and investors were described as victims of Nissen's fraud.  (*Id.* ¶¶ 133, 136.)  Prior to that time, FIU had deemed transactions with each of

---

[5] Nissen's victims allegedly included Falcon Strategic Partners IV, LP and FMP Agency Services, LLC ("Falcon"), Taly USA Holdings Inc. and SLL USA Holdings, LLC ("Taly"), and Hutton Ventures LLC ("Hutton").  They have purportedly assigned their putative claims against Citibank to Plaintiff.  (Compl. ¶¶ 9, 12–14.)  Each assignment provides that Plaintiff will share with the assignor any recovery on the assignor's alleged claims against Citibank. Citibank reserves all its rights with respect to the putative assignments.

Falcon, Taly, and Hutton to be "suspicious" or "questionable."  *See infra* at 10–11.

In June 2021, Plaintiff secured appointment of special litigation counsel specifically to investigate potential claims against the Debtors' banks, including Citibank.  (*See* Compl. ¶ 240.) Special counsel's investigation included, among other things, the use of Bankruptcy Rule 2004 to obtain substantial pre-suit discovery from Citibank of the Debtors' account and transaction records, thousands of pages of internal Citibank documents analyzing Nissen's and the Debtors' transactions, and the deposition testimony of Zachary D███.  (*See id.* ¶¶ 241–43.)  Even with the benefit of that discovery from Citibank, Taly's recorded conversations with Nissen, the cooperation of Nissen himself (*see, e.g.*, Ex. 11 at 8:22–9:10, 31:23–32:6, 65:8–9), and an "extensive and thorough review" of the Debtors' financial information by two teams of forensic accountants (Ex. 8 ¶¶ 33–34), Plaintiff has failed to state a claim against Citibank.

## ARGUMENT

### I. THE COMPLAINT DOES NOT ALLEGE AIDING AND ABETTING FRAUD WITH THE PARTICULARITY DEMANDED BY RULE 9(B)

To establish liability for aiding and abetting fraud under New York law, the plaintiff must show (1) the existence of an underlying fraud, (2) the defendant's knowledge of that fraud, and (3) that the defendant provided substantial assistance to advance the fraud's commission.  *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006).  Rule 9(b)'s heightened pleading requirements apply.  *Rosner v. Bank of China*, 2008 WL 5416380, at *4 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F. App'x 637 (2d Cir. 2009); *Renner v. Chase Manhattan Bank*, 2000 WL 781081, at *5 (S.D.N.Y. June 16, 2000), *aff'd*, 85 F. App'x 782 (2d Cir. 2004).  Here, even accepting for purposes of this motion that Nissen perpetrated a fraud, Plaintiff has failed to plead particularized facts demonstrating that Citibank had knowledge of that fraud or substantially assisted its commission.

### A.    The Complaint Does Not Plead "Specific Facts" Demonstrating That Citibank Had Actual Knowledge Of Nissen's Fraud

"As to the knowledge requirement, New York courts require that the alleged abettor have *actual* knowledge of the primary wrong." *Renner v. Chase Manhattan Bank, N.A.*, 85 F. App'x 782, 784 (2d Cir. 2004) (emphasis in original); *accord, e.g.*, *Lerner*, 459 F.3d at 293.  Merely alleging "[c]onstructive knowledge of the primary fraud—the possession of information which would cause a person exercising reasonable care and diligence to become aware of the fraud—is not sufficient to support an aiding and abetting claim." *Filler v. Hanvit Bank*, 339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004), *aff'd*, 156 F. App'x 413 (2d Cir. 2005).

Conclusory and speculative allegations of actual knowledge are insufficient. *See, e.g.*, *MLSMK Inv. v. JP Morgan Chase & Co.*, 431 F. App'x 17, 19–20 (2d Cir. 2011); *Lerner*, 459 F.3d at 293; *see also, e.g.*, *Williams v. Bank Leumi Trust Co. of New York*, 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997) ("conclusory allegations that Bank Leumi was aware of the scheme … fail to satisfy plaintiff's burden to plead actual knowledge").  Rule 9(b) requires the plaintiff to plead "specific facts" giving rise to a "strong inference" that the defendant had actual knowledge of the underlying fraud. *Berman v. Morgan Keegan & Co., Inc.*, 455 F. App'x 92, 95 (2d Cir. 2012); *Rosner*, 2008 WL 5416380, at *5.  "A failure to allege sufficient facts to support the inference that the alleged aider and abettor had actual knowledge of the fraudulent scheme warrants dismissal of the aiding and abetting claim at the pleading stage." *Krys*, 749 F.3d at 127.

### 1.    The Allegations About Citibank's Compliance Professionals Do Not Demonstrate Actual Knowledge Of Nissen's Fraud

Plaintiff alleges that Citibank flagged certain of the Debtors' transactions as "suspicious," "unusual," or presenting potential money laundering concerns.  (*See, e.g.*, Compl. ¶¶ 76, 83, 97, 112.)  But mere suspicions and concerns are not knowledge, either as a practical matter or as a

matter of law, and they certainly are not actual knowledge that Nissen was "falsely

represent[ing] to lenders and investors, including Falcon, Taly and Hutton, that he would use

money lent to him and the Company to purchase bulk quantities of premium tickets." (*Id.*

¶ 260.)  Indeed, Plaintiff's conclusory allegations that Citibank supposedly "figured out" or

"knew" about Nissen's fraud (*id.* ¶¶ 2, 4; *see id.* ¶¶ 96, 119) are contradicted by affirmative

allegations that the FIU could *not* ascertain or substantiate the Debtors' "source of funds" or their

███████████████████ (*see, e.g., id.* ¶¶ 110, 112) because the transactions ████████████

██████████████████████████████████████████████ (*id.* ¶ 124).

