SILVERMANACAMPORA LLP
Counsel to Kenneth P. Silverman, Chapter 7 Trustee
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Ronald J. Friedman

**Hearing Date:  November 27, 2018**
**Time:  10:00 a.m.**

**Objections Due Date: November 20, 2018**
**Time:  4:00 p.m.**

*-and-*

**Westerman Ball Ederer Miller Zucker & Sharfstein, LLP**
Counsel to Edward J. LoBello, Esq., as Estate Fiduciary of
  National Events of America Inc. and New World Events Group, Inc.
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200
Thomas A. Draghi

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

In re:

NATIONAL EVENTS HOLDINGS, LLC,
NATIONAL EVENTS INTERMEDIATE, LLC,
NATIONAL EVENT COMPANY II, LLC,
NATIONAL EVENT COMPANY III, LLC,
WORLD EVENTS GROUP II, LLC

                                        Debtors.

-------------------------------------------------------------------x

Chapter 7

Case No.:    17-11556 (JLG)
             17-11557 (JLG)
             17-11559 (JLG)
             17-11561 (JLG)
             17-11562 (JLG)

(Jointly Administered)

### NOTICE OF HEARING ON JOINT MOTION FOR AN ORDER (I) APPROVING THE SUBSTANTIVE CONSOLIDATION OF THE ESTATES IN ALL OF THE ABOVE-CAPTIONED BANKRUPTCY CASES, AND (II) TO THE EXTENT SUCH CASES ARE CONSOLIDATED, CONVERTING THE JOINTLY ADMINISTERED CHAPTER 11 CASES OF NATIONAL EVENTS OF AMERICA, INC. <u>AND NEW WORLD EVENTS GROUP, INC. TO CHAPTER 7 LIQUIDATIONS</u>

**PLEASE TAKE NOTICE**, that upon the annexed motion (the "Motion"), of Kenneth P.

Silverman, Esq., the chapter 7 Trustee (the "Trustee") of the jointly administered bankruptcy

estates of National Events Holdings, LLC, National Events Intermediate, LLC, National Event

Company II, LLC, National Event Company III, LLC, and World Events Group II, LLC,

(collectively the "LLC Debtors"), and Edward J. LoBello, Esq., Estate Fiduciary <u>the "Estate</u>
<u>Fiduciary</u>") of National Events of America, Inc. and New World Events Group, Inc. (collectively,
the "Corporate Debtors", and collectively with the LLC Debtors, the "Debtors"), by their
respective undersigned counsel, will move before the Honorable James L. Garrity, United
States Bankruptcy Judge for the Southern District of New York, Alexander Hamilton U.S.
Custom House, One Bowling Green, Courtroom 601, New York, New York, 10004, on
**November 27, 2018 at 10:00 a.m**. (the "Hearing"), or as soon thereafter as counsel can be
heard, for the entry of an order (a) substantively consolidating the estates of the Corporate
Debtors with the LLC Debtors (the proposed "Consolidated Debtors"), and (b), to the extent that
such relief (*i.e.*, consolidation) is approved, converting the Corporate Debtors' jointly
administered chapter 11 bankruptcy cases to liquidation cases under chapter 7, with all such
relief being *nunc pro tunc* to the LLC Debtor Conversion Date (as defined below). and for such
other, further and different relief as the Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE, that objections, if any, to the relief sought in the
Motion must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set
forth the name of the objecting party, the basis for the objection and the specific grounds
therefor, and must be filed electronically with the Bankruptcy Court in accordance with General
Order M-399 (General Order M-399 and the User's Manual for the Electronic Case Filing
System may be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court)
by registered users of the Bankruptcy Court's case filing system, and by all other parties in
interest on a disk, preferably in Portable Document Format (PDF), WordPerfect, or any other
Windows-based word processing format (with two, single sided copies delivered directly to
Chambers), and must be served upon: (i) the Clerk the United States Bankruptcy Court for the
Southern District of New York, located at the Alexander Hamilton United States Custom House,
One Bowling Green, New York, New York 10004-1408, with a courtesy copy to the Chambers of
the Honorable James L. Garrity, United States Bankruptcy Judge for the Southern District of

DJM/2231482.1/067493

New York; (ii) SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York,

11753, Attn: Ronald J. Friedman, Esq.; (iii) Westerman Ball Ederer Miller, Zucker & Sharfstein

LLP, 1201 RXR Plaza, Uniondale, New York 11556, Attn: Thomas A Draghi, Esq., and (iv) The

Office of the United States Trustee, 201 Varick Street Suite 1006, New York, New York, 10014,

no later than **November 20, 2018 at 4:00 p.m.**

PLEASE TAKE FURTHER NOTICE, that the Hearing may be adjourned without further

notice other than by announcement of such adjournment in open Court or by the filing of a

notice of such adjournment on the Court's docket for the Debtors' lead case.

PLEASE TAKE FURTHER NOTICE, that you need not appear at the Hearing if you do

not object to the relief sought in the Motion.

