J96WnisS

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          17 Cr. 477 (PAE)

 5   JASON NISSEN,

 6              Defendant.
                                           Sentence
 7   ------------------------------x

 8                                         New York, N.Y.
                                           September 6, 2019
 9                                         9:30 a.m.

10   Before:

11
                      HON. PAUL A. ENGELMAYER,
12
                                           District Judge
13
                            APPEARANCES
14
     GEOFFREY S. BERMAN
15        United States Attorney for the
          Southern District of New York
16   BY:  DOUGLAS S. ZOLKIND
          LARA E. POMERANTZ
17        Assistant United States Attorneys

18   MICHAEL F. BACHNER
     HOWARD S. WEINER
19        Attorneys for Defendant

20
     Also Present:  Special Agent Lauren Calvello, FBI
21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J96WnisS

```
1          (Case called)
2          MR. ZOLKIND:  Good morning, your Honor.  Douglas
3   Zolkind and Lara Pomerantz, for the government.  We're joined
4   at counsel table by Lauren Calvello of the FBI.
5          Also, behind us, your Honor, are two representatives
6   of Kroll in case the Court has any questions regarding Kroll's
7   analysis.
8          THE COURT:  OK.  Very good.  Thank you.
9          Good morning, Mr. Zolkind.
10         Good morning, Ms. Pomerantz.
11         Good morning, Agent Calvello.
12         And thank you in advance to the Kroll representatives
13  for the work that they performed, and I appreciate your being
14  here today.
15         I don't offhand think it likely that I'll need to
16  inquire of them, but I appreciate, counsel, you making them
17  available.
18         For the defense.
19         MR. BACHNER:  Good morning, your Honor.  Michael
20  Bachner and Howard Weiner of my office on behalf of Jason
21  Nissen, your Honor.  Mr. Nissen is, obviously, standing to my
22  right.
23         THE COURT:  Good morning, Mr. Bachner.
24         Good morning, Mr. Weiner.
25         And of course, good morning to you, Mr. Nissen.
```

J96WnisS

1          THE DEFENDANT:  Good morning, your Honor.

2          THE COURT:  Good morning as well to the members of the

3    public who are here today.

4          Let me just ask you, Mr. Bachner, whether any of the

5    people who are here are friends or family of your client.

6          MR. BACHNER:  Yes, your Honor.

7          THE COURT:  All right.  Can you point them out.

8          MR. BACHNER:  I only know some.  I know many of them

9    are Mr. Nissen's fraternity members and people he's done

10   business with.

11         Haydee Nissen, his wife, is in the first row, and I

12   think these are family members of Haydee's.

13         THE COURT:  OK.

14         Welcome.  Thank you for being here.  I appreciate your

15   presence.

16         Government, are there any representatives of the

17   victims who are here today?

18         MR. BACHNER:  Your Honor, I'm not sure.  We've been in

19   close contact with the office of the victim witness

20   coordinator, and we know that the victims have all been

21   notified today and are aware.  Whether any are here today, we

22   have no control.

23         THE COURT:  All right.

24         Let me just ask to see a show of hands.  Is there

25   anybody here who is either a victim or a representative of one

J96WnisS

1    of the victims in this case?

2            All right.  You are, sir?  Just keep your voice up.

3    Who are you?

4            MR. RAPS:  My name is Paul Raps, and I'm representing

5    Taly.

6            THE COURT:  And you represent?

7            MR. RAPS:  Taly.

8            THE COURT:  Taly.  All right.  Very good.

9            Any other hands?

10           All right.  Good morning, Mr. Raps, and thank you for

11   being here today.

12           All right.  We're here today to resume and complete

13   the sentencing hearing for defendant Jason Nissen that began on

14   September 21 of last year.  At that initial hearing, the Court

15   took up a number of preliminary matters relating to sentencing.

16   I incorporate by reference here all that was said and

17   accomplished at that proceeding for those matters.

18           For the benefit of those present today who weren't at

19   the initial hearing, I want to briefly recap what was covered

20   then.

21           First of all, I made a record of the materials,

22   voluminous materials, that had been submitted as of that date

23   in connection with this sentencing.

24           Second, I confirmed that all parties had received the

25   presentence report, and I gave the parties an opportunity to

J96WnisS

make factual objections to the presentence report.  For the
most part, the parties did not object to the PSR, although
there is one small, discrete outstanding factual item regarding
the PSR that I will take up shortly that is not of any apparent
consequence.

Third, I confirmed that all the parties agreed with
the probation department's calculation on the advisory
sentencing guidelines range.  Specifically, the guidelines as
calculated by the probation department recommend a sentence of
between 97 and 121 months in prison based on an adjusted
offense level of 30 and a criminal history category of I.  The
Court found that that is, in fact, the correct calculation of
the advisory guidelines.

Finally, I had an extended discussion with counsel
about an opening potential issue of potential considerable
importance, and that is what became of the more than $70
million that were the fruits of the fraud to which Mr. Nissen
has pled guilty.  The presentence report has made a reference
or two to Mr. Nissen's having acted, in part, "to enrich
himself."  One of the victims in this case, the lender Taly USA
Holdings, had written a letter to the Court which posited that
$10 million obtained by Mr. Nissen was missing and had been
stashed away for Mr. Nissen's future use, perhaps, on a
Caribbean island.

The government furnished the Court with that letter

J96WnisS

```
1    without suggesting that it had any doubts about that factual
2    representation, and so the Court took up the issue with
3    counsel.  It became apparent that the government and its case
4    agents, due to the way the case had come in, had not
5    investigated independently what had become of the fruits of the
6    fraud.  And it also became clear that that there had not really
7    been any systematic investigation into that, although it was
8    the case that Mr. Nissen, through his counsel, denied using the
9    fruits of the fraud for his personal benefit.
10          At the September 21, 2018, hearing, I tasked
11   government counsel, ultimately, with reconstructing factually
12   what had become of the more than $70 million and specifically
13   whether, if so, to what extent Mr. Nissen had received any
14   personal financial benefit from the fraud.  Ultimately, the
15   investigative firm, Kroll, which has been assisting in
16   Mr. Nissen's related bankruptcy proceedings, took on that
17   assignment, supervised effectively by counsel from both sides.
18          With that preface, let me recap what has happened in
19   the almost one year since the initial hearing.  Since then I've
20   received the following materials.
21          I've received a series of status letters from the
22   government and the defense as to the Kroll investigative work
23   that was being undertaken.  These included letters dated
24   November 2 and December 17 of 2018 and February 15, April 15
25   and June 13, 2019.  And I've received a letter from the
```

1    defense, dated July 11, asking for a final adjournment of the

2    deadline I had set to submit findings to the Court.

3              All of this culminated in a joint letter I received,

4    dated July 29, 2019, which set out both Kroll's findings and

5    the parties' perspectives on it.  The letter is docketed at

6    Dkt. 71.  I'm not going to purport to summarize it all here.

7    Kroll's central findings were that the accusation that there

8    was $10 million of missing or hidden funds was factually wrong.

9    Kroll, to a very detailed extent, was able to trace the funds

10   and found that 94 percent of the aggregate dollar amount of the

11   defendant's disbursements were most likely business-related;

12   that approximately $564,349, comprised of about 400

13   transactions, were, to a high degree of confidence, personal in

14   nature; and that approximately $483,670 relating to the

15   Mandalay Bay casino were likely personal expenditures; and

16   therefore a total of about $1,040,000 were likely personal in

17   nature.

18             The letter also set out the defense's view that these

19   sums should be viewed as offset by $60,000 that had been paid

20   to NECO employees and $150,170 paid by pre-Falcon funds.  The

21   letter also set out the defense's view that the personal

22   expenditures should be viewed as also offset by loans made to

23   the company and salary payments that Mr. Nissen was entitled to

24   but did not take.

25             On July 30, 2019, I issued an order, docketed at Dkt.

J96WnisS

| | |
|---|---|
| 1 | 72, stating my view, based on my review of that letter, that |
| 2 | although the parties differ about the significance and meaning |
| 3 | of certain matters, such as Mr. Nissen's not having taken his |
| 4 | full authorized salary, there did not appear to be any further |
| 5 | disputes of fact, and therefore, I scheduled sentencing today. |
| 6 | That's the recap of what brought us to this place. |
| 7 | Before I invite each side to be heard with respect to |
| 8 | sentencing, there are a couple of housekeeping matters I need |
| 9 | to take up. |
| 10 | To begin with, other than the submissions that I |
| 11 | listed at the initial sentencing proceeding that I just listed, |
| 12 | has anything else been submitted in connection with this |
| 13 | sentencing? |
| 14 | MR. ZOLKIND:  Your Honor, this morning we submitted a |
| 15 | consent order of forfeiture and a proposed order of |
| 16 | restitution. |
| 17 | THE COURT:  Right.  And the consent order of |
| 18 | forfeiture is identical to the one I referred to last year save |
| 19 | that it freshens up the date. |
| 20 | MR. ZOLKIND:  Exactly right. |
| 21 | THE COURT:  OK. |
| 22 | MR. ZOLKIND:  Your Honor, could I offer one minor |
| 23 | point of clarification to something the Court just said? |
| 24 | I think the Court said that Kroll's work was |
| 25 | effectively supervised by both the government and the defense. |

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J96WnisS

1    I just want to be very clear.  Kroll's work was supervised by

2    the government.  Certainly they received input and met with the

3    defense, but I just want to be clear that they were under the

4    supervision of the government.

5                THE COURT:  OK.  Thank you.  I think that's a more

6    helpful way of putting it.  What I really meant to capture, but

7    you put it better, was that the defense was actively consulted

8    in the process to make sure that nothing was missed.

9                Do I have that right?

10               MR. ZOLKIND:  Yes, your Honor.

11               THE COURT:  Mr. Bachner, anything else besides what I

12   have listed?

13               MR. BACHNER:  Your Honor, just to make sure, the

14   November 19, 2018, letter we submitted to the Court, which was

15   an upgraded diagnostic evaluation of Mr. Nissen's youngest

16   daughter, Elisabeth.

17               THE COURT:  Yes.  Thank you.  I appreciate that.

18   You're right; I forgot to --

19               MR. BACHNER:  No problem, your Honor.

20               THE COURT:  -- mention that, I think because it was

21   not on the public docket.

22               MR. BACHNER:  Correct.

23               THE COURT:  OK.

24               Second of all, at the last hearing, September of last

25   year, there was one small unresolved issue from paragraph 110

J96WnisS

1    of the presentence report.  It had stated that the defendant

2    had not yet filed his 2015 to 2017 tax returns.  Footnote 1 of

3    the July 29 joint letter reports that those returns have now,

4    in fact, been filed.

5            Is that correct?

6            MR. BACHNER:  Yes, Judge.

7            THE COURT:  Government, do you agree?

8            MR. ZOLKIND:  Yes, your Honor.

9            THE COURT:  All right.  Then I will amend paragraph

10   110 to reflect that, in fact, the returns have been filed.

11           Third, and finally, am I correct that with all of the

12   ground I've covered, there are no longer any factual disputes

13   arising out of the work that Kroll did analyzing the

14   defendant's expenditures?

15           MR. ZOLKIND:  We agree, your Honor, that there is no

16   material dispute of fact.

17           THE COURT:  All right.

18           MR. BACHNER:  Agreed, your Honor.

19           THE COURT:  Very well.

20           And again, I understand that the parties take

21   differing views as to the meaning of certain events, but the

22   events themselves appear to be undisputed.