### a.   Citibank's Compliance Professionals Deemed Certain Transactions To Be "Suspicious" or "Unusual," Not "Fraudulent" Or Evidence Of A Ponzi Scheme

Contrary to Plaintiff's conclusory allegation, the D███ Memo did not conclude that

Nissen and the Debtors "were committing fraud." (Compl. ¶ 96.)  This assertion is not supported

by anything in the Memo or by any particularized factual allegation in the Complaint.[6]

The D███ Memo concluded that, while "[t]he customer is operating a legitimate ticket

selling company,"

███ …██████████████████████████████████████

████████████████████████████████████████████

████████████ Some of the parties appear to be involved in the same industry of

---

[6] As Plaintiff is aware, it is also false.  While not necessary for the Court to consider at this stage to dismiss Plaintiff's claims, D███ testified as follows:

> Q.  Now at the time that you concluded your investigation and formed a view that activity in the accounts was suspicious, did you also reach any conclusions that the activity in the account was illegal?  A.  No.

> …

> Q.  Did you ever form a view, during the course of your work, that any of the activity in the accounts constituted fraud?  A.  No.

(Ex. 12 at 29:18–24, 30:15–19.)

the focus customer; however the frequency and amounts appear excessive and unusual. █████████████████████████████████████████████████████████
█████████████████████████████████████████████

(Ex. 1 at 26, emphasis added.)  Notably, the Complaint lists D████'s reasons for recommending

closure, none of which is fraud or suspicion of fraud.  (*See* Compl. ¶ 97.)  Indeed, the Memo says

nothing about (or even suggests awareness of) the Debtors' lenders or investors or that Nissen

was misusing their funds, much less that Nissen and the Debtors "were committing fraud."

Similarly, even as described by Plaintiff, the December 2016 FIU Closeout Memo does

not mention fraud or suspicion of fraud.  (*See id.* ¶¶ 109–12.)  To the contrary, the Memo noted

that National Events was transacting with parties — including Taly — ███████████████

███████████████████████████████████████████████████████████

████████ (Ex. 2 at 2; *see also* Ex. 1 at 15–17 [flagging Hutton and Taly as potentially suspicious

counterparties]).  The Closeout Memo further explained that ██████████████████████

█████████████████████████████████████ that Nissen's and the Debtors'

transactions appeared "indicative of an attempt to disguise the initial source of funds," and that

████████████████████████████████████████ (Ex. 2 at 3; *see* Compl.

¶ 110.)  Account closure was thus recommended because Nissen's and the Debtors' transactions

"present[ed] AML concern to the bank."  (Ex. 2 at 11; *see* Compl. ¶ 112.)

Further FIU reviews during the closure process noted similar concerns, including an

inability to ascertain or substantiate the source or usage of funds.  None mentions fraud or

suspicion of fraud.  An FIU review dated March 11, 2017 (the "L██ Memo") noted Nissen's

and the Debtors' accounts had "excessive movement of funds … [that] appear[ed] indicative of

layering" and deposits █████████████████████████████████████████████████

(Ex. 3 at 7909–10; *see* Compl. ¶ 117.)  Notably, the L███ Memo found "[t]he information

provided is not sufficient to explain the relationship between" Hutton and the Debtors (Ex. 3 at 7989), and thus flagged transactions with Hutton as "questionable" (*id.* at 7991).

Similarly, an FIU review dated March 29, 2017 (the "B████ Memo") observed that "the overall activity represented rapid movement of funds … which appeared indicative of layering" and "appeared suspicious as ████████████████████████████████ ████████████████████ and wires remitted from counterparties involved in negative news." (Ex. 4 at 2; *see* Compl. ¶¶ 121–22, 124.) The B████ Memo identified Taly (Ex. 4 at 100) and Hutton (*id.* at 105) as among the counterparties involved in negative news, and transactions with Falcon were also deemed "suspicious" (*id.* at 6).[7]

   **b.**  **None Of The Complaint's Allegations Or Findings By Citibank's Compliance Professionals Show Actual Knowledge Of Nissen's Fraudulent Scheme**

As Plaintiff has explained elsewhere, Nissen's efforts to hide his fraud were "thorough and complete" — so much so that even after Nissen admitted to his scheme and two teams of forensic accountants had spent more than a year examining the Debtors' books and records, it was still "difficult, if not impossible, to unwind" the Debtors' transactions and determine how Nissen had used (or misused) investors' funds. (*See* Ex. 8 ¶¶ 33–34, 38–46.) Here, though, Plaintiff insists that Nissen's and the Debtors' transactions so "were plainly indicative of a Ponzi