Dated: Jericho, New York
November 2, 2018

SILVERMANACAMPORA LLP
Counsel to Kenneth P. Silverman, Esq.,
the Chapter 7 Trustee of National Events Holdings,
LLC, *et al.*


By:     s/Ronald J. Friedman
        Ronald J. Friedman
        A Member of the Firm
        100 Jericho Quadrangle, Suite 300
        Jericho, NY 11753
        (516) 479-6300

DJM/2231482.1/067493

**SILVERMANACAMPORA LLP**
Counsel to Kenneth P. Silverman, Chapter 7 Trustee
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Ronald J. Friedman

-and-

**Westerman Ball Ederer Miller Zucker & Sharfstein, LLP**
Counsel to Edward J. LoBello, Esq., as Estate Fiduciary of
  National Events of America Inc. and New World Events Group, Inc.
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200
Thomas A. Draghi

**Hearing Date: November 27, 2018**
**Time: 10:00 a.m.**

**Objections Due Date: November 20, 2018**
**Time: 4:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 |
| NATIONAL EVENTS HOLDINGS, LLC,<br>NATIONAL EVENTS INTERMEDIATE, LLC,<br>NATIONAL EVENT COMPANY II, LLC,<br>NATIONAL EVENT COMPANY III, LLC,<br>WORLD EVENTS GROUP II, LLC | Case No.:    17-11556 (JLG)<br>17-11557 (JLG)<br>17-11559 (JLG)<br>17-11561 (JLG)<br>17-11562 (JLG) |
| Debtors. | (Jointly Administered) |

-----------------------------------------------------------------x

### JOINT MOTION FOR AN ORDER (I) APPROVING THE SUBSTANTIVE CONSOLIDATION OF THE ESTATES IN ALL OF THE ABOVE-CAPTIONED BANKRUPTCY CASES, AND (II) TO THE EXTENT SUCH CASES ARE CONSOLIDATED, CONVERTING THE JOINTLY ADMINISTERED CHAPTER 11 CASES OF NATIONAL EVENTS OF AMERICA, INC. AND NEW WORLD EVENTS GROUP, INC. TO CHAPTER 7 LIQUIDATIONS

Kenneth P. Silverman, Esq., the chapter 7 Trustee (the "**Trustee**") of the jointly

administered bankruptcy estates of National Events Holdings, LLC ("**NEH**"), National Events

Intermediate, LLC ("**NEI**"), National Event Company II, LLC ("**NEC II**"), National Event Company

III, LLC ("**NEC III**"), and World Events Group II, LLC ("**WEG II**" and, collectively with NEH, NEI,

NEC II and NEC III, the "**LLC Debtors**"), and Edward J. LoBello, Esq., Estate Fiduciary

("**LoBello" or the "Estate Fiduciary**") of National Events of America, Inc. ("**National Events**")

and New World Events Group, Inc. ("**New World**") (together, National Events and New World

are the "**Corporate Debtors**", and collectively with the LLC Debtors, the "**Debtors**"), by their

respective undersigned counsel, jointly submit this motion (the "**Motion**") for the entry of an

order (a) substantively consolidating the estates of the Corporate Debtors with the LLC Debtors

(the proposed "**Consolidated Debtors**"), and (b), to the extent that such relief (*i.e.*,

consolidation) is approved, converting the Corporate Debtors' jointly administered chapter 11

bankruptcy cases to liquidation cases under chapter 7, with all such relief being *nunc pro tunc* to

the LLC Debtor Conversion Date (as defined below).  In support, the movants respectfully

represent and set forth the following:

## BACKGROUND

### The LLC Debtors' Cases

1.    On June 5, 2017 (the "**LLC Debtor Petition Date**"), the LLC Debtors filed

voluntary petitions for relief under chapter 11 of Title 11, United States Code (the "**Bankruptcy**

**Code**") in the United States Bankruptcy Court for the Southern District of New York (the

"**Court**").  By Order dated June 13, 2017, the Court entered an Order providing for the joint

administration (procedural) of the LLC Debtors' estates (*see Doc. No. 20 in Bankr. S.D.N.Y. 17-

11556*).[1]  By Order of the Court dated August 7, 2017 (the "**LLC Debtor Conversion Date**"), the

LLC Debtors' chapter 11 cases were converted to chapter 7 liquidation cases (*see Doc. No. 143

in Bankr. S.D.N.Y. 17-11566*).  By Notice of Appointment dated August 7, 2017, Kenneth P.

Silverman, Esq., was appointed Interim Trustee in the LLC Debtors' bankruptcy cases and has

since qualified and is the duly appointed permanent trustee (*see Doc. No. 144 in Bankr.*

---

[1] The Court has jurisdiction over this Motion under 28 U.S.C. §§157 and 1334 and the Order of Reference
of the United Stated District Court for the Southern District of New York, dated July 10, 1984 (Ward,
Acting C.J.).  Venue for this case and the Motion is proper in this district under 28 U.S.C. §§1408 and
1409.  This matter is a core proceeding under 28 U.S.C. §157(b)(2)(A) and (O).  The statutory predicate
for the relief sought herein is Bankruptcy Code § 105.

RJF/2231824.1/Client

*S.D.N.Y. 17-11566*).

**The Corporate Debtors' Cases**

2.    After the arrest by the Federal Bureau of Investigation ("**FBI**") of the Debtors' chief executive officer, Jason Nissen ("**Nissen**"), for allegedly defrauding victims of $70 million in a Ponzi scheme, on June 1, 2017, victims of Nissen's scheme commenced state court litigation which resulted in the appointment of LoBello, as receiver, on June 5, 2017.  On June 28, 2017 (the "**Corporate Debtor Petition Date**"), LoBello, as receiver, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Court for the Corporate Debtors.  Pursuant to a Stipulation and Order entered by the Court [Dkt. No. 54, Case No. 17-11798], LoBello was appointed Estate Fiduciary of the Corporate Debtors, and since then has been administering the Corporate Debtors' jointly administered (procedural) chapter 11 bankruptcy cases.

**The Debtors' Business**

3.    The Debtors' business was conducted through a series of affiliated legal entities all of which were owned and/or controlled by Nissen, and many of which had very similar corporate or trade names, as more fully discussed below.  A chart identifying the Debtors and their ownership and corporate structure is attached hereto as **Exhibit "A"**.