23           Having taken care of all those necessary

24   preliminaries, we now come to the heart of the matter, which is

25   the parties' views with respect to sentencing.

J96WnisS

1          Government, I'd like to ask you to speak first, but

2     just as a preface, apart from the two victim letters that I've

3     received, I just want to pursue something we covered long ago.

4     You have given notice to the victims of this proceeding.

5          MR. ZOLKIND:  Yes, your Honor.

6          THE COURT:  And do you know if any victims seek to

7     speak here today?

8          MR. ZOLKIND:  We have not been informed of any victims

9     wishing to speak.

10         THE COURT:  All right.  Let me ask Mr. Raps, who is

11    the one victim representative who is here.  You have not

12    indicated an interest in speaking for your client.  Although I

13    have received your letter, I'm extending you the opportunity.

14    Is that something you wish to do today?

15         MR. RAPS:  No.

16         THE COURT:  All right.  Thank you.

17         Since a couple of people have come in since the

18    proceeding began, has any other representative of a victim

19    appeared today?

20         OK.  Very good.

21         Government, I'd be happy to hear from you.

22         MR. ZOLKIND:  Thank you, your Honor.

23         Your Honor, the government will, I think, primarily

24    rely on the sentencing submission that we provided to the Court

25    in advance of the originally scheduled date, but let me add a

1     few additional points and factors of mitigation.

2           It is our view, your Honor, and continues to be

3     adamantly the government's view, after the Kroll analysis, that

4     the defendant perpetrated an extremely serious fraud.  Real

5     victims, real people lost more than $70 million because they

6     were duped by the defendant's lies.  And the government submits

7     that the conduct here calls for a meaningful sentence.

8           Let me just talk a little bit about the offense

9     conduct, and I do think it is important to acknowledge that,

10    from our understanding, it appears that the defendant started

11    his business with what, from all appearances, seems to be pure

12    enough intentions.  This doesn't seem to be the kind of case

13    where the defendant set out from the outset to perpetrate

14    fraud.  At least that's not what our investigation has

15    indicated.

16          THE COURT:  Well, you're using the word "seems."  I

17    mean, it seems to me undisputed that that's the case; that this

18    was a legitimate business that got into trouble, he made the

19    wrong call and turned it into a fraud.

20          MR. ZOLKIND:  Exactly.

21          I'm simply acknowledging something of a mitigating

22    factor.  It appears that he set out, we don't dispute he set

23    out, to run a legitimate business.

24          THE COURT:  Right.

25          MR. ZOLKIND:  But at some point around 2015 or a

J96WnisS

1    little earlier, the company was running into financial

2    problems.  He didn't have enough capital to pay his debts, and

3    the defendant was faced with a choice.  And again, I think it's

4    critical to recognize that he had a choice.

5           He's a sophisticated businessperson.  He could have

6    dealt with his financial predicament responsibly.  He could

7    have tried to refinance the loans or filed for bankruptcy or

8    done any other number of things, but he made the decision to

9    cheat and lie.  He wasn't pressured into it.  He wasn't acting

10   out of some mistake.  That was his decision, and so he

11   approached new lenders, one of whom, Falcon, loaned more than

12   $40 million to him ultimately.  And in often cases he went to

13   people that knew him, people that trusted him.  And he hid from

14   those people -- those lenders, investors -- information that

15   was highly material.  So, perhaps most material, he hid the

16   extent to which he was already indebted to other lenders.  And

17   so at that point the scheme became essentially a Ponzi scheme,

18   where he was taking in money from new lenders and using that

19   money in the main to repay other lenders rather than using it

20   to run his business.

21          THE COURT:  There was a small amount of the money that

22   was explicitly earmarked for old lenders, but that turned out

23   to be a fraction of the money that was, in fact, used to pay

24   old debts.

25          MR. ZOLKIND:  That's right, your Honor.  And just as

1   true some of the money that came in from the new lenders was

2   used to buy tickets and run the business but not nearly to the

3   extent that was represented.

4          He also falsely inflated his company's sales data to

5   make it appear that the company was thriving when the exact

6   opposite was true.  In certain cases he used programs like

7   Photoshop to falsify financial statements.  He went to

8   significant lengths to hide this fraud from everyone else in

9   his company, including the CFO.  And so, I think we've seen in

10  some of what the defense has said the suggestion that he was

11  running a legitimate business during this period, and we

12  vigorously disagree with that characterization.

13         Among other things, Kroll's investigation confirmed

14  that the defendant's recordkeeping was egregious; that there

15  was really no effort made to segregate personal expenditures

16  from business expenditures.

17         One example of how the business was run is that --

18  there's an individual, Jona Rechnitz, who's been a government

19  cooperator in other cases; that person helped to bring in

20  investors to the defendant's business, and the defendant

21  compensated Rechnitz, in large part, by paying off his American

22  Express for the purpose, as we understand it, to disguise the

23  fact of those payments and to try to avoid income taxes.

24         THE COURT:  Avoid income tax payments by Rechnitz.

25         MR. ZOLKIND:  That's right.

J96WnisS

|     |     |
| --- | --- |
| 1   | THE COURT:  He was facilitating Rechnitz's evasion. |
| 2   | MR. ZOLKIND:  That's correct. |
| 3   | THE COURT:  I don't think that's in the PSR.  You're |
| 4   | not asking me to treat as any an aggravating fact any aiding |
| 5   | and abetting of a Rechnitz tax scheme, right? |
| 6   | MR. ZOLKIND:  We're not, your Honor.  I'm just |
| 7   | pointing it out as part of the description of how the business |
| 8   | was run. |
| 9   | THE COURT:  Understood. |
| 10  | MR. ZOLKIND:  Now, I do want to acknowledge another |
| 11  | mitigating factor, which is not insignificant, that the |
| 12  | defendant of his own accord, came in, met with the government |
| 13  | and disclosed virtually the full extent of his fraud.  That is |
| 14  | not common -- it doesn't happen -- and saved the government |
| 15  | considerable resources, and it deserves recognition. |
| 16  | I think it is also certainly fair to say that the |
| 17  | business was crumbling at that point and highly likely that |
| 18  | this all would've been -- |
| 19  | THE COURT:  Disclosure was inevitable; it was just a |
| 20  | matter of time. |
| 21  | MR. ZOLKIND:  I think that's right.  There was really |
| 22  | no question. |
| 23  | It is also not insignificant that, as Kroll found, |
| 24  | this was not a case like, say, Bernie Madoff or something like |
| 25  | that, who was running a Ponzi scheme, hiding the assets |

J96WnisS

offshore, funding an exorbitant lifestyle.  He was using the

money in part for his own personal benefit, but that doesn't

seem to have been the main driver here.

THE COURT:  Mr. Bachner's point is right, isn't it,

that if the point of this was personal enrichment, there was

low-hanging fruit that he didn't take, like the authorized

salary he didn't take.

MR. ZOLKIND:  That's right.

THE COURT:  So, while it's true that the sloppy nature

of the rest of the business led him to pay in its entirety

American Express bills that only partly subsumed business as

opposed to personal costs, it's also the case that he left some

personal compensation untapped.

MR. ZOLKIND:  That's right.  I mean, clearly he was

trying to make his business bigger and more profitable, which

would have ultimately inured to his significant personal

benefit if it had worked, but he couldn't sustain the scheme,

as is often the case with Ponzi schemes.

Your Honor, I guess I would close, if I could, just by

referring to some of the statements made by the victims,

because I think they help to reinforce that even though the

money in this case came from hedge funds and entities that are

often perceived as having unlimited net worths, or close

thereto, at its heart, there were real people that were harmed

by this.

J96WnisS

```
1              As the principal of Taly USA Holdings put it, he said:
2      "This is not a victimless crime.  Futures have been destroyed.
3      Life savings have been depleted."  He went on to say that while
4      his companies may sound like faceless corporate entities,
5      they're not.  They are companies of people who rely on them for
6      their livelihoods.
7              If I could quote just one more victim?
8              THE COURT:  Of course.
9              MR. ZOLKIND:  Dean Landis Credit Cash said, and I
10     quote: "My family and I were, and continue to be, severely
11     impacted by this crime.  I own and manage a relatively small
12     business.  The financial loss has been devastating.  Upon
13     realizing that I'd been defrauded and would perhaps lose
14     millions of dollars, I was crushed.  The immediate shock that
15     and toll on me was worse than any feeling I had ever had.  I
16     was worried for my business's survival, my family's well-being
17     and my employees' confidence that we could withstand such a
18     catastrophe."
19             For all these reasons, the government recommends a
20     sentence within the guidelines.
21             THE COURT:  Let me follow up just on a few things, but
22     just as a matter of housekeeping, we have the consent
23     preliminary order of forfeiture, which you have given me with
24     the new dates, and I'll check in a moment with the defense, but
25     I intend to sign that.
```

1      You've also given me, though, an order of restitution

2    which does not quite track with what the presentence report

3    recommends.

4            MR. ZOLKIND:  Yes.

5            THE COURT:  I have not checked whether the numbers

6    match.  Let me begin with that.  Do the numbers match what's in

7    the presentence report?

8            MR. ZOLKIND:  I can explain that, your Honor.

9            The order of restitution we provided to the Court

10    matches the amount in the forfeiture order.  It is, I think,

11    $150,000 less than the amount in the PSR, and that is because

12    subsequent to providing information to the probation office

13    that they then incorporated into the PSR, we determined, in

14    discussions with defense counsel and with counsel to Falcon,

15    that in our calculations we had added $150,000 to Falcon's loss

16    that was not correct.  They've agreed that that was not

17    correct, and the defense and the government are in accord.

18            THE COURT:  All right.  So, the figures in the

19    schedule of victims attached to the proposed restitution order

20    are correct, and those supersede those in the presentence

21    report.

22            MR. ZOLKIND:  That's correct.

23            THE COURT:  All right.

24            The presentence report has a familiar provision under

25    which the defendant is to pay a portion of his income over time

1    towards unpaid restitution.  The order of restitution you have

2    given me, which is quite brief, contains the following

3    arresting statement:

4              "The defendant sham complete restitution payments

5    within 90 days of the entry of this order."

6              It says nothing about any obligation as to unpaid

7    restitution.  What does that sentence mean?  You're not

8    representing that the defendant has even a fraction of the

9    restitution amount in hand or coming to him in 90 days.  What

10   does that sentence mean?

11             MR. ZOLKIND:  You're absolutely right, your Honor.  I

12   apologize for that.

13             THE COURT:  That just seems derived from some other

14   case.

15             MR. ZOLKIND:  It must be, your Honor.

16             THE COURT:  All right.

17             MR. ZOLKIND:  My apologies.

18             THE COURT:  No worries.  I'm just trying to make this

19   workable.

20             Let me put out the following, which is, under the law,

21   the Court can give counsel an extension of time after a

22   sentencing to submit a restitution order.  Subject to what I

23   hear from the defense, it's my expectation that I would want to

24   order restitution with the same numbers that you have but that

25   contains a provision akin to that in the presentence report

J96WnisS

that embeds an ongoing obligation reflected as a portion of

income for Mr. Nissen to be paying restitution, and beyond

that, I would be making the order of restitution a condition of

supervised release.  And I expect that the formation of the

supervised release term, on the likely assumption that

restitution remains then outstanding, that the U.S. Attorney's

Office victim unit would convert that supervised release term

into a consent judgment so that the victims can continue to

pursue the restitution from Mr. Nissen even after supervised

release is done.