---

[7] The B████ Memo for the first time identified negative news on Nissen and the Debtors. (*See* Compl. ¶ 124.) That recently-identified negative news, however, was not in any way suggestive of or pertinent to Nissen's defrauding of investors. Rather, (1) in October 2003, as a Queens high school math teacher, Nissen was investigated for allegedly selling concert tickets to students that were apparently available for free, and in connection with that investigation it was noted that he had been arrested in September 2002 for reselling tickets to the U.S. Open tennis tournament near the ticket counters (Ex. 4 at 9–10), and (2) one of the Debtors was named as a defendant in a class action lawsuit alleging that the defendants sold tickets at inflated prices after buying them from Ticketmaster (*id.* at 11–12). None of this supports Plaintiff's aiding and abetting claims. *See, e.g.*, *In re Agape Litig.*, 773 F. Supp. 2d 298, 312 (E.D.N.Y. 2011) ("*Agape II*") ("Because Cosmo's previous conviction did not involve Plaintiffs or Agape, BOA's knowledge of Cosmo's previous fraud conviction does not constitute actual knowledge of a fraud perpetrated years later merely because Cosmo was involved.") (quotations and citations omitted).

scheme" that Citibank must have known of the scheme, despite no facts demonstrating such knowledge. (Compl. ¶ 113; *see id.* ¶¶ 117, 124, 129.) Plaintiff's *post hoc* assertion is not supported by any specific facts demonstrating Citibank had actual knowledge of Nissen's fraud.

Put simply, "the complaint does not allege facts indicating that [Citibank's] own investigations revealed any actual evidence of the Ponzi scheme after [Nissen's and the Debtors'] accounts were flagged for suspicious banking activities." *Heinert v. Bank of America N.A.*, 835 F. App'x 627, 630 (2d Cir. 2020) (affirming dismissal of complaint). Among other things: (1) the Complaint does not (and could not) allege that Citibank was aware of what statements or inducements Nissen made to investors or of the existence, much less the terms, of lenders' credit agreements or investors' event-specific contracts with the Debtors; (2) the Complaint acknowledges (and the FIU memoranda confirm) that the FIU analysts repeatedly and consistently stressed that they could not ascertain either the source of the Debtors' funds or the purpose for the transactions; (3) far from being identified as victims, Taly, Hutton, and Falcon were all identified as suspicious counterparties; and (4) as the Department of Justice acknowledged and Judge Engelmayer found, even though Nissen misused investors' funds, he still used those funds overwhelmingly for business-related purposes (not, *e.g.*, to buy a yacht).

The allegations purporting to show actual knowledge are thus wholly deficient, because suspicious behavior cannot on its own give rise to a strong inference of actual knowledge of the underlying fraud. For example, it is irrelevant that, according to Plaintiff, "Nissen frequently transacted in large amounts of cash" (Compl. ¶ 81) or that "Citibank's FIU flagged Nissen's and the Company's account activity as suspicious soon after their opening" (*id.* ¶ 83). *See, e.g.*, *Zhao v. JPMorgan Chase & Co.*, 2019 WL 1173010, at *5 (S.D.N.Y. Mar. 13, 2019) ("knowledge of frequent withdrawals, wire transfers to accounts in countries recognized as money laundering

havens, and [a] transfer recall request … fall short of creating the 'strong inference' of actual knowledge of a primary violation"); *Liu Yao-Yi v. Wilmington Trust Co.*, 301 F. Supp. 3d 403, 421 (W.D.N.Y. 2017) ("the alleged volume of substantial 'atypical money transfers' does not create a strong inference of 'actual knowledge' of fraudulent conduct").

Equally irrelevant are the alleged "Know Your Customer" inquiries respecting Nissen's and the Debtors' accounts.  (*See* Compl. ¶¶ 75–80, 101.)  Even a failure to meet KYC obligations (not alleged here) does not supply knowledge of misconduct.  *See Berman*, 455 F. App'x at 95 (failure to satisfy such obligations could suggest, at most, that the bank "should have known of [the] wrongdoing, not that it had actual knowledge thereof"); *Liu Yao-Yi*, 301 F. Supp. 3d at 420 ("Plaintiffs' assertion that Defendant's personalized services and its obligation to 'know their customers' made it aware of the alleged wrongful conduct … at most, could only create a plausible inference of *constructive* knowledge of potential misconduct.") (emphasis in original).

Nor does it matter that some of the transactions were supposedly for no apparent business purpose or inconsistent with what Citibank allegedly knew about the Debtors' business.  (*See* Compl. ¶¶ 96, 111.)  First, as acknowledged by the Department of Justice and found by Judge Engelmayer, based on an analysis by Plaintiff's own forensic accountants, Nissen was operating "a legitimate business" and "94 percent of the aggregate dollar amount of [Nissen's] disbursements were most likely business-related."  (Ex. 11 at 6:10–7:17, 12:16–23; *see* Ex. 10 at 9 ["In the main, … [Nissen] used the money that he obtained from his victims to purchase event tickets, to invest in the business, and to repay other victims."].)  Even putting that aside, "the assertion that the account activity was obviously inconsistent with what [Citibank] knew about [Nissen's] business" does not support a strong inference of actual knowledge of Nissen's fraud.  *Agape II*, 773 F. Supp. 2d at 311; *see Rosner*, 2008 WL 5416380, at *6 (allegations that

13

fraudster's transactions were "suspicious," "atypical and non-routine," and were known by the bank to be "inconsistent with the type of business … in which [the fraudster] was engaged" held "insufficient to support a strong inference [of] actual knowledge of the underlying fraud").