4.    NEC II was formed in July 2006.  NEC II and the then existing Debtors operated in a collective manner as a ticket broker and wholesale distributor of tickets for sporting and theatrical events.  The Debtors' primary business was ticket brokerage and the sale of event tickets on the secondary market[2] for all concert, theater and sporting event tickets, as well as various V.I.P. hospitality packages that delivered exclusive access to big name events, including hotels, celebrity meet and greets, and exclusive parties.  At its formation in 2006, National Events was a holding company for Nissen's interests in NEC II, but, from time to time, may have transacted business or engaged in transactions related to NEC II's business.

---

[2] The secondary market constitutes the marketplace from which individuals and entities purchase event tickets when the primary marketplace, such as Ticketmaster, Telecharge, or the teams or event venues are sold out or do not offer the type of ticket desired

RJF/2231824.1/Client

5. When the LLC Debtors were formed in 2015 (discussed in more detail below), the original World Events Group, Inc. entity was merged into and became part of WEG II (an LLC Debtor entity), while National Events remained a stand-alone entity wholly-owned by Nissen. At the same time, New World (a Corporate Debtor entity) was formed as a replacement for World Events Group, Inc., with New World being solely owned by Nissen.

6. Throughout, the Debtor entities in existence at any given point in time, worked collectively to stock premium tickets to concerts, Broadway theatre, red carpet premieres and sporting events worldwide. The Debtors had one of the largest revolving inventories for such events nationwide and provided professional on-site assistance at national events to ensure proper execution and timely delivery.

7. Initially, the Debtors would purchase tickets for resale on the secondary marketplace through Ticketmaster and various "non-traditional" channels. As the Debtors' business matured, the Debtors purchased tickets directly from various sports teams and sports leagues, in bulk. WEG II was one of the first companies to purchase tickets directly, "through the front door," based upon official sponsorships with NFL teams.

8. Those sponsorships allowed the Debtors to obtain large groups of Super Bowl tickets directly from NFL teams, and to run travel plan programs for NFL teams when they played road games. The Debtors had relationships with teams such as the Houston Texans, San Francisco 49ers, Oakland Raiders, Arizona Cardinals, Miami Dolphins, New Orleans Saints, Atlanta Falcons, and Baltimore Ravens. The Debtors also offered fan travel and corporate hospitality for major events other than the Super Bowl, including the NCAA Final Four, the Masters Tournament, and the Kentucky Derby.

9. Once the Debtors had direct access to the teams and events, the Debtors began dealing with other ticket brokers to sell tickets which either the teams or the events could not sell at face value. At that stage, the Debtors were purchasing tickets directly from the teams and through other ticket brokers and often received "favored nation treatment" from teams such as

RJF/2231824.1/Client

the New York Yankees.

10. Not surprisingly, the cost of tickets to the Debtors and whether the Debtors could purchase blocks of tickets were the most important components of the Debtors' business. Demand then drove the Debtors' resale price, which could fluctuate depending upon other available sources of ticket supply and the popularity or desirability of a given event.

11. The Debtors also sold to the Debtors' customers tickets that were held by other ticket brokers, when the Debtors did not have those tickets in their own inventory. The Debtors' clients were individuals, corporations and other businesses, hotels such as The Pierre and The Penisula, and so-called "lifestyle companies" such as Quintessentially, Luxury Attache, and Les Concierge. The Debtors also had relationships with American Express Centurion to which it also sold tickets.

12. The Debtors marketed their services and their tickets on thousands of websites around the world, which enabled the Debtors to sell to other ticket brokers through internal broker channels and to other marketplaces such as Stubhub, TicketsNow, Vivid, Ticket Network, Razorgator, Ticket City, and Viagogo, which purchased tens of millions of dollars' worth of tickets from the Debtors.

**Funding the Debtors' Business**

13. Historically, the Debtors' business has been internally funded along with arrangements via "trusted relationships" with certain "friends and family" who provided bridge funding for major events, such as the World Cup and the Super Bowl, on the condition that those "friends and family" would receive 50% of the gross profit margin on the underlying "deals" that they funded. At December 31, 2014, the carrying value of the Debtors' "friends and family" obligation was $2.6 million and was as high as $6 million in March 2014.

14. In or about April 2015, Falcon Strategic Partners IV, LP ("**Falcon**") provided Nissen with a financing proposal, subject to appropriate due diligence, through which Falcon would provide up to $60 million in financing to the LLC Debtors by financing $25 million in senior

secured notes and purchasing $15 million in preferred equity in the LLC Debtors.

15. Ultimately, Falcon entered into a Purchase Agreement dated July 6, 2015, and related documentation with the LLC Debtors, through which Falcon agreed to purchase (a) up to $25 million in aggregate principal amount of 11% Senior Secured Notes of the LLC Debtors due in 2020 (the "**Falcon Secured Loan**"), (b) up to $15 million in aggregate principal amount of 8% Senior Unsecured PIK Notes of the LLC Debtors due in 2022 (the "**Falcon Unsecured Loan**"), and (c) 48 Class A Units representing membership interests in NEH. Falcon's Secured Loan was secured by security interests in substantially all of the LLC Debtors' assets.

16. Falcon has filed proofs of claim in the LLC Debtors' cases asserting that as of the LLC Debtor Petition Date, the LLC Debtors owed Falcon nearly $30 million on the Falcon Secured Loan and more than $17 million on the Falcon Unsecured Loan. Falcon has filed similar if not identical proofs of claim in the Corporate Debtors' cases.