          Isn't that the right way to proceed here?

          MR. ZOLKIND:  Yes, your Honor.

          THE COURT:  All right.  How much time do you think

before it would take to conform the order of restitution

essentially to terms along those lines?

          MR. ZOLKIND:  Would one week be acceptable?

          THE COURT:  More than acceptable.  That's quite fast.

That's fine.  We'll come back to that at the end of sentencing,

but the important thing is that the numbers here are correct.

But I think the actual text is going to need some work.

          MR. ZOLKIND:  Thank you, your Honor.

          THE COURT:  All right.

          The final question really involves the last thing you

said.  At the beginning of your remarks, you said you wanted a

meaningful sentence.  At the end, you were phrasing something

J96WnisS

1    that was said in the sentencing letter of more than a year ago.

2    The government asked for a sentence within the guideline range.

3    Is it the government's view that there's no sentence below 97

4    months that could reasonably take into account the 3553(a)

5    factors?

6        MR. ZOLKIND:  Your Honor, the way we've approached it

7    is that we look at the amount of the fraud, the way it was

8    perpetrated, and we think that those factors solidly call for a

9    guidelines sentence.  And then we've looked at whether the

10   mitigation is such that it would take this case out of our

11   ordinary practice of recommending a guidelines sentence.

12       THE COURT:  Your view is that that justifies -- that

13   would make a sentence of anything less than 97 months

14   unreasonable.

15       MR. ZOLKIND:  Your Honor, I won't say that we think a

16   sentence below 97 months would be unreasonable.  I think

17   there's a range of sentences that could be reasonable in this

18   case.

19       THE COURT:  I agree with that.  Under the parsimony

20   principle, the Court has to choose the lowest of the reasonable

21   sentences, and that's why, while I appreciate your advocacy

22   that a guidelines is among the reasonable outcomes here --

23       MR. ZOLKIND:  Yes.

24       THE COURT:  -- the question for me is not that; it's

25   what the lowest of the reasonable sentences is, and so I'm

J96WnisS

1    putting it to you.  Is it really the government's view that no

2    sentence below the guideline range would reasonably take into

3    account the 3553(a) factors?

4             MR. ZOLKIND:  Your Honor, I would not say this is the

5    kind of case where our position is that no sentence dipping

6    below 97 months could be reasonable.  And so I think, in our

7    view, a guidelines sentence is reasonable in this case, but we

8    do recognize that there are mitigating factors that distinguish

9    this case from other, significant frauds, so we certainly

10   acknowledge that and recognize that a sentence below 97 months

11   could be reasonable.

12            THE COURT:  Does the government have a fear when

13   Mr. Nissen is at liberty again of his committing another crime?

14   Is that a realistic consideration here?

15            MR. ZOLKIND:  Sure.  I think so.

16            THE COURT:  Why?

17            MR. ZOLKIND:  Well, he doesn't have a significant

18   criminal history.

19            THE COURT:  He doesn't have a criminal history.

20            MR. ZOLKIND:  He doesn't, correct.

21            So, this is not a case where someone has been

22   committing frauds all their adult life, but at the same time,

23   it was a serious fraud.  It was not a rash decision.  It was

24   the kind of thing done over time in a very deliberate manner,

25   and so I think there is reason to be hopeful that he has

J96WnisS

1    learned his lesson, and certainly the fact that he brought it

2    to the government's attention is reason to be optimistic in

3    that regard.  And I think a sentence of imprisonment would help

4    certainly to reinforce that deterrent, so I think there's

5    certainly reason to be hopeful that he won't return to

6    committing this type of fraud again.  But do I think it is

7    something that -- the need for deterrence is something that

8    should factor into the Court's sentencing decision?

9    Absolutely.

10           THE COURT:  OK.  Thank you very much.  All right.

11   Very helpful.

12           Mr. Bachner, before I ask more systematically for your

13   views, let me take care of some of the loose ends.  You consent

14   to the order of forfeiture, correct?

15           MR. BACHNER:  Yes, your Honor.

16           THE COURT:  All right.

17           As to restitution, you're in agreement with the

18   numbers that the government now proposes.

19           MR. BACHNER:  We are in agreement.

20           This is something to work out later.  As I understand

21   it, there were moneys that have been recovered by the trustee

22   in bankruptcy in the estate, so that number ultimately will

23   be -- the obligation ultimately from Mr. Nissen will be lower,

24   but that is the amount of the restitution.

25           THE COURT:  Let me put it this way.  For the purposes

1    of the restitution order, do you agree with the numbers the

2    government has now proposed?

3            MR. BACHNER:  Yes, Judge.

4            THE COURT:  Understanding that some of the sequelae

5    from the bankruptcy may result in payments that are applied to

6    those numbers.

7            MR. BACHNER:  Correct.

8            THE COURT:  That's what you're saying.

9            MR. BACHNER:  Yes.

10           THE COURT:  All right.  Any reason why, then, I

11   shouldn't give the government a short period of time to modify

12   the restitution order to embed an ongoing payment obligation by

13   Mr. Nissen?

14           MR. BACHNER:  We're in full agreement with that,

15   Judge.

16           THE COURT:  Do you have any sense right now of what

17   money, including through the bankruptcy, is, in practice, going

18   to be available?  I mean, what is it that can be collected

19   through the bankruptcy process that ultimately, net of

20   bankruptcy relevant costs, is likely to be available for the

21   victims?

22           MR. BACHNER:  Judge, I've heard the number of about 5

23   million bandied around, but I don't know that for a fact.

24           THE COURT:  OK.  All right.  Thank you very much.

25           Having taken care of then just restitution and

J96WnisS

1    forfeiture, anything you want to say on those subjects?

2              MR. BACHNER:  No, Judge.

3              THE COURT:  I'm happy to hear from you more broadly

4    then.

5              MR. BACHNER:  Thank you, your Honor.

6              Judge, first of all, we want to thank the Court for

7    the one-year delay that you suggested and ordered in this case,

8    because I think it's indicative of the attention that your

9    Honor -- I don't mean to be -- but it's just how I feel, that

10   this is indicative of the attention that your Honor has given

11   to the case and the significance, I think, your Honor, we hope,

12   will be implying in the motives Mr. Nissen had in committing

13   what is clearly a serious crime.

14             Judge, I've been doing this -- sometimes I hate to

15   admit it, because it's hard to believe; it's been about 35

16   years as a defense lawyer and four years prior to that as a

17   prosecutor, and in all the years I've been doing this, it never

18   ceases to amaze me that the hardest part of my job is doing

19   what I'm doing now, but I would never switch places with a

20   judge, in a heartbeat.  I couldn't do it.  The need and the

21   purpose of sentencing a defendant is such a monumental task,

22   and I know that is why your Honor has done what you've done,

23   delaying the sentence for as long as you need to get all of the

24   facts, to make the right decision.

25             In my representation, I know in front the courts you

1    see a lot of bad folks who come in front of you who have done a

2    lot of bad things in the past and sometimes have done bad

3    things for the first time, but there's really serious

4    indications that these people are oftentimes people who have

5    made often a lot of very bad choices and have sometimes earned

6    the title of being kind of bad people, either through their

7    criminal history category, etc.

8         And sometimes people come in front of you who are

9    people who have done things seriously wrong really for the

10   first time in their lives after living a pretty good life and

11   indicating that they're not bad people, but they made very

12   serious misjudgments, very serious choices that were bad, as

13   Mr. Zolkind indicated, and Mr. Nissen made a very bad choice.

14   And my request of this Court is that that bad choice not color

15   who Mr. Nissen really is.

16        Mr. Nissen, Judge, is, frankly, as the letters we've

17   submitted to the Court, a very good man, who has indicated

18   through his life a philanthropic, altruistic tendency in his

19   life, and that's why when your Honor asked Mr. Zolkind whether

20   he believed Mr. Nissen could commit crimes like this again in

21   the future, I mean, I know sometimes -- and I have enormous

22   respect for both prosecutors in this case; they've been fair,

23   judicious, and they've worked with the defense and they should

24   be commended for that, your Honor.  But sometimes prosecutors,

25   and I may have done this myself when I was one, act

1    reflexively.

2              There's really no reason to think, statistically or

3    otherwise, that Mr. Nissen will ever commit a crime like this

4    again.  We know statistically that white collar defendants,

5    like Mr. Nissen, in his age group, his marital status, his lack

6    of criminal record, I think the recidivism level is less than 4

7    percent.  So, if even from a statistical level it's unlikely he

8    would do it, but certainly from his unique humanity and

9    characteristics of who this person is, I think the chances of

10   him doing this are remarkably lower than that.  I wouldn't be

11   disingenuous with the Court and ever rule anything out, because

12   nobody can do that.  But I think your Honor should be

13   comfortable that from a specific-deterrence point of view,

14   Mr. Nissen is going to be in front of this judge or any judge

15   again.  I think that's a good bet.  Nothing's perfect, but I

16   think it's a good bet.

17             Your Honor, the first criteria that a judge, under

18   3553(a), should be considering is the nature and circumstances

19   of the offense and the history and the characteristics of the

20   defendant.

21             To me, your Honor, I don't think it's any accident

22   that that is the singular, only criteria under 3553(a) that is

23   in the conjunctive; that is, a Court's obligated to look at the

24   nature and circumstances of the offense and the history and

25   characteristics of the defendant.  And that is because no

judge, under the guidelines or under 3553(a), should be looking only at the crime and then at the defendant.  They have to be looked at together.  What instigated this?  What were the motives?  What type of person was involved in this offense?  And that I believe, is why it's in the conjunctive.

Judge, you've probably had the Honorable Judge Rakoff thrown at you many times in sentencing memorandums, as he should be, because he's one of the most admirable judges on the bench, but I think the words that he used in one case are just worth repeating.  He said:

"Surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies and systems of justice was plainly what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'"

It's such a beautifully stated purpose of what sentencing is, in deciding an appropriate sentence.  And then the Supreme Court said it a year later when they said that in sentencing a defendant a court must consider the fact that it is a "unique study in the human failings that sometimes

J96WnisS

mitigate, sometimes magnify, the crime and the punishment to
ensue."

To me, Judge, and you said it to Mr. Zolkind, the
overarching principle of what is a fair and reasonable sentence
in any criminal case is the parsimony clause, and that is what
is the lowest sentence a court can impose that is sufficient,
not greater than necessary, to meet the goals of sentencing?
It's not the highest sentence, because for that it would be for
life.  It's what is the lowest sentence, because, frankly,
Judge, and I'll talk about this a little bit later.

I was at a conference, and we had a fellow, who ended
up on 60 Minutes, like, a month ago, who robbed a few banks
when he was a young guy.  Then he became a lawyer, remarkably.
He clerked for a federal judge, and he became one of the great
sentencing mavens we have; he goes around the country.  And he
was giving a bunch of lawyers and judges these statistics.

The United States of America represents 5 percent of
the world's population.  We represent 25 percent of the
incarcerated population.  There are 113 million Americans who
either know or have a friend or relative who was or is in jail,
and we have almost 3 million Americans presently incarcerated.

The bottom line, Judge, is we sentence people a lot
more than any other country for longer periods of time than any
other country, and our crime is no better.  We punish a lot and
we warehouse people a lot.  We just do, and I'm not here to

1   judge right or wrong, but these are just statistically the

2   facts.  And I'm going to get to this, Judge, but the question

3   for your Honor is, under the goals of sentencing, what is the

4   right sentence for punishment?