Indeed, even "[p]atterns of behavior highly indicative of fraud … are insufficient to give rise to an inference of actual knowledge of an underlying fraud." *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 413 (S.D.N.Y. 2021); *see, e.g.*, *Rosner*, 2008 WL 5416380, at *10.  Thus, even where a plaintiff has "gathered allegations of 'red flags' and suspicious circumstances, which in hindsight may appear to indicate the obviousness of the fraud," such allegations "fail to rise to the level of specificity that New York state courts and courts in the Second Circuit have routinely required before holding that a plaintiff has sufficiently alleged facts that raise a strong inference of actual knowledge from circumstantial evidence." *Agape II*, 773 F. Supp. 2d at 318–19; *see, e.g.*, *Heinert v. Bank of America, N.A.*, 410 F. Supp. 3d 544, 549–50 (W.D.N.Y. 2019) ("It is well settled in the Second Circuit that a bank's negligent failure to identify warning signs of fraudulent activity, such as atypical transactions – even where such signs converge to form a veritable 'forest of red flags' – is insufficient to impute actual knowledge of ongoing fraud."), *aff'd*, 835 F. App'x 627 (2d Cir. 2020).

Particularly illustrative of these firmly-established principles is *Ryan v. Hunton & Williams*, 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000), in which the plaintiffs, victims of a Ponzi scheme operated by Wolas, sued Chemical Bank for aiding and abetting Wolas's fraud.  In that case, "[f]rom the accounts' inception" a branch officer "suspected that they were a vehicle for fraudulent activity and immediately referred them to Chemical's in-house fraud investigative unit." *Id.* at *1.  The court stressed, however, that the referral was "based on suspicions—not actual knowledge—of fraudulent activity." *Id.* at *9.  It accordingly dismissed the complaint,

14

explaining that "[a]llegations that Chemical suspected fraudulent activity … do not raise an inference of actual knowledge of Wolas's fraud." *Id.*; *see, e.g.*, *Berdeaux*, 561 F. Supp. 3d at 413 ("BNYM's suspicions of fraud and its decision to investigate … are insufficient in and of themselves to generate an inference of actual knowledge.").

Here, as noted, there is no particularized allegation that Citibank suspected "fraudulent activity," and Citibank never referred Nissen to its fraud investigative unit.  Flagging certain transactions as "suspicious" or "unusual" is thus of no legal significance.  "Under Second Circuit case law, [even a defendant's] knowledge that [the fraudster] was acting improperly in one capacity does not raise a strong inference that [the defendant] had actual knowledge of the underlying fraudulent scheme." *Agape II*, 773 F. Supp. 2d at 313; *see Filler*, 339 F. Supp. 2d at 560 (rejecting "a broad definition of the underlying fraud").

This principle is especially pertinent here.  The Complaint contains no allegation — none — that Citibank was aware of any fraudulent statements Nissen made to investors; or of the Debtors' credit agreements or event-specific contracts; or of any restrictions on the Debtors' permitted use of funds; or that funds were being used for unauthorized purposes.  *See, e.g.*, *Krys*, 749 F.3d at 130 (affirming dismissal where complaint lacked factual allegations defendant knew "key facts" regarding fraudster's improper use of clients' funds); *Lerner*, 459 F.3d at 293 ("plaintiffs allege in detail that the banks knew that [attorney] Schick engaged in improper conduct that would warrant discipline by the Appellate Division, but those alleged facts do not give rise to the 'strong inference,' required by Federal Rule of Civil Procedure 9(b), of actual knowledge of his outright looting of client funds"); *Rosner v. Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009) ("Even if BOC had reason to suspect that Siu Lap was laundering money, this does not mean that BOC had actual knowledge of the fraudulent scheme"); *Kirschner v. Bennett*,

648 F. Supp. 2d 525, 545–46 (S.D.N.Y. 2009) (complaint lacked allegations that defendants "had

any idea that unauthorized diversions of funds from FX customers' accounts were occurring");

*Filler*, 339 F. Supp. 2d at 560 ("Plaintiffs do not allege that defendants were actually aware of

the representations made to [them] … the underlying fraud of which defendants were allegedly

aware and which they assisted is not the defrauding of these plaintiffs").[8]

Plaintiff has suggested (*see* ECF 19 at 3) that *Vasquez v. Hong Kong and Shanghai*

*Banking Corporation Ltd.*, 2019 WL 2327810 (S.D.N.Y. May 30, 2019), supports his position

because it distinguished certain of the cases cited above and held actual knowledge was

adequately pleaded.  In fact, *Vasquez* underscores why the Complaint is irremediably deficient.