17. The Debtors also sought and obtained loans from other sources, most notably Taly USA Holdings, Inc. and SLL USA Holdings, Inc. (together, "**Taly**"), and Hutton Ventures LLC ("**Hutton**"). For example, in 2016-17 Taly entered into a series of loan transactions with the Corporate Debtors. As of the Corporate Debtor Petition Date, Taly asserts a claim against all of the Debtors for approximately $25 million. In 2016, Hutton entered into a series of loan transactions with the Corporate Debtors. As of the Corporate Debtor Petition Date, Hutton asserts a claim against all of the Debtors for in excess of $9 million. In addition, Taly and Hutton provided certain post-petition financing in the principal amount of $280,000 to the Corporate Debtors pursuant to the Bankruptcy Court's order dated October 13, 2017 [Dkt. No. 60, Case No. 17-11798] (the **"Final DIP Order"**), and therefore hold secured and other claims against the Corporate Debtors' estates as a result of same.

**The Debtors' Corporate Structure**

18. The Trustee and the Estate Fiduciary, and their respective professionals, have had the opportunity to review documents filed with the Court, documents of the Debtors, and

6

RJF/2231824.1/Client

documents filed with the United States District Court for the Southern District of New York in criminal proceedings related to the Ponzi scheme and fraud that were perpetrated by Nissen, including but not limited to the Criminal Complaint filed in the matter of *U.S.A. v. Jason Nissen,* 17-CR-00477 (PAE), sworn to by Federal Bureau of Investigation Special Agent Joseph Downs on May 30, 2017 (the "**Downs Affidavit**").

19. According to the Downs Affidavit and the independent investigations undertaken by the Trustee and Estate Fiduciary, prior to the infusion of funds by Falcon, Nissen owned 100% of National Events (*i.e.,* National Events of America, Inc.) and 100% of World Events Group, Inc. In turn, National Events owned 100% of NEC II (*i.e.,* National Event Company II, LLC) and 100% of NEC III (*i.e.,* National Event Company III, LLC). World Events Group, Inc. owned 100% of Ultimatefan.com.

20. After the Falcon transaction, the ownership structure of the Debtors was as follows:

 a. Falcon (24%), National Events (75%), and New World (*i.e.,* New World Events Group, Inc.) (1%) owned 100% of NEH (*i.e.,* National Events Holdings, LLC);

 b. NEH owned 100% of NEI (*i.e.,* National Events Intermediate, LLC); and

 c. NEI owned (i) 100% of NEC II (which owned 40% of Concierge Live, LLC), (ii) 100% of NEC III, (iii) 50% of Winter Music Festivals, LLC, and (iv) 100% of WEG II (*i.e.,* World Events Group II, LLC) (which owned 100% of the Ultimate Fan.com).

21. Nissen controlled the operations of National Events and New World as the president and chief executive officer of those corporations, and otherwise controlled the Corporate Debtors as the sole shareholder of each entity. *See* **Exhibit A**.

**The Ponzi Scheme**

22. On May 31, 2017, Nissen was arrested and charged by the FBI with allegedly defrauding victims of at least $70 million through a Ponzi scheme. Thereafter, a Federal Complaint was filed against Nissen which charged him with one count of Wire Fraud in violation of 18 USC §1342 (the "**Federal Complaint**").

7

23.  Nissen surrendered to the authorities.  On March 28, 2018, Nissen pled guilty to one count of Wire Fraud, and is currently awaiting sentencing.

24.  The Federal Complaint alleges that from at least in or about 2015, up to, and including in or about 2017, Nissen engaged in a scheme to obtain money and property by means of false and fraudulent pretenses, defrauding victims of at least $70 million.  Specifically, the Federal Complaint charged that Nissen solicited tens of millions of dollars from lenders by falsely representing that Nissen would use the lenders' money to purchase and re-sell wholesale quantities of premium tickets for sporting and entertainment events, when, in truth and in fact, Nissen used the lenders' money to repay other lenders and enrich himself.

25.  The Federal Complaint also charges that Nissen induced victims to enter into credit agreements, under which the money obtained from the victims was to be used for the specific purposes of purchasing ticket inventory, including for designated events.  According to the Federal Complaint, Nissen falsified financial documents and inflated accounts receivable ledgers, which Nissen presented to certain victims as purported proof that their money was being used to purchase premium tickets for resale.  The Federal Complaint further alleges that Nissen admitted to one of his victims in early May 2017 that he had been operating a "Ponzi Scheme" and that he had engaged in fraud.

26.  Through his control of the Debtors, Nissen fraudulently solicited tens of millions of dollars from lenders for the purported purpose of purchasing and re-selling wholesale quantities of premium tickets for sporting and entertainment events, only to misappropriate the vast majority of those funds to repay other lenders and enrich himself through a Ponzi-type scheme.

27.  Nissen facilitated this Ponzi scheme by transferring millions of the dollars lent by his victims to third parties for purposes other than purchasing tickets.

28.  Nissen disguised many of those transfers when routing them out of the Debtors' accounts.

RJF/2231824.1/Client

29.  The Federal Complaint rests in large part upon information and evidentiary material provided by Taly, which, in part, served as the basis for Nissen's arrest.

### The Civil Litigation Against Nissen and The Debtors

30.  On May 26, 2017, Taly filed a lawsuit against Nissen and others, including some of the Debtors, captioned "*Taly USA Holdings Inc. et al. v. Jason Nissen, et al.*", under Index No. 652865 in the Supreme Court of New York, County of New York ("**Taly Litigation**").  The Taly Litigation alleges that Nissen and the Debtors engaged in a Ponzi scheme, whereby $120 million was fraudulently obtained to purportedly support NEH.  Taly alleged that, from June 2016 until 2017, Nissen and the Debtors and other defendants induced plaintiffs to make event-specific investments under the false pretenses that those funds would be used to purchase tickets for resale at a substantial profit.