5        He knows he's going to jail, and frankly, he should be

6   going to jail for a period of time for what he's done.  The

7   question is when does punishment -- the appropriate punishment,

8   0top and when does warehousing begin?  When are we just putting

9   him away for a purpose other than appropriately punishing him

10  for what he has done?

11       Your Honor, Mr. Nissen understands, and he's written

12  to the Court, that his conduct was just monumentally wrong, and

13  the victims who wrote to this Court -- it's easy for us to say

14  how remorseful Mr. Nissen is, but he is.  He had a reputation

15  of trying to be honest and live a life of integrity in this

16  business, and it's been shattered.  He feels horrible for what

17  he's done, and in order to rectify that, what he tried to do,

18  and what he did do, is affirmatively go out, before there was

19  an investigation -- and we can quibble about whether something

20  was going to happen, not happen, but Judge, you've been a long

21  time, and I have, 99 percent of the people wait for it to

22  happen.  They don't go in there and call the U.S. Attorney's

23  Office up, as we did, when there was just a problem.

24       And Mr. Nissen, Judge, he could have fought this case.

25  He could have filed motions.  He could have had hearings.  He

1   could have put the victims on the stand.  He could've done a

2   lot of things, and maybe we could have made some mash-up.  Who

3   knows?  But that was never the game plan.  The game plan was "I

4   screwed up here, this is bad, call the U.S. Attorney's Office,"

5   and I immediately did it, at his direction, not my advice, at

6   his direction.  When we went in there, he proffered.  He told

7   them exactly what he did.  He went through the records with

8   them, met with the FBI, told them stuff about Mr. Rechnitz they

9   weren't even aware of, about his relationship with Mr. Rechnitz

10  that came out at the trial.

11          No 5K letter was written or entered into, no formal

12  cooperation agreement, but there was clear cooperation in the

13  case.  He went and did that because it was the right thing to

14  do, and then against the advice of the lawyer again, without

15  going through communications, he calls up Mr. Taly to meet with

16  him and tells him what he did with, frankly, the understanding

17  that he was very likely going to get tape recorded here.  And

18  against the advice of counsel, he went out to do this because

19  he felt he couldn't deal with it.  He wanted to try and work it

20  out.  He wanted to see if Taly could take over the company,

21  work something out with Falcon, to try and see if it could work

22  out.

23          This is really who Nissen is.  This was not something

24  he was trying to hide.  He went in, and he just bared his soul

25  to the U.S. Attorney's Office, and, Judge, he met with the

J96WnisS

1    trustees.  He met with the receivers.  He made himself

2    available to the government and to Kroll to try and figure out

3    the losses and what the numbers were.  This is a defendant,

4    your Honor, who did everything right in order to try and put

5    his money where his mouth is, to say not only am I remorseful,

6    but I want to try to make it better if I can.

7         The reason this is so significant, Judge, there was

8    another ticket guy who got indicted in this district and got

9    sentenced by Judge Wood to 78 months in jail named Joseph Meli.

10   Meli's case, your Honor, had a $60 million fraud.  Even though

11   $106 million of investor money was taken in, the government

12   gave him credit -- I just was reading the sentence memo.  The

13   government gave him credit for interest payments, actually,

14   that were made, which we did not get in this case.  And I'm not

15   saying we're entitled to it, but they did get it for Meli's

16   case.  Mr. Meli did nothing to help the government.  He

17   actually continued to obfuscate the crimes.  Actually, he was

18   someone, Judge, who did nothing right in connection with this

19   investigation.  And the reason that's significant is because

20   his defense lawyer moved for a variance, and the government, in

21   distinguishing cases in which the judges gave significant

22   variances, said, Unlike those defendants he did nothing to help

23   us.  He didn't go to the SEC and try -- some of those other

24   cases.

25         So, in other words, the government, your Honor, in

1    fighting against Meli's motion for a variance, argued that he

2    didn't help us, he didn't go forward.  Contrary to the

3    insinuations that Meli had given -- that's why it was fair

4    comment, because otherwise, of course, you could never really

5    hold it against a defendant that he didn't cooperate, but he'd

6    insinuated that he was trying to do these right things.  So, my

7    argument, Judge, is where a defendant does all of these right

8    things, it seems to me that, even in the government's

9    perspective, certainly that they raised in the Meli case, a

10   defendant should be entitled to, I believe, very significant

11   credit for the remorse and the help and the cooperation he

12   gave.  And under *U.S. v. Fernandez*, even if it doesn't lead to

13   a 5K agreement, as your Honor's aware, you have full authority

14   and right to give Mr. Nissen credit for all the right things he

15   tried to do after this happened.

16           Judge, I want to talk for two minutes about what NECO

17   was to give you some understanding about the bad judgment that

18   he did.  And before I say that I know, I'm happy you

19   understand, your Honor, that I don't think anyone thinks this

20   is a predatory fraud.  This was not something where Mr. Nissen

21   went out and his primary or sole motivation was to reap

22   enrichment for himself.

23           We know, from the *Rivernider* case, that that is a very

24   significant point for a judge to consider.  Judge Rakoff has

25   and many, many -- Judge Crotty has, and many other judges have

J96WnisS

thought about the fact that, you know, Judge, if I run somebody
over with my car by accident or run somebody over with my car
because I'm drunk, either way I run somebody over, but the law
always looks to why did I run somebody over?  What were my
motivations?  And sometimes the defendant's conduct is
different even though the result is the same.

          $71 million was lost by these victims, and we wish we
could turn the clock back, because we know this caused harm to
people.  There's no getting around that, and we're not trying.
But at the end of the day, the motivations behind what
Mr. Nissen did were not the type of, as Mr. Zolkind indicated,
Madoff-related greed, to screw everybody he could screw --
excuse me language, your Honor -- in order to try and get that
motivation.  The ABA, your Honor, defines a predatory offense
as intended to inflict loss with the sole or dominant purpose
of generating personal gains for the defendant.  That's clearly
not what happened here.

          Judge, regarding the $71 million, Mr. Nissen started
NECO in 2006.  He was 34 years old, I think, back then.  Over
the time, your Honor, he put his entire life savings of about
$3 million into the company.  He took no salary from 2012 to
2015.  He loaned the company his own salary.  He tried to make
this, and did make it, an enormously successful business.
Indeed, your Honor, in 2016, after the loans were acquired, the
company generated almost $60 million in sales.  This was, even

J96WnisS

1    at the time that Falcon came in, a really profitable, really

2    revenue-generated company.  One of the issues, this was all too

3    granular in some ways, was EBITDA versus the actual profits,

4    but there was terrific revenues that were being generated.

5            Mr. Nissen needed cash to operate.  He had taken out

6    these horrible, what would otherwise have been usurious loans,

7    and he couldn't make the payments.  And rather than going into

8    bankruptcy -- Mr. Zolkind is right, and maybe he should have

9    done that; not maybe, he should've done that.  What he did is

10   he went to Falcon and he borrowed money.  7 million of it was

11   authorized for other payments, but I think it's important for

12   the Court to know that out of the moneys he took from Falcon, a

13   vast majority of it, in fact, did go for business expenses.

14           Payments clearly went to pay some other investors, but

15   for example, your Honor -- this is in my sentencing memo -- 4

16   million out of the money that he got from Falcon, in the

17   closing, in July 2015, was immediately expended just on costs,

18   out of the money got from Falcon.  7 million of the money went

19   to a prior investor.  16 million went to overhead.  2 million

20   was lost in the college football.  A million was lost in a

21   minus zero winter festival event.  5 million was lost on the

22   Super Bowl.  There were tremendous losses of capital that he

23   got from Falcon.  The amounts of money that actually went to

24   pay other investors post-Falcon was probably -- I don't want to

25   guess, but it's certainly less than $10 million.  $11 million

1  of the money went to Jona Rechnitz as a finder's fee for

2  Rechnitz, as an expense for getting other people to bring in,

3  to make investments into the company.

4       The point I'm making is not to justify his conduct,

5  but I think it's important for your Honor to know that this was

6  not the Ponzi scheme where everything from Falcon was shooting

7  out to pay investors.  It was going to generate and run the

8  company primarily, but there was money that went out, and money

9  was secured by Falcon through false statements.  No one's

10 trying to reduce the charges against that, but as far as the

11 predatory nature of the offense, I think it's appropriately

12 important for the Court to know that, as well as the

13 government, what was going on.

14      You also should know, your Honor, Falcon was looking

15 at the books and records of this company in a very, very

16 significant way as well, so I think that that's important for

17 the Court to know.

18      Judge, Mr. Nissen is 47 years old.  He has no criminal

19 convictions.  He was born and raised in Brooklyn, New York.

20 His parents were both school teachers.  His two siblings --

21 one's an attorney and one's a managing director as an insurance

22 company.  I'm not going to repeat this here openly in court,

23 but as the memo indicates, let's say he has fairly complicated

24 family relationships.  His mom's not here today.  His dad is in

25 the hospital, diagnosed with cancer.  He's been in the hospital

J96WnisS

1    since April.  He has not been out.  He has to learn to walk

2    again, etc.  Mr. Nissen has revived a bit of that relationship

3    with his dad, who wanted to be here today but he could not.  He

4    has no relationship with one sibling and one relationship with

5    the other.

6           Growing up, he's never had much of a safety net, and

7    he doesn't have much of one now.  He's thankful for what he

8    does have from his family, from his parents and his siblings,

9    but it's not much.

10          Since his arrest, your Honor, he has relied almost

11   exclusively on his wife's love and kindness and on the kindness

12   and generosity of friends.  Mr. Nissen's not a lazy guy, Judge.

13   When he couldn't work in this business anymore, he drove an

14   Uber.  When the Uber business fired him because of his arrest

15   in this case, he has been spending the last year or so loading

16   trucks at Hunts Point from 1:00 in the morning until 3:00 in

17   the afternoon so that he could then come home and take care of

18   his children while his wife was often at work during the day.

19   That's what he's been doing, for minimum wage, because that's

20   the kind of person he is.  He has obligations financially to

21   his family, and he has, since he's been a kid, been a hard,

22   honest worker.  That's who Jason is.  He was never -- is not

23   now and was not then -- a lazy thief looking for quick money.

24          When he was in high school, he had enormous athletic

25   distinction, including academic ones, where he won math awards,

J96WnisS

science awards, all detailed in our memorandum.  He has always

been, since a kid, philanthropic.  When he was an Eagle Scout,

he literally was, proverbially and literally, the boy scout.

He ran a food bank, essentially, for 700 senior citizens, where

he managed that as an Eagle Scout.  Letters from his college

friends and football friends -- when the sentence was

originally set, about a year ago, Judge, we had about 50 of his

fraternity brothers and other friends, people who know him and

who deal with him, talk about him, ready to come on to court.

Many of them could not reschedule flights today, but they've

all written letters and many of them still are here today.

Judge, I know you've read this -- I don't want to

belabor the record, but I think indicative of the relationship

that people think of him comes from his football coach in

college, who wrote:

"Jason's most appealing characteristic was ability to

strive to improve.  He was always asking how can I get better.

He would quickly raise -- quickly rise to be one of our team

leader's.  He gained the team's respect by what he did, on and

off the field, and the intensity that he did it.  He was always

there to help a coach with the recruiting of a new prospect or

to help his teammates with a math class.  He was truly a person

who valued his community and his teammates."