*Vasquez* found actual knowledge adequately pleaded (but still dismissed the complaint for failure

to plead substantial assistance, *see infra* § I.B) because the defendant "drew the affirmative

conclusion, from its research, that it was most likely [its customer] was a Ponzi scheme" yet

"chose not to investigate further" and instead continued to service the client; this established

actual knowledge under the "conscious avoidance doctrine."  2019 WL 2327810, at *17.  It is

"unclear," however, "whether a claim of aiding and abetting under New York law is sustainable

on a basis not of actual knowledge but of conscious avoidance of knowledge," *Krys*, 749 F.3d at

131, and Plaintiff does not in any event purport to allege "conscious avoidance."  *See also*

---

[8] Plainly, FIU's observation in September 2017 — months *after* Nissen's arrest, the Debtors' bankruptcy, and closure of the accounts — that "Nissen appeared to have been conducting a traditional Ponzi scheme" (Compl. ¶¶ 133–39), does not show Citibank had actual knowledge of the fraud in 2016.  *See Berdeaux*, 561 F. Supp. 3d at 412 (even though defendant bank was alleged to have subsequently concluded that its client appeared to be running a Ponzi scheme, "Plaintiffs fail[ed] to plead particular facts raising a strong inference that BNYM had actual knowledge of the underlying fraud *at the time it allegedly facilitated transfers of proceeds of the fraud*.") (emphasis added) (quotations and citations omitted).  Nor is there any significance to the allegation that the Debtors moved accounts to Citibank to accommodate Falcon's "DACA" requirement.  (Compl. ¶ 68.)  The Deposit Account Control Agreement merely provided that, upon receipt of instructions from Falcon, Citibank would follow Falcon's direction regarding funds in the account; prior to such instructions, however, the Debtors had sole authority to direct the withdrawal or transfer of those funds.  (*See* Ex. 7 ¶ 2.)  The Complaint does not allege that Falcon ever delivered DACA instructions to Citibank.

*Berdeaux*, 561 F. Supp. 3d at 416 (distinguishing *Vasquez* and dismissing complaint alleging defendant had "a strong suspicion of fraud" and had concluded that its client "'appeared to be' a Ponzi scheme" and "appeared to be engaged in 'layering'").

### 2. The Allegations About Citibank's Bankers Do Not Demonstrate Actual Knowledge Of Nissen's Fraud

Equally deficient are Plaintiff's efforts to plead actual knowledge based on the alleged motives or actions of Crowley and Santana, Nissen's and the Debtors' relationship managers and/or business bankers at Citibank. Manifestly, allegations that Santana had a "personal relationship" with Nissen (Compl. ¶ 71) and that Crowley was motivated to maintain the client relationship to bolster his performance reviews and compensation (*id.* ¶ 74) cannot support a "strong inference" of actual knowledge or fraudulent intent on their part. *See, e.g.*, *Agape II*, 773 F. Supp. 2d at 322 ("a motive required to successfully allege a strong inference of fraud must be based on some benefit beyond additional compensation or prestige from a position already held") (quotations omitted); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 494–95 (S.D.N.Y. 2001) ("[o]rdinary economic motive" insufficient to establish actual knowledge of primary fraud); *Renner*, 2000 WL 781081, at *10 (that branch manager had "ongoing relationship" with perpetrators of the fraud and "would likely seek to attract business" insufficient).[9]

Plaintiff also alleges that Crowley and Santana "stall[ed]" and disputed FIU's account closure recommendation "knowing they had no legitimate basis to do so" (Compl. ¶ 159; *see id.* ¶¶ 160, 172, 175) because they "had actual knowledge that … Nissen was running a Ponzi

---

[9] Similarly insufficient is the allegation that Citibank "chose … to substantially assist the fraud in an effort to reap the substantial pecuniary gains it made through their transaction fees and their continued relationship" with Nissen and the Debtors. (Compl. ¶ 255.) "Plaintiff must allege more than [Citibank's] interest in bank fees and deposits in order to create a reasonable inference of fraudulent intent." *Renner*, 2000 WL 781081, at *13; *see, e.g.*, *Liu Yao-Yi*, 301 F. Supp. 3d at 421 (that defendant "was motivated to process as many 'atypical' transactions as possible in an effort to accumulate additional fees" insufficient to create strong inference of actual knowledge).

scheme" (*id.* ¶ 204).  Such unsupported conclusory allegations are "clearly insufficient."  *Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 24 (S.D.N.Y. 2009).

Stripped of hyperbole, the only facts alleged respecting Crowley and Santana give rise to a strong inference of nothing more than ordinary-course client service motivated by a reasonable belief that Nissen was operating a legitimate business.  They thus worked diligently — as requested by FIU (*see* Compl. ¶¶ 104, 107–08, 165) — "to gain a better understanding of Nissen's and the Company's cash flows" and obtain information to address FIU's concerns (*id.* ¶ 168; *see id.* ¶¶ 181, 201, 219).  To that end, they requested and received information from Nissen which was duly forwarded to Citibank compliance professionals (*see, e.g.*, *id.* ¶¶ 171, 185–88, 192–94, 200–03, 212–14), even while acknowledging "confus[ion]" about some of the documentation provided and expressing skepticism *to fellow Citibank employees* about its adequacy (*see id.* ¶ 182), and then agreed the accounts should be closed upon being told by the Debtors' CFO of (unspecified) "improprieties" regarding Nissen (*see id.* ¶¶ 227–28).  Nor can Plaintiff's labelling this conduct as "stalling" be squared with the facts alleged — asking Nissen "to keep information coming" (*id.* ¶ 193) and "to get the info you said you would send us ASAP" (*id.* ¶ 212), apologizing to colleagues for being unable to set up a call because someone who wanted to join was on vacation (*id.* ¶ 199), or responding to a Friday request for an update by scheduling a multiparty conference call for the following Wednesday (*id.* ¶¶ 202–03).