31.  A separate contract was entered into for each investment, signed by Nissen on behalf of National Events that described the particular event in which plaintiffs were investing, the anticipated rate of return, a guaranteed base return, and the anticipated repayment date. According to Taly, defendants did not use the funds as represented, but rather used the funds to pay some investors while defrauding others.

I.

### SUBSTANTIVE CONSOLIDATION OF THE CORPORATE DEBTORS' BANKRUPTCY ESTATES WITH THE LLC DEBTORS' BANKRUPTCY ESTATES IS APPROPRIATE AND WARRANTED

32.  The substantive consolidation of estates in bankruptcy affects the combination of the assets and the liabilities of distinct, bankrupt entities and their treatment as if they belong to a single entity.  As is relevant here, substantive consolidation results not only in the pooling of assets and liabilities of two or more entities, but also in satisfying liabilities from the resultant, common fund and eliminating inter-entity claims.  *See Union Savings Bank v. Augie/Restivo Baking Company, Ltd., et. al. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir. 1988).

9

33. By order dated September 15, 2017 and effective as of August 24, 2017, the Court approved the retention of Kroll Associates, Inc., ("**Kroll**") by the Trustee to act as forensic accountants in the LLC Debtors' case. Similarly, by order dated October 27, 2017 and effective *nunc pro tunc* to June 28, 2017, the Court approved the retention of Eisner Amper LLP ("**Eisner**") by the Estate Fiduciary to act as forensic accountants in the Corporate Debtors' bankruptcy case.

34. Over the last 14 months, Kroll, Eisner, and the respective counsel for the LLC Debtors and the Corporate Debtors have worked collaboratively in order to sort out the web of interrelated transactions orchestrated by Nissen. Both Kroll and Eisner have conducted an extensive and thorough review of the available financial and other information for the LLC Debtors and the Corporate Debtors. Collectively, they have reviewed tens of thousands of transactions, including more than 3,500 transactions reviewed regarding the Corporate Debtors and more than 47,000 regarding the LLC Debtors, of which thousands were intermingled between and among the related entities.

35. Although there is no express statutory authority for substantive consolidation in the Bankruptcy Code, the concept and relief it provides is a product of judicial gloss. *Augie/Restivo*, 860 F.2d at 518. Moreover, courts have consistently found sufficient statutory authority for substantive consolidation in the Bankruptcy Court's general equitable powers as set forth in section 105(a) of the Bankruptcy Code. *See, e.g., Id.* at 518 n.1. Numerous courts have stated that the appropriateness of such consolidation is to be determined on a case-by-case basis, *FDIC v. Colonial Realty Co.*, 960 F.2d 57, 59 (2d Cir. 1992), with the overriding goal and purpose of substantive consolidation being to "ensure the equitable treatment of all creditors." *Augie/Restivo*, 860 F.2d at 518.

36. In the seminal case of *Augie/Restivo, supra*, the United States Court of Appeals for the Second Circuit held that the determination of whether substantive consolidation is warranted hinges on two factors. The first is "whether the creditors dealt with the entities as a single

RJF/2231824.1/Client

economic unit and 'did not rely on the separate identities in extending credit' ...." *Augie/Restivo*, 860 F.2d at 518.  The second is "whether the affairs of the debtors are so entangled that the consolidation will benefit all creditors ...." *Id.*  In resolving these two questions, courts have considered:

> (a)     the presence or absence of consolidated financial statements;
>
> (b)     the unity of interest and ownership between various corporate entities;
>
> (c)     the existence of parent and intercompany guarantees on loans;
>
> (d)     the degree of difficulty in segregating and ascertaining individual assets and liabilities;
>
> (e)     the existence of transfers of assets without formal observation of corporate formalities;
>
> (f)     the commingling of assets and business functions; and
>
> (g)     the profitability of consolidation at a single physical location.

*In re GC Cos., Inc.*, 274 B.R. 7663, 672 (Bankr. D. Del. 2002); *In re Gainsville P-H Properties, Inc.,* 106 B.R. 304, 305 (Bankr. M.D. Fla. 1989); *see Augie/Restivo*, 860 F.2d at 518.

37.  Here, and as is set out in more detail below, application of an *Augie/Restivo* analysis clearly confirms that the Debtors dealt with their creditors as a single economic unit, and that their creditors dealt with them on the same basis.  As a result, the Debtors' affairs became so intertwined that consolidation will benefit all creditors.

**The Debtors Were Operated As A Single Economic Unit**

38.  The proposed Consolidated Debtors operated a single ticket reselling business. The proposed Consolidated Debtors collectively received, exchanged, and disbursed millions of dollars to fund ticket, event, hospitality, investment, loan, and personal expenditures on behalf of the companies and their owner, Jason Nissen.  The Corporate Debtors were ostensibly holding companies, but were also vehicles through which the LLC Debtors (as well as NEC II and World Events Group Inc., before them) facilitated the ticket broker business.  Ticket

RJF/2231824.1/Client

purchases and large event/hospitality engagements were facilitated by the Corporate Debtors for the purpose of supporting transactions of the LLC Debtors (or their predecessor entities). Funds originating from the LLC Debtors and/or the Corporate Debtors were readily exchanged between and among the entities and interchangeably disbursed to various payees. The receipts and disbursements were generally executed with disregard to the entities' legal classifications or nature of the transactions.

39. For example, on January 27, 2017, a Corporate Debtor received $1,437,250 from Taly and the same day, the Corporate Debtor transferred $1,093,050 to an LLC Debtor, which then transferred $812,380 to another LLC Debtor.  Finally, on that same day, January 27, 2017, the final recipient LLC Debtor transferred the entire $812,380 to a professional football organization for ticket and hospitality related services.