And he's continued to do that.  He was active with

underprivileged children and remained active with

1   underprivileged children.  He sponsored tournaments in

2   basketball and softball, and still does.  He tutored kids in

3   math for free in underprivileged areas.  After he graduated

4   college, he didn't run away with his math degree and his math

5   ring to get an MBA and work on Wall Street.  Nothing wrong with

6   that, but that's not what he did.  He became a schoolteacher,

7   where he again taught math.  He then, Judge, tutored kids for

8   free on their SATs, and one woman wrote a letter to the Court

9   about the impact he had on that.

10          During NECO and since, your Honor, he's coached the

11   boys' and girls' softball teams at Frank Sinatra School of

12   Arts.  He provides math tutoring to underprivileged kids at

13   PS-292 in East New York.  He volunteered for the NBA Junior

14   Nets program, sponsored by the NBA, to help underprivileged

15   kids.  He's sponsored leagues and tournaments:  In 2013, the

16   Fab 48 Basketball tournament for youths; the New York Urban

17   Professional League in Harlem; the Tip of the Hat Tournament in

18   New York City in 2016, after this case had already become, come

19   around; 2013 to '17, Chicago Mustangs basketball team to attend

20   tournaments for, again, underprivileged kids.

21          Gary DeCesare, your Honor, who is a high school

22   administrator in Chicago, who's known Jason for nine years,

23   wrote a letter to the Court about how Jason has been in his

24   community in Chicago to "mentor our young men" and continues

25   "to help low-income students to attend private school."  That's

1    what Jason does.  That is the kind of person he is.

2              There's letters, your Honor:

3              Christine Liu, a lawyer and former assistant chief

4    counsel for the Department of Homeland Security, who wrote a

5    letter to the Court about Jason's dedication to the Albertson

6    Herricks Little League and how he's dedicated there -- his

7    daughter plays there -- to help the team;

8              Deven Shah, who's a senior information risk officer at

9    Bank of New York-Mellon, talks about Jason's kindness;

10             Norvin Lee, deputy assistant commissioner for DCAS,

11   administration-police unit and the Albertson Herricks Little

12   League, talks about his dedication to children;

13             Kevin Cloutier, who's known Jason forever, who is now

14   a partner in a major law firm, talks about his kindness and he

15   is the epitome, would give anything, take the shirt off his

16   back for anybody;

17             Geoffrey Engler, an affordable housing developer

18   working in Massachusetts, writes about the kindness that Jason

19   has always extended; and on and on and on, Judge.

20             And perhaps somewhat moving is also an individual,

21   your Honor, who is someone in his family who got very, very

22   sick.  Jason was there.  Jason got doctors together.  That's

23   the guy he is.  That's the guy he is, someone who, by and

24   large, your Honor, on the scales of justice, this is the bad

25   stuff and this is the good stuff.  Just a fact, Judge.

J96WnisS

1          Now, your Honor, the saddest part of any criminal

2     sentencing is the horrible impact it has on families.  Whether

3     it's Mr. Nissen or anybody else who appears in front of you, if

4     there's families and children, they're impacted when dad or mom

5     has to go to jail, and Mr. Nissen knows that and he lives with

6     it daily and cries about it all the time, but he knows it's his

7     fault and he has to now deal with those impacts.

8          The question for your Honor, I respectfully urge, even

9     before the old days, *Booker*, when you had the extraordinary

10    circumstances you had to show, even then, under that very high

11    standard, the courts recognized the purpose of a sentencing

12    court was never, ever to inadvertently, as a condition or part

13    of the sentence, wreak havoc quote/unquote on the family unit.

14    And that's unfortunately what's going to happen.  Regardless of

15    what your Honor does, there's going to be wreaking of some

16    havoc, and sorry to say it to Mr. Nissen, but that's his fault.

17         The issue, though, is how much havoc has to be wreaked

18    before the parsimony clause says it's enough?  How much damage

19    has to be done, which are going to be collateral consequences

20    of his own behavior?

21         Haydee's here in court today.  She's about eight

22    months' pregnant.  I think she's due in about 20 days.  He's

23    got a daughter with Haydee, Elisabeth.  We've indicated to the

24    Court in our sentencing memorandum some of the serious issues

25    that she's going through at the age of three years old, about

J96WnisS

three, the cognitive issues, etc., without having to go through

that in open court.  Jason is one of the few remarkable guys

who's actually still very close with his first wife, Deana, who

wrote a letter to the Court about the type of terrific person

Jason is and the outstanding dad he is to their daughter Ava,

who is 11 years old.  I was going to read her letter, but I

don't think I could do it, frankly, without tearing up.  This

is the situation that Mr. Nissen finds himself in, trying to

save his family, knowing that he has to get punished for what

he's done, and that's one of the reasons, your Honor, that I

opened up my remarks by saying that I wouldn't trade my job for

yours for anything.

        Judge, Dr. Silver -- we thought it was important to

have a clinical perspective of this.  He's indicated in his

report what he thinks the impact of any sentence, but certainly

a long sentence, would be.  And Judge, we know that when

children are removed from their parents, which unfortunately

has happened in some political environments, that there is

post-stress syndrome that evokes from that.

        Jason is very, very close and very intertwined in the

lives of his children.  Whenever -- he's always with them when

he's not working.  Ava adores him.  Ava and Elisabeth live

close to each other.  Haydee and Deana try to maintain a

relationship with each other, and the concern is, once Jason's

gone, how that's going to work its way out.  Ava and Elisabeth

J96WnisS

1    not are only half-sisters, they're just like sisters to each

2    other.  And Elisabeth, they're just enormously concerned.  And,

3    Judge, you're a dad, I'm a dad.  We all know the impact of the

4    actions when we take -- when we have to leave for a short --

5    parents who go to war, come back in a year, the impact on

6    children.  When you're talking about the types of numbers that

7    the guidelines talk about here, it's just kind of

8    mind-boggling.

9         So, Judge, talking about what's the right type of

10   sentence to impose, the guideline numbers -- again, Judge

11   Rakoff and many other judges have called them -- Judge Gleeson,

12   etc. -- call them kind of the arithmetical madness that results

13   from these numbers.  You know what, Judge, what's weird, if you

14   look at 1987 -- I put this in my memo.  In 1987, Mr. Nissen's

15   offense level would have called for a sentence of somewhere in

16   the 30-month range for his conduct, the loss $5 million and up.

17        Judge, what I did is I took the value of $5 million

18   and up and said what is $5 million then worth today?  $5

19   million then is worth about $11-1/2 million in today's money.

20   If you look at what the guidelines are for $11-1/2 million,

21   it's almost 70 months.  So, just taking the base numbers and

22   just extrapolating to our numbers, we have tripled the amount

23   of jail time that what we thought was good in '87 to what we

24   think is good now, for no empirical reason.  None.

25        And Judge, you know it from all the memos you've read,

J96WnisS

1    there is no science behind it.  It is purely, respectfully, as

2    the literature shows, a reaction to address the public saying

3    you've got to put more people in jail, for some reason, where

4    Congress felt they had to react.  There is really no science

5    behind it; we just tripled the amount of time.  And indeed, if

6    you looked at the amount of gain that Mr. Nissen made from the

7    offense and you weren't looking at the loss number, at an

8    $800,000 gain, you're probably looking at somewhere in the

9    three-year range as well.

10           At the end of the day, Judge, for some reason our

11   guidelines now are talking about warehousing a 47-year-old man

12   essentially until he's 57 or 55 for a very serious crime,

13   admittedly, but ignoring, respectfully, all of these other very

14   serious factors.  And I can see why so many judges in this

15   district -- and this district is the most creative district in

16   the country for imposing sentences below the guidelines range,

17   because, frankly, I think judges, many of them, and I don't

18   mean to impute some, respectfully, I think that there's an

19   understanding that human life means something and that

20   punishment means something, but a guy like Jason Nissen can be

21   doing a lot more out sooner than in longer.  And a guy like

22   Jason Nissen and Elisabeth and Ava and his wife, there's a

23   serious amount of pain they have to suffer, but again, Judge,

24   not to be redundant, how much is enough?

25           That is, your Honor, for you to determine.

J96WnisS

1          Finally, Judge, as far as disparity issues are

2     concerned in sentencing, we've given the Court a whole bunch of

3     cases, and I know you know those cases and you've read those

4     cases, where defendants have committed crimes, some less

5     serious, some much more serious, where courts have given very,

6     very, very significant variances to defendants based upon their

7     view of the arithmetic craziness of the numbers and a whole lot

8     of other reasons.

9          Your Honor, I understand that one of the purposes of

10    sentencing is to send a message.  It's an important thing to

11    do, general deterrence we lawyers call it.  You've got to send

12    the message out to society you can't do this stuff without

13    suffering for it.  Statistically and empirically, and it's all

14    in the memo, we all know that short and definite sentences have

15    a greater impact, actually, than long sentences down the road

16    on white collar defendants.  They just do.  There's no need,

17    Judge -- a white collar offender is not going to say, Let me

18    see, if I get three years that's a good one; if I get nine

19    years that's a bad one.  White collar offenders -- and many

20    other offenders may think that.  Anyway, Judge, the analysis is

21    on white collar offenders.  They know that even sentences of

22    probation have drastic, drastic deterrent impacts of

23    defendants, and I'm not suggesting that that's what's happening

24    here, but they all know that.

25          Judge, it all comes back to the parsimony clause

J96WnisS

1    again.  Your Honor, we defer to your judgment, your experience

2    and your view of all these facts to come up with a fair number

3    and a reasonable number that is the lowest number that meets

4    the goals of sentencing, taking into consideration his

5    cooperation, his clean record, his charitable events, which in

6    and of themselves deserve a variance.  And all of those other

7    factors and, most remarkably, the family unit that we argue

8    deserves serious, serious consideration by your Honor.

9         Thank you so much, your Honor.

10        THE COURT:  Thank you, Mr. Bachner.

11        Mr. Nissen, do you wish to make a statement?

12        THE DEFENDANT:  Yes, your Honor.

13        THE COURT:  Just kindly speak into the microphone.

14        THE DEFENDANT:  Yes, your Honor.

15        THE COURT:  Thank you.

16        THE DEFENDANT:  I have mixed emotions as I stand

17   before this Court.  On the one hand, I am very scared.  Growing

18   up and leading the life that I have had, I never thought I

19   would do something so very wrong and facing a sentence before a

20   judge.

21        But I have also been looking forward to today because

22   I have wanted for a long time, since I was arrested, to tell

23   certain people how sorry I am for my actions, how sad I am

24   because of what I have done to good people, and how remorseful

25   I am for my actions.

J96WnisS

1          Somehow I lost my way in trying to keep my company

2     afloat.  NECO to me was like a child I reared and nurtured.  I

3     was so excited about building the business and being a success.

4     It was a real business, a growing business.  In my mind I felt

5     like I could not abandon it when we suffered certain losses.  I

6     always believed things would work out and no harm would be done

7     to anyone.  I never intended for anyone to lose any money.

8          But my conduct was wrong.  There is no real excuse for

9     what I did.  I just want people to understand what I was

10    thinking.

11         My illegal conduct is something I will live with for

12    the rest of my life.  I have already apologized to Falcon and

13    to other victims of my conduct, and to those I have not

14    apologized to personally, I do so now.  I quickly pled guilty.