All the above reflects good faith conduct explicitly alleged in the Complaint; merely characterizing it using conclusory pejoratives such as "falsely" and "lying" — no matter how many times Plaintiff does so — cannot substitute for the "specific *facts*" required by Rule 9(b) to support a strong inference of fraudulent intent.  *See PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 494–95 (S.D.N.Y. 2017) ("conclusory allegations regarding [an individual's] intent are not

enough" to allege a strong inference of fraudulent intent based on conduct that "is hardly a nefarious act on its own").  Likewise, that Crowley and Santana sought approval for transactions requested by Nissen (*see, e.g.*, Compl. ¶¶ 142–49, 161, 184, 197) is also entirely consistent with good faith and does not give rise to a strong inference of actual knowledge of Nissen's fraud. *See Ryan*, 2000 WL 1375265, at *9 (banker's authorizations and approvals of wire transfers did not create an inference of knowledge of the scheme); *see also Heinert*, 410 F. Supp. 3d at 550 ("[A]llegations concerning a bank's willingness to 'bend the rules' to accommodate influential customers by processing irregular transactions does not give rise to a 'strong inference' of actual knowledge that those customers are engaged in fraud.").

Finally, that Crowley and Santana supposedly understood Falcon was a minority investor in the Debtors (Compl. ¶ 173) and that Taly and Hutton were companies with which the Debtors "did 'partnerships'" (*id.* ¶ 179; *see also id.* ¶ 102) do not support a strong inference of actual knowledge of Nissen's fraudulent scheme.  Those allegations do not remotely suggest either of them knew anything about any inducements made to such parties, about the terms of any of those party's investments in or dealings with the Debtors, or that Nissen was using their funds for purposes they had not authorized.  *See Agape II*, 773 F. Supp. 2d at 316–17 (no actual knowledge of Ponzi scheme alleged where plaintiff "failed to provide a basis for asserting that [bankers] were aware of [the] limitation on [fraudster's] investment authority").[10]

---

[10] Plaintiff alleges that in April 2017 Nissen falsely told Taly that Citibank had mistakenly wired funds for Taly to someone else, forged a letter from Citibank to support this claim, and Santana then knowingly misrepresented to Taly there was a problem with the wire to support what the forged letter stated.  (Compl. ¶¶ 215–17.)  Not only is this allegation entirely conclusory, but, as revealed by Taly's recorded conversations with Nissen, he explained to Taly that no one from Citibank helped him forge the letter and what Taly was told about the wire was because "I [Nissen] had a different wire go out and come back that wasn't for you [Taly].  Just a different wire."  (*See* Ex. 6 at Ex. B pp. 2–3.)

**B.      The Complaint Does Not Plead Particularized Facts Demonstrating That Citibank Substantially Assisted Nissen's Fraud**

The Complaint also fails to adequately plead the independent element of substantial

assistance.  *See, e.g.*, *Vasquez*, 2019 WL 2327810, at *18–19; *see also, e.g.*, *Renner*, 2000 WL

781081, at *12 ("Even if actual knowledge could be attributed to Chase, it did not substantially

assist in the fraud.").  As a matter of law, substantial assistance generally exists only where

(1) the defendant affirmatively assists, helps conceal, or by virtue of failing to act when required

to do so enables the fraud to proceed, *and* (2) the defendant's actions proximately caused the

harm on which the primary liability is predicated.  *Vasquez*, 2019 WL 2327810, at *18; *Rosner*,

2008 WL 5416380, at *12.  Because Plaintiff does not allege Citibank owed any independent

duty to the victims of Nissen's scheme or did anything other than provide Nissen with standard

banking services, the substantial assistance element is not satisfied.

"Banks generally do not owe non-customers a duty to protect them from fraud

perpetrated by customers."  *MLSMK*, 431 F. App'x at 20; *see Lerner*, 459 F.3d at 286.  It is thus

"well-established that the mere fact that participants in a fraudulent scheme use accounts at a

financial institution to perpetrate it, without more, does not in and of itself rise to the level of

substantial assistance."  *Berman*, 455 F. App'x at 96; *see Williams*, 1997 WL 289865, at *5.

It is equally well-settled that standard banking services of the type Citibank provided to

Nissen and the Debtors — such as processing wire transfers and cashing checks (*see* Compl.

¶¶ 176–78, 184, 197, 221) — do not constitute substantial assistance.  *See, e.g.*, *Berdeaux*, 561 F.

Supp. 3d at 411 ("The provision of routine banking services to alleged fraudsters, even if it aids

in the commission of the fraud, simply does not qualify as substantial assistance."); *Zamora v.

JPMorgan Chase Bank, N.A.*, 2015 WL 4653234, at *3 (S.D.N.Y. July 31, 2015) ("Routine

banking services, including opening accounts, executing wire transfers, and processing checks do

20

not constitute 'substantial assistance.'").  Thus, even if Crowley and Santana allegedly sought transaction approvals while the closeout process was underway, such routine banking services do not constitute substantial assistance, "*even [if] there is a suspicion of fraudulent activity*."  *In re Agape Litig.*, 681 F. Supp. 2d 352, 365 (E.D.N.Y. 2010) ("*Agape I*") (emphasis added); *see Ryan*, 2000 WL 1375265, at *9 ("approving various transfers, and then closing the accounts on the basis of suspected fraud, without more, do[es] not constitute substantial assistance").