40. Third party financing was often obtained by the Corporate Debtors for the benefit of transactions to be undertaken by the LLC Debtors (and/or their predecessors).  Moreover, funds that were obtained by the Corporate Debtors through third party financing, were in part and at times transferred to the LLC Debtors.  There were existing contractual provisions that prohibited the LLC Debtor from procuring additional third-party financing. Despite these contractual provisions, it appears that the LLC Debtor obtained additional third-party financing through the Corporate Debtors for the benefit of the LLC Debtor. The payments made to the financing entities and individuals of these financing arrangements were made from the LLC Debtors, the Corporate Debtors, as well as Jason Nissen's personal accounts.

41. In sum, to the extent that the Corporate Debtors conducted business, that business supplemented the LLC Debtors' operations.  Although certain individual vendors or creditors may have dealt with only a single entity, substantive consolidation is nonetheless appropriate and any "separateness" considerations are diminished by context.  First, it appears that, at times, Nissen provided intermingled financial information, and induced creditors to do business with or lend money to, the LLC Debtors and/or the Corporate Debtors without regard to any

corporate differences or corporate structure. Moreover, Nissen himself at times provided guaranties. The fact that financing parties sought credit enhancements and protections from the sole owner of the Corporate Debtors and majority owner of the LLC Debtors is just another indication of the fact that creditors viewed the proposed Consolidated Debtors' business on a consolidated basis.

42. Consistent with this analysis, creditors would often lend funds to one Debtor entity, and have it repaid by another, or enter into a financing arrangement with one entity but fund a completely different entity simply because that was where Nissen directed them to send funds. This consolidated interaction with creditors was demonstrated when Taly, one of the highest value third party financing entities, accepted payments from the guarantor's (Nissen's) personal bank accounts, funded from an LLC Debtor account rather than from the primary obligor, a Corporate Debtor. The payments would randomly alternate between the maker and guarantor, in as little as one week apart.

43. Consistent with their consolidated operations, both the LLC Debtors and the Corporate Debtors, whose very corporate names were similar and oftentimes used interchangeably, operated out of a single office space in midtown Manhattan and all operations were ultimately controlled by Nissen. Subsequent to the Falcon transaction, Nissen routinely infused cash through the Corporate Debtors to finance the LLC Debtors' business and to prop up his ongoing Ponzi scheme. These transactions were recorded in the LLC Debtors' books and records. The only reasonable inference to be drawn from those transactions is that the Corporate Debtors, through Nissen and consistent with prior practice, were obtaining financing and entering into transactions for the benefit of the LLC Debtors. The Corporate Debtors did not maintain (i) any employee relationships, (ii) corporate books and records reflecting sales, or (iii) observe corporate formalities with respect to the transactions with the LLC Debtors. Nevertheless the Corporate Debtors appeared to work closely and in concert with the LLC Debtors under the direction of Nissen.

RJF/2231824.1/Client

44.  For example, on November 23, 2015, Falcon financed a $9,850,000 transfer into an LLC Debtor. The next day, on November 24, 2015, the LLC Debtor made a transfer of $2,000,000 into a Corporate Debtor.  This $2,000,000 transaction was recorded in the LLC Debtors' books and records as intended for "Inventory Asset," or tickets, related to the upcoming "Summer Olympics." That same day, however, the Corporate Debtor then transferred $1,230,000 of the transfer to another "high-interest" third party financing entity, as described by Nissen.

45.  Moreover, this was a two-way street:  Nissen would also funnel money out of the LLC Debtors to the Corporate Debtors, obfuscating his use of the LLC Debtors' income and expenses and in doing so used funds advanced by Falcon to repay loans and debts incurred by the Corporate Debtors, as well as debts incurred by or for the benefit of the LLC Debtors which had, in the first instance, been paid by the Corporate Debtors.  Nissen's manipulation of the books and records of the various Debtor entities was thorough and complete.

46. In a loan repayment example, on April 11, 2017, an LLC Debtor received $4,000,000 from Falcon and the same day, the LLC Debtor transferred $2,000,000 into Nissen's personal checking account.  That same day, a Corporate debtor also transferred $934,500 into Jason Nissen's personal checking account.  Finally, on that same day, April 11, 2017, Nissen personally transferred $2,650,000 to Taly, the third-party financing entity that Nissen had procured financing through a Corporate Debtor in violation of the LLC Debtor's and Falcon's contractual financing provisions. The foregoing represents two examples where we have been able to unwind certain transactions.  Numerous other manipulations of the proposed Consolidated Debtors' books and records to move money and hide Nissen's fraud are more difficult, if not impossible, to unwind.

47.  In sum, creditors dealt with and accepted payments from the Debtors, many with very similar corporate or trade names, as though there was no distinction between them.  Loans that were supposed to be funded to one entity, were funded to another.  Loans that were to be

14

repaid by one entity, were paid by another. Expenses incurred by one entity were repaid by another. Larger creditors received credit enhancements and guarantees from others, and Nissen often gave personal guaranties for larger debts. Many of the major creditors in these cases have filed virtually identical proofs of claim against each of the Debtors' estates. From the "outside looking in," the only reasonable inference to be drawn from the manner in which creditors did business with the Debtors, is that they viewed this as one entity and business enterprise.

**The Affairs of the Debtors Were So**
**Entangled That Consolidation Will Benefit All Creditors**

48.   The same is true when viewed purely "from the inside."

49.   The books and records of the Debtors also reflect hundreds of intercompany cash and other transactions, including some that were unsupported by documentation of any legitimate business purpose. Rather, a review of those transactions by the Trustee's and Estate Fiduciary's professionals reveals that, apparently, transfers were often made simply to hide Nissen's fraudulent scheme.