15    I self-reported my crime.  I have given my full cooperation to

16    help recover any funds that could and should be recovered.  I

17    express my sincere remorse to Falcon, Hutton, Taly, EGC and

18    TickPick for their losses and hardships I have caused, and I

19    promise to work hard to make restitution to all of you.

20         As I rehabilitate myself, I hope to become an

21    upstanding member of my community and society and that I will

22    also earn your forgiveness.

23         I also want to apologize to my family and friends.  It

24    is often the loved ones of the people who commit a crime that

25    pay the highest price, and it is no different in my case.  My

J96WnisS

```
1    wife, who is eight months' pregnant, and my two young children,
2    Ava and Elisabeth, have suffered and will suffer more than I
3    can describe because of what I did.  Mr. Bachner has discussed
4    in our report the serious family issues I have and the horrible
5    impact my sentencing will have on Haydee and our kids.  I know
6    this is all of my fault, but still I must beg of your Honor to
7    please consider and show me some mercy, for their sakes only.
8            Not only have I caused pain to the victims of my crime
9    and to my wife and children, but I have hurt my parents, who
10   raised me to know right from wrong.  I feel tremendous shame.
11           I don't know what the future has in store for me, but
12   the one thing I can say with certainty is that I will never do
13   anything like this again.  Before my conduct in this case, I
14   lived an honorable life.  I am basically a good person, but I
15   did wrong and understand I will be punished.  I ask this Court
16   for mercy on behalf of my family, not for me.
17           I thank the Court for the time it has given me to
18   speak today.
19           THE COURT:  Thank you, Mr. Bachner.
20           Counsel, we're going to take a five-minute recess for
21   everyone's comfort and while I collect my thoughts.
22           (Recess)
23           THE COURT:  Be seated, everyone.
24           Is there any reason why sentence should not now be
25   imposed?
```

1          MR. ZOLKIND:  No, your Honor.

2          MR. BACHNER:  No, your Honor.

3          THE COURT:  Let me begin, before I set out my

4   sentencing remarks, just by thanking all counsel both for your

5   really helpful written submissions in advance of sentencing but

6   also your very thoughtful and helpful oral submissions today.

7   And I particularly want to thank counsel for spending a great

8   deal of time with the process of reconstructing the money trail

9   here, which turned out to be important but obviously imposed a

10  burden on counsel beyond that which occurs in the usual case.

11  It was of considerable assistance to me in helping me figure

12  out the just outcome here, so I'm grateful to all here.

13          As I have stated, the guideline range applicable to

14  this case is 97 to 121 months' imprisonment.

15          Under the Supreme Court's decision in *Booker*, and the

16  cases that have followed it, the guidelines range is only one

17  factor that the Court must consider in deciding the appropriate

18  sentence.  The Court is also required to consider the other

19  factors set forth in 18 U.S.C. 3553(a).  These include:

20          The nature and circumstances of the offense and the

21  history and characteristics of the defendant;

22          The need for the sentence imposed to reflect the

23  seriousness of the offense, to promote respect for the law; and

24  to provide just punishment for the offense; to afford adequate

25  deterrence to criminal conduct; to protect the public from

J96WnisS

1    further crimes of the defendant; and to provide the defendant

2    with needed education or vocational training, medical care or

3    other correctional treatment in the most effective manner;

4               The kinds of sentences available;

5               The guidelines range;

6               Any pertinent policy statement;

7               The need to avoid unwarranted sentence disparities

8    among defendants with similar records who have been found

9    guilty of similar conduct; and

10              The need to provide restitution to any victims of the

11   offense.

12              The Court is also required to impose a sentence

13   sufficient but no greater than necessary to comply with the

14   purposes set out above.

15              I find that the sentence I am about to pronounce is

16   sufficient but not greater than necessary to satisfy the

17   purposes of sentencing I have just mentioned.

18              Mr. Nissen, imposing sentence is always difficult.

19   But I have found your case to be a particularly difficult and

20   tragic one.  I reflected on your case in the lead-up to the

21   initial sentencing hearing last year.  It has been on my mind

22   in the nearly one year in between then and now while Kroll did

23   its work.  And in the past several weeks, as this day has

24   approached, I have given a great deal of thought and attention

25   to the appropriate sentence in this case, in general and

1   specifically in light of the Section 3553(a) factors that guide

2   a court in sentencing, and the appropriate purposes of

3   sentencing.

4          It is safe to say there are factors that point

5   strongly towards quite a long sentence, and there are factors

6   that point strongly in the other direction.  I have carefully

7   reviewed the parties' submissions, the two victim impact

8   statements I have received, and the letters I received on your

9   behalf from your family and friends, the people who know you

10  best.  The following are my thoughts.

11         Forgive me at the outset for going on at some length,

12  but this is a complex case, and explaining the sentence I have

13  determined to be just and reasonable takes some time.

14         Under Section 3553(a), one set of factors a court must

15  consider is the seriousness of the offense and the need for

16  just punishment and the need for the sentence to promote

17  respect for the law.  Of the various 3553(a) factors, these

18  factors are the ones that point most strongly towards a long

19  sentence.

20         To put it simply, as Mr. Zolkind said, you perpetrated

21  a fraud on a massive scale.  The fraud cost your lenders more

22  than $71 million.  And make no mistake, the crime here did not

23  consist of a failure to repay a loan.  That, without more,

24  would not have been a crime.  The crime here involved obtaining

25  those loans on false pretenses.  That's what made it a fraud.

1    There were various false pretenses, but your core false

2    pretense in your representations to potential lenders was that

3    the money you were obtaining would almost all be put towards

4    future business; that is, the purchase of ticket inventory and

5    the like.  That was false.  In fact, as you well knew, the

6    money was going to be used to repay old debtors to a degree far

7    greater than you disclosed.  You knew the loan proceeds would

8    be used in this fashion, but to get the loans you falsely

9    pretended otherwise.  And that's, in fact, what happened.

10   Money that lenders thought was going to be applied towards

11   future business was used to pay back old debts that you were

12   otherwise unable to repay.  In effect, although your underlying

13   ticket business was legitimate, your conduct as it related to

14   financing that business became a Ponzi scheme in which new

15   money, styled as investments, went to pay back old debts.

16            And along the way, to keep the fraud going and to

17   avoid discovery, you made collateral lies to dupe your lenders.

18   You forged documents.  You changed the balance on a bank

19   statement via Photoshop.  You fabricated accounts receivable

20   numbers of the ticket company that were being reported to

21   lenders.  You transferred funds among accounts to give the

22   illusion of financial solvency.  In all these ways, you

23   camouflaged the true state of the company's finances and you

24   perpetrated the fraud.  This took time and effort and

25   forethought.  The fact that your crime continued over time and

1    was not a one-time event and necessarily involved a series of

2    deliberate actions to con your lenders and avoid detection

3    makes it more serious.

4            The crime is also serious because of the consequences.

5    The effect of the crime was to rip off a number of lenders --

6    Falcon Strategic Partners, Taly USA Holdings and an affiliate,

7    Hutton Ventures, TickPick LLC and Dean Landis and related

8    entities.  The fact that the victim companies are corporate

9    entities does not mitigate the crime.  Corporate victims have

10   rights too.  And as the victim impact letters I have received

11   reflect, and Mr. Zolkind made the point well, behind those

12   corporate entities are real people with real lives whom your

13   scheme badly harmed.  The letter from the representative of one

14   victim described the damage that you did by looting that

15   company.  The letter stated that your crime ate up the savings

16   of innocent individuals who had stakes in that company and

17   depended on its solvency.  Your crime, that victim stated,

18   devastated people who were counting on their company to provide

19   for their retirements and for their children's educations.  In

20   other words, the damage you did here was anything but abstract.

21   Real people were hurt, indirectly but predictably, by the $71

22   million fraud you directed to the lending companies.

23           You and Mr. Bachner, to your credit, have not blamed

24   the victims here, but I nevertheless want to be very clear.  To

25   the extent there could be any suggestion that these companies

1   assumed the risk your criminal conduct presented, I reject that
2   claim completely.  The victim companies were in the lending
3   business, and they assumed the risk of losing all their money.
4   Any company that lends money to a company in the
5   ticket-reselling business is taking a large risk that they will
6   not get their money back.  Lending to a ticket-reselling
7   company is playing with fire.  It's not like lending money to
8   General Electric or IBM.  And the high interest rates that your
9   company was obligated to pay the lenders make clear that the
10  lenders perceived a big risk.  But your lenders had rights too,
11  and chief among them was to be told the truth.  They did not
12  take the risk of getting defrauded by their debtor.  They had
13  the right to rely, before parting with their money, on the
14  truthfulness of your representations as to where the money was
15  headed.

16          And their rights were not only at the outset of the
17  lending relationship.  During the time period that the loans
18  remained outstanding, your lenders had the right to rely on
19  your representations as to where the loaned money had gone and
20  what the ticket company's financial condition then and there
21  was.  Had the lenders who had fronted your company money known
22  earlier in time that your company was in desperate straits and
23  overextended and effectively on life support, they could have
24  acted then to protect their interests.  But your lies to them,
25  over time, lulled them into inaction.  Your lies deprived them

J96WnisS

1    of the ability to act to protect their interests until it was
2    too late.

3         Mr. Nissen, I appreciate that you, through your
4    counsel, have criticized one of the lenders for accusing you in
5    its letter of absconding with $10 million of the proceeds for
6    later use on a Caribbean island, or something of that nature.
7    I am persuaded that that was an inaccurate accusation.
8    Ultimately, its falsity was exposed by Kroll's work, but the
9    bottom line is that Taly and Falcon and the three other lenders
10   whose money you diverted to pay your preexisting debts are
11   victims here.  I completely understand the victims' outrage at
12   being looted of millions of dollars.  I can understand how a
13   victim of a fraud of this scale might jump to the conclusion
14   that the perpetrator of a fraud of this scale had stashed money
15   away somewhere.  It just so happens, though, as Kroll has
16   shown, that that isn't the case.

17        The bottom line is this.  Under Section 3553(a), the
18   $71 million fraud here, perpetrated by a long-running series of
19   lies, makes this crime extremely serious.  Section 3553(a)
20   requires a sentence to reflect just punishment, and the
21   gravity, duration and means and methods of the crime together
22   mean that there is simply some level below which a sentence
23   simply cannot go lest it not reflect just punishment.

24        And so, victims of the crime here, to the extent you
25   are here, and I think that's just one, but victims as well who

will read this transcript later, please know that the sentence
I impose today will respect and reflect the wrong that was done
to you, and I will put in place a restitution order reflecting
the debt that Mr. Nissen owes each of you from the scheme.  I
will make it a condition of the maximum term of supervised
release that will follow Mr. Nissen's incarceration that he
make payments towards that restitution order.  And more than
that, I expect that to the extent restitution is unpaid at the
end of the supervised release term, the restitution order, by
my hand, will be converted to a civil judgment against
Mr. Nissen.  The victims can then use that order to assure
Mr. Nissen's continued payment towards restitution in the many
years and, if necessary, decades, to come.

          Before leaving this first set of Section 3553(a)
factors, I do want to comment on the motive for this crime,
because that is important context.