Nor can Plaintiff state a claim by alleging Crowley purportedly violated internal Citibank policy by telling Nissen his banking relationship was under investigation (Compl. ¶ 194) or Citibank purportedly allowed Nissen more time than prescribed by its guidelines to contest account closure (*id.* ¶¶ 163, 201).  *See, e.g.*, *Zhao*, 2019 WL 1173010, at *8 (violation of an organization's policies with respect to financial transactions is not substantial assistance); *Cromer*, 137 F. Supp. 2d at 471 ("A failure to enforce margin requirements, or continuing to execute trades despite margin violations … does not constitute substantial assistance.").

Because "[Citibank] had no affirmative duty to detect and thwart [Nissen's] fraud," its alleged "failure to act may not serve as the basis for claiming that [it] provided substantial assistance."  *Agape I*, 681 F. Supp. 2d at 365.  Thus, allegations that Crowley and Santana were "stalling," or that Citibank otherwise improperly "fail[ed] to shut down the accounts sooner," even if assumed to be true, do not show substantial assistance.  *Ryan*, 2000 WL 1375265, at *10; *see, e.g.*, *Berdeaux*, 561 F. Supp. 3d at 417 ("BNYM's alleged failure to take more exhaustive or efficacious measures following its investigation of OneCoin does not, as a matter of law," demonstrate substantial assistance); *Vasquez*, 2019 WL 2327810, at *18 ("substantial assistance is … not met by HSBC USA's failure to act to terminate the correspondent account relationship"); *Musalli*, 261 F.R.D. at 26 (absent fiduciary duty owed to plaintiff, bank's failure

21

to shut down fraudster's account did not constitute substantial assistance); *Renner*, 2000 WL 781081, at *14 ("claims that Chase should have detected the fraud sooner and acted more quickly" were "insufficient to demonstrate an intent to assist in fraud.").

Finally, to be "substantial," the alleged assistance must have been the proximate cause of the plaintiff's claimed harm. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 202 (S.D.N.Y. 2006). "But for" causation is not sufficient. *Berdeaux*, 561 F. Supp. 3d at 418; *Rosner*, 2008 WL 5416380, at *12. Here, though, that is all Plaintiff alleges — literally.[11] Merely alleging that "Nissen could not have executed his Ponzi scheme" without Citibank's (or Crowley's and Santana's) supposed assistance (Compl. ¶ 64) does not plead *substantial* assistance. The proximate cause of Plaintiff's and the putative assignors' claimed losses was Nissen, not Citibank. *See, e.g.*, *Berdeaux*, 561 F. Supp. 3d at 418 ("while the Ponzi scheme may have needed the assistance of banks, the proximate cause of Plaintiffs' injury was not BNYM's transfer of funds."); *Vasquez*, 2019 WL 2327810, at *19 (defendant's "conventional banking transactions were not the proximate cause of the Plaintiffs' damages and therefore do not constitute substantial assistance"); *Cromer*, 137 F. Supp. 2d at 472 ("While the Ponzi scheme may only have been possible because of Bear Stearns' actions, or inaction, Bear Stearns' conduct was not the proximate cause of the Ponzi scheme.").

## II.   PLAINTIFF'S CLAIM ON BEHALF OF THE DEBTORS SHOULD BE DISMISSED ON *IN PARI DELICTO* AND/OR STANDING GROUNDS

Plaintiff's first cause of action, purportedly asserted on behalf of the Debtors' estates

---

[11] *Compare, e.g.*, Compl. ¶ 150 ("But for this pattern of plainly improper overdraft authorizations … Nissen's and the Company's access to overdraft credit would have evaporated and the Ponzi scheme would have collapsed."); *id.* ¶ 162 ("But for Crowley's and Santana's substantial assistance in this regard, Nissen could not have run his Ponzi scheme and his and the Company's Citibank accounts would have been closed months earlier than they were."), *with, e.g.*, *Cromer*, 137 F. Supp. 2d at 472 ("The plaintiffs are unable to cure the defect in their pleading of substantial assistance by emphasizing that the alleged fraud included a Ponzi scheme that could not have functioned but for the extension of credit and margin violations.").

22

(Compl. ¶¶ 245–56), is independently foreclosed by both (1) the *in pari delicto* doctrine, which "bars a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault contributed to the loss," *In re Lehr Constr. Corp.*, 551 B.R. 732, 738 (S.D.N.Y. 2016), *aff'd*, 666 F. App'x 66 (2d Cir. 2016) (quotations omitted), and (2) the related prudential limitation on standing under federal bankruptcy law established in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991), which provides that trustees "do not have standing to seek recovery from third parties where corporate insiders engaged in the wrongdoing that caused the damages," *In re Lehr Constr. Corp.*, 551 B.R. at 740 (quotations omitted).  Both issues are appropriately addressed at the pleading stage.  *E.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 65 (2d Cir. 2013); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1090–91 (2d Cir. 1995).