50.   To further complicate matters, many of the intra-company transfers moved money that was either received by, or moved out of, the LLC Debtors and the Corporate Debtors in the form of cash. As a result, the financial activities of the LLC Debtors and the Corporate Debtors were so entangled that accurate identification and allocation of their individual assets and liabilities likely cannot be achieved without extraordinary measures.

51.   To the extent it is even possible to untangle the Debtors' books and records regarding inter-estate transactions with any accuracy, it would be cost prohibitive to segregate the operations, businesses, and liabilities of the LLC Debtors and the Corporate Debtors, or to unwind the numerous intercompany relationships and transfers. This supports substantive consolidation of the Debtors' estates.

RJF/2231824.1/Client

52. Indeed, even where there is no showing of creditor reliance on two entities constituting a single economic unit, the Court may nevertheless invoke its broad equitable powers to consolidate. *In re Commercial Envelope Mfg. Co.*, 14 C.B.C. 191, 196 (Bankr. S.D.N.Y. 1977); *see also In re 599 Consumer Elec. Inc.*, 195 B.R. 244, 250 (S.D.N.Y. 1996) ("[a] finding that creditors knew they were dealing with separate entities does not necessarily preclude substantive consolidation on the ground that it is impossible or prohibitively expensive to unravel the debtors' commingled finances"). Consolidation based upon entanglement of the debtor's affairs is justified when the time and expense necessary to attempt to unscramble those affairs is so substantial that the realization of any net assets for creditors is threatened or when no accurate identification and allocation of assets is possible. That is precisely what we are dealing with here.

53. Finally, the manner in which Nissen cycled money between the Debtors' estates will necessarily result in significant competing claims to assets and unnecessarily complicate each estate's ability to assert and recover on avoidance actions against third parties. Avoidance actions are the primary asset of the Debtors' estates.

54. The Consolidated Debtors effectively commingled assets and business functions, used the other's funds to pay their own debts and liabilities, failed to deal with each other on an arms'-length basis, and otherwise disregarded their corporate separateness. Substantive consolidation will streamline and reduce the administrative and closing costs of these estates, and is appropriate because the Consolidated Debtors shared a business, were all used in the execution of the same scheme, and maintained common interest in the same assets and liabilities.

**Effect of Substantive Consolidation on Creditors**

55. The consolidation of the Consolidated Debtors' estates will ease the administration of these cases and will not prejudice creditors. *Cf. In re Jennifer Convertibles Inc.*, 447 B.R. 719 (Bankr. S.D.N.Y. 2011) (ruling that if prejudice to creditors exists, then substantive consolidation

RJF/2231824.1/Client

may still be appropriate if prejudice is minimal). Here, after consolidation, secured lenders will continue to retain their liens against any collateral securing their debts in the same priority that existed before consolidation. For example, to the extent Falcon is determined to hold allowed first priority liens against the assets of the LLC Debtors, Falcon will continue to do so after the cases are consolidated. The same applies to Hutton and Taly and the secured claims they hold against the Corporate Debtors as a result of the court approved post-petition financing they provided to such Debtors under the Final DIP Order, which terms and conditions will not be affected by substantive consolidation. So, secured creditors will certainly not be prejudiced by consolidation.

56. Similarly, holders of general unsecured claims will not be prejudiced if the cases are consolidated. Indeed, given how entangled all of the Debtors' cases are and the litigation costs that necessarily would need to be incurred in pursuing the competing significant claims that each estate would assert against the other, the administrative expenses to be expended in trying to unscramble the Debtors' business affairs would be extremely costly. These priority claims would significantly reduce any net recoveries to be realized by unsecured creditors, thereby warranting the Court's approval of substantive consolidation.

57. As mentioned above, a stated "purpose of substantive consolidation is to ensure the equitable treatment of all creditors." *Augie/Restivo*, 860 F.2d at 518.; *In re Source Enterprise Inc.*, 392 B.R. 541, 552 (S.D.N.Y. 2008). In considering substantive consolidation, the Trustee and the Estate Fiduciary have carefully considered the effects of substantive consolidation on the creditors of the Consolidated Debtors' respective estates. The Trustee and the Estate Fiduciary maintain that such relief is in the best interests of creditors and warranted since segregating the entities will result in great expense to the estates and in the end have minimal or no impact on creditors. Thus, substantive consolidation of the Debtors' estates will allow for more efficient, economical and expeditious administration of these cases.

RJF/2231824.1/Client

58. Therefore, the Trustee and the Estate Fiduciary respectfully request that the Court substantively consolidate the Consolidated Debtors' bankruptcy estates so that the estates can be administered in a more efficient, economical and expeditious manner.

## II.

### UPON APPROVAL OF SUBSTANTIVE CONSOLIDATION, THE CORPORATE DEBTORS' CHAPTER 11 BANKRUPTCY CASES SHOULD BE CONVERTED TO CHAPTER 7 LIQUIDATIONS

59. Pursuant to section 1112(a) of the Bankruptcy Code, the Estate Fiduciary and the Trustee respectfully submit that, to the extent the Court is inclined to ultimately grant substantive consolidation as is described and requested herein, the Corporate Debtors' chapter 11 cases should be converted to liquidation cases under chapter 7, and further submit that the Trustee should remain in place to oversee the liquidation of the Consolidated Debtors.