          As a judge in this court, I see many cases involving
financial fraud.  The vast majority of defendants sentenced for
such crimes were motivated by personal greed.  I'm referring to
cases involving insider trading schemes, boiler room schemes,
telemarketing schemes, corporate schemes to phony up earnings
reports and other financial metrics and any number of other
schemes and scams prosecuted as mail fraud, wire fraud, bank
fraud or securities fraud.  The goal of these frauds is almost
always personal enrichment, and the fruits of those frauds are

often opulent real estate and swollen bank accounts and
driveways full of luxury cars and extravagant resort travel and
shopping sprees and the like.  I have seen many of those cases,
years ago, as a prosecutor and, in more recent years, as a
judge.

          This is not such a case, or even remotely close.

          You have written in your letter to me, and you have
consistently said, Mr. Nissen, that your goal in seeking the
loans here by illegal means was to keep your company alive.
The record, as developed by Kroll, under the supervision of
government counsel over the last year, makes clear that that is
so.

          Of course, your desire to keep NECO alive did not
justify breaking the law and lying to lenders.  The responsible
course for you was instead to tell the truth to the lenders.
Your responsibility was to accurately portray the company's
finances and to let the chips fall where they might; if your
company went bust, if a lender forced you into bankruptcy, with
all the hard consequences that meant for you and your employees
and all the shame you might have felt, so be it.  You had no
right to dupe lenders because you weren't willing to face up to
the company's inability to pay its debts.  You had no right to
take liberties like that with other people's money or to put
your company's survival over the rights of your lenders.

          But the fact that your motivation was to save the

1    company and not to line your pockets is important in my

2    assessment of the just punishment.  The crime would be much

3    worse and much more predatory and despicable had it been

4    committed out of personal greed.  I am persuaded that this

5    crime had its roots in your unwillingness to face reality.  You

6    were unable to acknowledge that your company, after a series of

7    financial reversals, could not pay its debts and was on the

8    brink of collapse.  In the crucible, you panicked and you made

9    a terrible decision, one with whose consequences you will live

10   for the rest of your life.  Instead of owning the problem and

11   taking responsibility, you shifted responsibility to your

12   creditors, whom you misled.  And while that kept the company

13   going somewhat longer, it only deepened the hole you were in

14   and it only deferred the reckoning.  That's why we're here

15   today.

16          I asked that the Kroll investigation be done because

17   it was important for me to determine empirically what your

18   motivation had been, and the Kroll investigation almost

19   entirely bears out your version of events.  It shows that

20   almost all of the money obtained from lenders was used to keep

21   your company afloat by paying its debts.

22          Now, the record is not perfect in this respect.  A

23   subset of the funds obtained by NECO were used to pay personal

24   expenses of yours.  These included money paid towards the

25   purchase of your home and alimony to your ex-wife and payment

J96WnisS

of Haydee Nissen's credit card expenses and gambling losses.
And so it isn't literally the case that there was no direct
personal benefit whatsoever.  There was some, and that is an
unfortunate fact for you.  That fact is today's sentence.

        But the big picture revealed by Kroll's work is that
this crime was fundamentally a misbegotten effort to save the
company, and as Mr. Bachner points out, had you been driven by
personal enrichment as opposed to trying to keep the company
alive, you would have taken for yourself, and not kept in the
company, the hundreds of thousands of dollars in uncashed
distribution checks to which you were entitled.

        Bottom line, while your crime inflicted great harm,
your motive was far more situational than in most cases of
comparable sized fraud.  Most cases generating guidelines like
yours involve perpetrators whose motives are more malignant.

        That ends my discussion of the first set of 3553(a)
factors, meaning the need for just punishment and the like.

        Under Section 3553(a), I am to consider next the
interest in what is called general deterrence.  That refers to
the need for the sentence I impose to be sufficient to
discourage other people who would consider committing a
financial fraud like yours from doing so.  There is a very
strong interest in that here.  There are far too many cases
involving business fraud in our criminal justice system.  It's
important that the sentences imposed in these cases, considered

1    in the aggregate, be sufficient to convey to people who

2    consider crossing such a line that, if they get caught, there

3    will be life-changing consequences.

4            As the government points out, the interest in a

5    sentence that will serve as a general deterrent is particularly

6    acute in the area of white collar crime.  That is so for a

7    number of reasons.  There tend to be fewer prosecutions in that

8    area; the cases of guilt beyond a reasonable doubt can be

9    harder to build in that area; the prosecutions and sentences in

10   cases in that area tend to get outsized attention; and people

11   in white collar lines of work tend to hear about sentences

12   imposed on white collar perpetrators, like you, of financial

13   frauds.  So, the premise of general deterrence has special

14   traction in the area of business crimes like yours.

15           At the same time, while the interest in general

16   deterrence favors a meaningful prison sentence, it does not

17   guide a court more specifically than that.  There has been a

18   lot of scholarship in the area of general deterrence.  It

19   pretty universally shows that when it comes to deterring other

20   people from committing crimes, it is primarily the speed and

21   likelihood of getting caught and convicted that is the most

22   powerful general deterrent.  Provided that there is some

23   meaningful sentence, the scholarship does not suggest that the

24   length of the sentence contributes much at all to general

25   deterrence.  Beyond a certain point, an incrementally longer

J96WnisS

1    sentence does not yield incrementally greater general

2    deterrence of other people, so the factor of general deterrence

3    favors a meaningful prison sentence, but not one of any

4    particular length.  It certainly doesn't require anything

5    remotely close to a sentence within the guideline range here.

6            Under Section 3553(a), I am also to consider the

7    interest in specific deterrence.  That refers to the need for

8    the sentence I impose to send a message that is sufficient to

9    deter you from committing a future crime, Mr. Nissen.  That

10   factor, in my judgment, is not insignificant in your case.

11   This was your first offense.  You have had a completely

12   spotless criminal record.  In fact, outside of this offense,

13   you appear to have led a thoroughly upstanding life, with a

14   strong record of gainful employment, industry and civil

15   engagement, and this offense was self-evidently the product of

16   particular circumstances.  Your company was up against it, and

17   you made a terrible choice.  You succumbed to the temptation to

18   try to patch your company through by seeking out loans on false

19   pretenses.

20           But there is nothing in your history or the record of

21   this case that would lead a person to think that you will

22   recidivate.  There is nothing that suggests that you are prone

23   generally to taking advantage of others.  Everything I have

24   read about you is to the contrary.

25           It's also clear to me that you are in agony as a

result of being disgraced, of being prosecuted, of facing a

term in federal prison, and of subjecting your wife and the

children, who you adore, to financial hardship and separation

from you.  I have no doubt, none whatsoever, that if you are

ever tempted to commit a crime again, the searing pain of the

past several years would stay your hand, and so, insofar as the

3553(a) factor of specific deterrence is concerned, a long

prison sentence is not needed here.  Coupled with all the other

adverse effects upon you of the exposure of your fraud, a

prison sentence of almost any length should get your attention

and deter you from committing another crime.

        In this respect as well, Mr. Nissen, your situation is

different from many fraud defendants with guidelines ranges

like yours.  In many of those cases, the defendant's conduct

and history is one good reason to fear that he may strike

again.

        Under Section 3553(a), I also have to consider the

interest in protecting the public, otherwise known as

incapacitation.  That refers to the benefit that the public

gets when a person who is prone to commit further crimes is put

in federal prison, where, by definition, they cannot injure the

free public.  For much the same reasons as I covered just now

in discussing specific deterrence, that is also not a

consequential factor here.  I do not believe you are a risk to

the public.

1          The public has little to fear from you, Mr. Nissen, if

2     you are at large.  Until this crime, you were very much a

3     positive contributor to your various communities.  Unlike many

4     of the violent criminals or drug dealers or serial thieves or

5     fraud perpetrators whom I have occasion all too much occasion

6     to sentence, you do not have any demonstrated proclivity to

7     commit crimes.  There are other reasons a meaningful prison

8     sentence is required here, primarily just punishment and to

9     some degree general deterrence.  The protection of the public

10    is not one of them.  In this respect as well, your case is

11    quite different from the heartland of cases to which the fraud

12    guidelines apply.

13         So far I have reviewed the factors under Section

14    3553(a) that, in many cases, tend favor a longer period of

15    incarceration, although in your case, only some of them do.  I

16    now want to turn to two other 3553(a) factors, two other

17    factors that favor you.  To begin with, you accepted

18    responsibility.  You did that, first and foremost, by pleading

19    guilty.  In so doing, you acknowledged that you had done wrong,

20    and you spared the Justice Department and the federal courts

21    the resources that otherwise would have been consumed in

22    litigating your guilt.  That matters to the Court, as it does

23    under the sentencing guidelines.  Please know that had you not

24    pled guilty, had your guilt been established instead at a trial

25    that had facts that were substantially the same, the sentence

J96WnisS

1    you would have received would have been a good deal higher.

2              In your case, there is added significance to your

3    acceptance of responsibility because of the exceptional

4    circumstances surrounding it and the exceptional nature of the

5    steps you took.  Ordinarily, a defendant who gets credit for

6    accepting responsibility is indicted, and then sometime later,

7    after receiving discovery and while on a pretrial schedule,

8    agrees to plead guilty and admits guilt.  In your case, in

9    contrast, you confessed to your victims and you walked the case

10   into the U.S. Attorney's Office.  You admitted your guilt, and

11   from there it was just a matter of negotiating the details of

12   the plea.

13             Now, I understand that credit for that wise decision

14   is due, in part, to your counsel, and I also understand that

15   the circumstances left you with limited viable options.

16   Circumstances, as the government rightly points out, had

17   spiraled well out of your control.  You were unable to pay your

18   creditors.  You had been confronted by them.  You had confessed

19   to some of them, and it was clear to all that you had brazenly

20   lied to them to get their money.  It was a matter of time

21   before your creditors would have reported the fraud presumably

22   to the Justice Department, and it was a matter of time before

23   you were charged and apprehended.

24             Nevertheless, with the benefit of eight years on the

25   bench, I can say that your decision to self-report your fraud

J96WnisS

|    |                                                                              |
|----|------------------------------------------------------------------------------|
| 1  | was extraordinary.  I've seen many defendants who, by any                    |
| 2  | objective measure, are dead to rights.  The evidence of their                |
| 3  | guilt is increasingly overwhelming.  They, however, do not                   |
| 4  | self-report, and they often enter pleas of guilty long after                 |
| 5  | indictment.  You deserve more credit for owning your guilt and               |
| 6  | admitting it early and unequivocally.  Again, you saved the                  |
| 7  | system substantial resources that could presumptively put to                 |
| 8  | use in other matters.  In the same vein, you have worked with                |
| 9  | your lenders and the bankruptcy trustee to reconstruct events.               |
| 10 | All of that may help your victims gain a degree of relief.                   |
| 11 | Certainly it has helped counsel and the Court formulate                      |
| 12 | restitution and forfeiture orders, whose terms you properly do               |
| 13 | not dispute.                                                                 |
| 14 | I also accept that you are remorseful for your crimes.                       |
| 15 | I've read your lengthy letter to me.  I've heard your remarks                |
| 16 | today.  It's clear to me that you appreciate the steep price                 |
| 17 | that your family is paying and will continue to pay for your                 |
| 18 | decision to defraud your lenders.  I appreciate that you've                  |
| 19 | expressed remorse for the harm you visited upon your lenders,                |
| 20 | who did not deserve what they got.                                           |
| 21 | Apart from your acceptance of responsibility, as Mr.                         |
| 22 | Bachner points out, I am required, under Section 3553(a), a                  |
| 23 | court to consider the defendant's history and characteristics,              |
| 24 | and at this point in the analysis, I am focused on the aspects               |
| 25 | of your life and character independent of the crime for which                |

1    you are about to be sentenced.  In assessing that, I have been

2    benefitted by an excellent and perceptive presentence report

3    but also by the very insightful sentencing submission I

4    received from Mr. Bachner and from the many letters attached to

5    it.