These doctrines are grounded in well-settled agency principles — "namely, the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals."  *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010); *see, e.g.*, *Wright v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) ("Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in.").  "Agency law presumes imputation even where the agent acts less then admirably, exhibits poor business judgment, or commits fraud," meaning that "all corporate acts — including fraudulent ones — are subject to the presumption of imputation."  *Kirschner*, 15 N.Y.3d at 465–66.  Because Nissen's misconduct is imputed to the Debtors, and because Plaintiff stands in the Debtors' shoes, *in pari delicto* and *Wagoner* require dismissal of the Complaint's first cause of action as a matter of law.  *E.g.*, *In re Bernard L. Madoff Inv. Sec.*

*LLC*, 721 F.3d at 63–64; *Wagoner*, 944 F.2d at 118–20.

Plaintiff's attempt to invoke the "adverse interest" exception to the *in pari delicto* doctrine (*see* Compl. ¶ 252) fails.  This "most narrow of exceptions" applies only if fraud is committed *against* the corporation, not "[w]here the agent is perpetrating a fraud that will benefit his principal."  *Kirschner*, 15 N.Y.3d at 466–67.  It "applies only when the agent has '*totally abandoned* his principal's interests' and is 'acting *entirely* for his own or another's purposes.'"  *In re Lehr Constr. Corp.*, 551 B.R. at 738 (quoting *Kirschner*, 15 N.Y.3d at 466) (emphasis in original).  "The crucial distinction is between conduct that defrauds the corporation and conduct that defrauds others for the corporation's benefit."  *Kirschner*, 15 N.Y.3d at 467–68.[12]

Plaintiff's conclusory allegation that Nissen "looted" the Debtors (Compl. ¶ 252) is refuted by specific allegations in the Complaint and matters subject to judicial notice.  *See, e.g.*, *Hirsch*, 72 F.3d at 1092, 1095; *In re Lehr Constr. Corp.*, 551 B.R. at 737.  As the Complaint concedes, and as Plaintiff has elsewhere acknowledged, although Nissen misrepresented to investors how their funds would be used, he still used their funds for business purposes — including to pay corporate debts and buy tickets (although not to the extent he led investors to believe).  (*See, e.g.*, Compl. ¶¶ 32, 102; Ex. 9 ¶ 26; Ex. 10 at 9.)  Indeed, as Judge Engelmayer observed, the situation with Nissen was not "remotely close" to the typical situation where financial fraud is motivated by personal greed; rather, Nissen's motivation "was to keep [the

---

[12] Because the adverse interest exception does not apply, Plaintiff's assertion that Nissen was not the "sole actor" for the Debtors (*see* Compl. ¶ 254) is irrelevant.  Where the principal and agent are one and the same, the adverse interest exception (which would defeat imputation) is itself subject to the "sole actor" exception, which results in imputation notwithstanding the agent's self-dealing.  *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d at 64 n.14.  Since the adverse interest exception does not apply, however, whether Nissen was the "sole actor" for the Debtors is of no consequence.  In the circumstances here, moreover, any such argument is "foreclosed by *Kirschner*."  *See In re Lehr Constr. Corp.*, 551 B.R. at 745 n.10 ("Where the agent is defrauding someone else on the corporation's behalf, the presumption of full communication between agents and principals remains in full force and effect.") (quoting *Kirschner*, 15 N.Y.3d at 466).

Debtors] alive" and "almost all of the money obtained from lenders was used to keep [the Debtors] afloat by paying [their] debts." (Ex. 11 at 56:17–57:12, 57:25–58:21.)  Even Plaintiff acknowledges that Nissen's misconduct "prolonged the Company's existence." (Compl. ¶ 252.)

The adverse interest exception is inapplicable if the agent's actions "had some corporate purpose" and "provided some corporate benefit," regardless whether the ultimate outcome was a net harm to the company and its creditors. *In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 284807, at *35, *37 (S.D.N.Y. Jan. 23, 2019).  Thus, "the mere fact that a corporation is forced to file for bankruptcy does not determine whether its agents' conduct was, at the time it was committed, adverse to the company." *Kirschner*, 15 N.Y.3d at 468.  "So long as the corporate wrongdoer's fraudulent conduct enables the business to survive — to attract investors and customers and raise funds for corporate purposes — [the adverse interest] test is not met." *Id.*; *see, e.g.*, *In re ICP Strategic Credit Income Fund, Ltd.*, 568 B.R. 596, 611–12 (S.D.N.Y. 2017) ("simply keeping a business alive [is] enough of a benefit to defeat the adverse interest exception," even though the agent's actions only kept the business "temporarily afloat" and ultimately harmed the business), *aff'd*, 730 F. App'x 78 (2d Cir. 2018).  Plaintiff's first claim for relief is thus independently subject to dismissal.

## CONCLUSION

Given that Plaintiff "has had ample opportunity to investigate his claims, and has still fallen short," amendment would be futile. *In re Dreier LLP*, 453 B.R. 499, 518 (Bankr. S.D.N.Y. 2011); *see Ryan*, 2000 WL 1375265, at *11.  Dismissal should be with prejudice.

Dated: New York, New York        SHEARMAN & STERLING LLP
       August 23, 2022

                         By:     /s/ John Gueli
                                 Adam S. Hakki

John Gueli
Katherine J. Stoller
Randall Martin

599 Lexington Avenue
New York, NY  10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
adam.hakki@shearman.com
jgueli@shearman.com
katherine.stoller@shearman.com
randall.martin@shearman.com

*Attorneys for Defendant Citibank, N.A.*

2023286295.8