## III.

### NUNC PRO TUNC RELIEF

60. The Estate Fiduciary and the Trustee respectfully request that, based on the particular equities of these cases, the Court grant the relief sought by this motion *nunc pro tunc* to the LLC Debtor Conversion Date of August 7, 2017.[3]

61. Since such date, the Trustee and the Estate Fiduciary, with their respective counsel and financial advisors, have worked collaboratively with each other to peel back the many layers of fraud and deception that exist in the Debtors' entangled cases and identify claims and causes of action that may be pursued for the benefit of all of the Debtors' creditors. This included the parties conducting an in-depth investigation and review of all aspects of the Debtors' business operations and financial affairs, which was a necessary prerequisite to the conclusion that these are cases where substantive consolidation is warranted. The parties expended significant time

---

[3] The Trustee and Estate Fiduciary are not seeking *nunc pro tunc* relief to the Corporate Debtor Petition Date of June 28, 2017. Rather, they are only seeking to have such relief be effective as of the date the Trustee was appointed on the LLC Debtor Conversion Date of August 7, 2017, which is the date the two fiduciaries and their professionals began to work collaboratively with each other in administering the respective estates for the benefit of creditors.

RJF/2231824.1/Client

and effort in pursuing these objectives, including examining and analyzing, among other things, the Debtors' books and records, documents and information produced by third parties as a result of subpoenas and demand letters, including from the Debtors' banks, and through meetings and interviews of various parties. All of this was done for the benefit of creditors.

62. These substantial efforts have led the two estate fiduciaries to the inexorable conclusion that substantive consolidation is not only appropriate, but necessary under the particular circumstances of these cases. This conclusion was reached collaboratively by the Trustee and Estate Fiduciary while working under the extraordinary circumstances present in these cases, including the existence of a Ponzi scheme involving seven (7) affiliated debtors, with five (5) estates being administered by a chapter 7 trustee and two (2) by a chapter 11 estate fiduciary up until this point in time. In light of the fraud and the investigation thereof, it would be appropriate to grant the consolidation of Debtors' cases and the conversion of the Corporate Debtors' cases to chapter 7 cases as of the day the liquidation proceedings commenced – the LLC Debtors Conversion Date.

63. Moreover, the parties recognize that it would be inequitable under the circumstances if the Estate Fiduciary and his professionals were relegated to a claim status different than that of the Trustee and his professionals, particularly given the key role each party played in bringing these cases to the point where the two fiduciaries have concluded that substantive consolidation is warranted. The investigations have resulted in the mutually agreed upon conclusion that substantive consolidation is appropriate. The Debtors, which always operated as one economic unit, and whose operations were marked by commingling of assets and liabilities and fraud and a shuffling of similar corporate names to obfuscate their scheme, should be substantively consolidated and the Corporate Debtors' cases converted as of the LLC Debtor Conversion Date. *See, e.g.*, *Mitan v. Duval* (*In re Mitan*), 573 F.3d 237 (6th Cir. 2009) (affirming *nunc pro tunc* conversion of chapter 11 bankruptcy case to chapter 7, holding that section 105(a) of the Bankruptcy Code grants the court with such authority upon a finding that

RJF/2231824.1/Client

such order is necessary or appropriate).

64. Creditors would also not be prejudiced if the Court were to grant the relief requested. The Trustee and his professionals have agreed that any claims by the Estate Fiduciary and his professionals arising from and after the LLC Debtor Conversion Date should be treated *pro rata* with their claims. Further, unsecured creditors will not be adversely affected since any allowed administrative expense claims of the Estate Fiduciary and his professionals, whether under chapter 11 or chapter 7, would have priority over all general unsecured claims. Any such allowed administrative expenses would also be subordinate to applicable secured claims. Accordingly, granting the relief requested based on the unique circumstances of these cases would not be prejudicial to creditors, but would place the Estate Fiduciary and his professionals on the same level as the Trustee and his professionals, which the parties submit is fair and reasonable under the circumstances.

## CONCLUSION

65. For the reasons stated herein, the Trustee and the Estate Fiduciary respectfully request that the Court (a) substantively consolidate the assets and liabilities of the Corporate Debtors with the Debtors' jointly administered bankruptcy cases, and (b) to the extent that such relief is granted, convert the Corporate Debtors' chapter 11 cases to liquidation cases under chapter 7, *nunc pro tunc* as of the LLC Debtor Conversion Date.

66. No prior request for the relief sought herein has been made to this or any other Court.

**WHEREFORE**, the Trustee and the Estate Fiduciary respectfully request that the Court enter a proposed order, substantially in the form annexed as **Exhibit "B"**, (a) substantively consolidating the Corporate Debtors' estates with the LLC Debtors' bankruptcy estates into a single bankruptcy estate for all purposes, and merging the assets and liabilities of the Debtors, and (b) to the extent such relief is granted, converting the Corporate Debtors' jointly administrated cases to liquidation cases under chapter 7, with all such relief being granted *nunc pro tunc* as of the LLC Debtor Conversion Date, and granting the Estate Fiduciary and the Trustee such other, further and different relief as to this Court may seem just and proper.

Dated:  Jericho, New York
      November 2, 2018

                               **SILVERMANACAMPORA LLP**
                               Attorneys for the Chapter 7 Trustee


                               By: *s/Ronald J. Friedman*
                                    Ronald J. Friedman
                               A Member of the Firm
                               100 Jericho Quadrangle, Suite 300
                               Jericho, New York 11753
                               (516) 479-6300

Dated: Uniondale, New York
      November 2, 2018


                               **Westerman Ball Ederer Miller Zucker & Sharfstein, LLP**
                               Attorneys for the Chapter 11 Estate Fiduciary



                               By: *s/Thomas A Draghi*
                                    Thomas A. Draghi
                               A Member of the Firm
                               1201 RXR Plaza
                               Uniondale, New York 11556
                               (516) 622-9200

# EXHIBIT A

## Organizational Structure