6              From the many letters I have received about you, it is

7    clear to me that this offense, while gravely wrong, is also

8    completely anomalous in your life's experience.  You present

9    from those letters as a person with a profound work ethic,

10    going back to your teens; as a devoted son and brother and

11    father and husband; as a girls' softball coach who has taken an

12    outsized interest in the well-being of the children on his team

13    and their families; and as an employer with a laudable degree

14    of commitment to his employees, albeit that may have led you to

15    stray here.

16              It is also clear to me that as a result of the central

17    role you play in the lives of many people, including your wife

18    and daughters and even your ex-wife, your absence will hit

19    others hard.  It's also clear to me, as we heard this morning,

20    that certain people in your extended family who are positioned

21    to step up to fill the void that you will leave upon your

22    incarceration, particularly in the life of your younger

23    daughter, have not done so.  That saddens me.  In the interest

24    of your daughter, who has done nothing wrong and should not be

25    shunned on account of her father's misdeeds, I certainly hope

1    that her relatives and others will rally around her.

2         I've read carefully all the letters I received on your

3    behalf, as I did the victim impact letters.  I was going to

4    read aloud extensive excerpts from the letters.  I'm not going

5    to do that, because Mr. Bachner has essentially all but done

6    that for me, and while there is more that I could capture in

7    the letters, I think his summary substantially captured the

8    central ingredients.

9         Let me just ask, by a show of hands, who here wrote

10   letters to me.

11        All right.  Please know that I read in detail all of

12   those letters, and I appreciate those of you who participated

13   in this proceeding by writing about Mr. Nissen.  Your insights

14   and your accounts of his good works absolutely made a

15   difference in my assessment of his history and characteristics,

16   and I thank you for participating as you did.

17        These letters are all impressive testimonials.  On the

18   day that a person is sentenced, it is appropriate that they be

19   evaluated in light of the totality of their life's experience,

20   the good as well as the bad.  I will do so today, Mr. Nissen.

21   Please know the letters I have received about you from your

22   family and your many friends have assisted me in my reflections

23   as to the just sentence.

24        In the end, my judgment here is that while a real and

25   meaningful term of imprisonment is necessary as a matter of

1    necessary and just punishment, the guidelines recommendation of

2    a term of between 97 and 121 months' imprisonment is not only

3    excessive but obviously excessive.  The Court's obligation

4    under the law is not to be a slave to the guidelines, and the

5    judges in this district recognize that.  In over half the cases

6    in this district, courts vary below the guidelines range, often

7    markedly, and under the parsimony principle repeatedly

8    articulated by the Second Circuit, it is not merely to impose

9    some reasonable sentence; it is to impose the lowest reasonable

10   sentence viewed in light of the 3353(a) factors.

11          Here, while an eight- to ten-year sentence could

12   certainly be viewed in some sense as among the reasonable

13   sentencing options, the 3553(a) factors make sentences

14   materially below that guideline range eminently reasonable too,

15   and again, under the parsimony principle, the lower of the

16   reasonable sentences as a matter of law is to control.

17          The guideline range here is driven almost entirely by

18   the dollar amount of the fraud, but the guidelines do not take

19   into account the factors that distinguish your case from

20   others' with similar ranges.  Most of all, as I've said a

21   couple times, those cases, the defendant presents almost always

22   a real risk of recidivism, such that the factors of protection

23   of the public and specific deterrence require a prison term of

24   greater length.

25          Not so here.  For the reasons I have stated, in your

J96WnisS

case, the risk of recidivism is not a serious concern.  Your

life's experience involves an admirable amount of good works,

and I do not perceive any risk to the public presented by your

being at liberty.  On the contrary, it is clear to the Court

that once you have served your time for this crime, society

will be better off with you in it as a free man, doing good and

helping pay down the judgments against you.  Your life's

experience tells me that a free society is better off with you

in it than behind bars.

I will, accordingly, impose a prison sentence that

reflects a substantial downward variance to the guideline

range.  To the extent, however, that the defense at any point

might have envisioned a noncustodial sentence or a sentence so

short as to permit Mr. Nissen to be released in time for

certain milestones within his family, I regret that any such

request is also unrealistic, and Mr. Bachner, of course, today

acknowledged the need for a prison sentence.  This was a vast

fraud, and as a matter of just punishment, as I said at the

outset, and I will conclude with this, there are limits below

which a court cannot responsibly go lest to trivialize the

offense.

Mr. Nissen, since the time your loan scheme ran

aground, you have done all a person can do to accept

responsibility and to begin to make amends, but as a matter of

justice, as a matter of just punishment that fits the crime,

J96WnisS

there is a price you must pay, with your liberty, for that

offense.  The variance from the guidelines here will,

therefore, still result in a consequential term of imprisonment

that I'm convinced no one would rationally choose.

I have given long and hard thought to the sentence

here.  Here, I hope it's obvious that the sentence I'm about to

impose is the lowest one, after considered thought, that I

believe to be responsibly and reasonably imposed consistent

with the Section 3553(a) factors, including the sentencing

guidelines.

I'm now going to formally state the sentence I intend

to impose.  The attorneys will have a final opportunity to make

legal objections before the sentence is finally imposed.

Mr. Nissen, would you please rise.

After assessing the particular facts of this case and

the factors under Section 3553(a), including the sentencing

guidelines, it is the judgment of the Court that you are to

serve a sentence of 27 months' imprisonment in the custody of

the Bureau of Prisons to be followed by a period of three years

of supervised release.

As to the supervised release, the standard conditions

of supervised release shall apply.

In addition, you will be subject to the following

mandatory conditions:

You shall not commit another federal, state or local

1    crime.

2            You shall not illegally possess a controlled

3    substance.

4            You shall not possess a firearm or destructive device.

5            You must cooperate in the collection of DNA as

6    directed by the probation officer.

7            You must notify the Court of any material change in

8    your economic circumstances that might affect your ability to

9    pay restitution, forfeiture or special assessments.

10           You must also meet the special conditions that are set

11   out on page 32 of the presentence report.

12           You must provide the probation officer with access to

13   any requested financial information.  You must not incur new

14   credit charges or open additional lines of credit without the

15   approval of the probation officer unless you are in compliance

16   with the installment payment schedule that will be set in

17   connection with restitution.

18           I'm also going to make the payment of restitution, of

19   course, a condition of supervised release.

20           As to restitution, I find that the victims have

21   suffered monetary losses compensable under the victim

22   protection act in the amount set out in the order of

23   restitution that the government has provided, to wit,

24   $71,678,669.90.

25           I, however, will give the government two weeks to

J96WnisS

 1    provide me with a revised restitution order that is consistent

 2    not just with the dollar amounts that are set out in the draft

 3    order but with the proposal on pages 32 to 33 of the

 4    presentence report with respect to, among other things, the

 5    payment of 15 percent of gross monthly income towards the

 6    satisfaction of restitution.

 7         With respect to a fine, I'm not going to impose a

 8    fine.  I am concerned that if I did so, it would interfere with

 9    your restitution payments that simply have to take priority.

10         With respect to the special assessment, I am imposing

11    a mandatory special assessment of $100, which shall be due

12    immediately.

13         Finally, with respect to forfeiture, I'm going to

14    execute the consent forfeiture order that all parties have

15    given me.

16         Does either counsel know of any legal reason why the

17    sentence shall not be imposed as stated?

18         MR. ZOLKIND:  No, your Honor.

19         MR. BACHNER:  No, Judge.

20         THE COURT:  The sentence is imposed as stated.

21         Counsel, are there any open counts?

22         MR. ZOLKIND:  No, your Honor.

23         THE COURT:  All right.

24         Mr. Nissen, to the extent you have not given up your

25    right to appeal your conviction and your sentence through your

1    plea of guilty and the plea agreement you entered into with the

2    government in connection with that plea, you have a right to

3    appeal those things, your conviction and your sentence.  If

4    you're unable to pay for the cost of an appeal, you may apply

5    for leave to appeal *in forma pauperis*.  The notice of appeal

6    must be filed within 14 days of the judgment of conviction.

7            Government, I take it you are comfortable with the

8    defendant's voluntary surrender.

9            MR. ZOLKIND:  We are, your Honor.

10           THE COURT:  Mr. Bachner, two things.

11           First of all, do you want me to make a recommendation

12   to the Bureau of Prisons with respect to the institution in

13   which he would serve his sentence?

14           MR. BACHNER:  Yes, Judge.  In order to facilitate

15   visits and for religious reasons, Otisville would be a

16   wonderful recommendation, if you could.

17           THE COURT:  I take it if Otisville is unavailable,

18   you'd want as a backup recommendation as close as possible to

19   the New York area.

20           MR. BACHNER:  Yes.

21           THE COURT:  All right.  What about the surrender date?

22           MR. BACHNER:  Your Honor, given the birth of the child

23   that's expected in about a month, if we could do the first week

24   of November, that would be great.  I know it's a little bit

25   longer than normal, Judge, but that would be wonderful.

J96WnisS

1          THE COURT:  Any objection from the government?

2          MR. ZOLKIND:  No objection.

3          THE COURT:  Mr. Smallman, a date in the first week of

4    November.

5          I'm going to direct that Mr. Nissen surrender for

6    service at the institution designated by the Bureau of Prisons

7    by 2 p.m. on November the 7th, or as notified by pretrial

8    services or the probation department.  If for some reason an

9    institution has not been designated, Mr. Nissen, you are to

10   surrender to the U.S. Marshals in this district on that date

11   and time unless the Court, in advance, has deferred the

12   surrender date.

13         Mr. Nissen, your conditions of release continue up

14   until the time that you report to begin your sentence.  If you

15   fail to report for your sentence, you may be charged with

16   another criminal offense.  Again, if you don't receive notice

17   of the designated facility to which you're about to surrender,

18   you need to surrender to the U.S. Marshals by the date and time

19   I've given you.

20         Anything further from the government?

21         MR. ZOLKIND:  No, your Honor.

22         THE COURT:  Anything further from the defense?

23         MR. BACHNER:  No, your Honor.  Thank you.

24         THE COURT:  Mr. Nissen, I just want to conclude by

25   wishing you well.  You made a terrible criminal mistake.  You

J96WnisS

1    also demonstrated another aspect of your life, real civic

2    commitment, real commitment, to your friends and family.  I

3    have little doubt that you have gotten the message from this

4    experience, but I do expect, consistent with what I learned

5    about you, that while you are in prison and afterwards, you

6    will be working overtime to repay the restitution debt and to

7    comport yourself in a way consistent with the expectations that

8    your friends and family and the Court have for you.

9              You may be seated.

10             With respect to the friends and family that are here,

11   again, I want to thank you, first of all, for writing me, to

12   the extent that you did, but I also want to thank all of you

13   for being here today.  Mr. Nissen has a hard road ahead of him.

14   He will be at one point returning to free society, and he will

15   need your support to help him rebuild his life and put himself

16   in a position where he can once again earn money to help repay

17   the victims.  The fact that you're here today tells me you're

18   in his corner for the long term, and that's encouraging to me.

19   It gives me confidence that you will steer him right for the

20   rest of the way.

21             We stand adjourned.

22             (Adjourned)

23

24

25