```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/6/2023
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                      :
KENNETH P. SILVERMAN, ESQ.,                           :
                                                      :
                                      Plaintiff,      :          1:22-cv-5211-GHW
                                                      :
                      -v –                            :       MEMORANDUM OPINON &
                                                      :              ORDER
CITIBANK, N.A.,                                       :
                                                      :
                                      Defendant.      :
                                                      :
------------------------------------------------------------------ X
GREGORY H. WOODS, United States District Judge:

## I.      INTRODUCTION

From at least 2015 until his arrest in 2017, Jason Nissen ("Nissen") ran a Ponzi scheme that

defrauded investors out of tens of millions of dollars.  For most of the scheme's duration, Citibank,

N.A. ("Citibank") was Nissen's primary banking institution.  According to Plaintiff, the trustee for

Nissen's now-bankrupt companies, for nearly two years, Citibank allowed Nissen's accounts to rack

up thousands of highly suspicious transactions.  After Citibank formally recommended closing his

accounts on suspicion of fraud, it let its closure recommendations languish for months as Nissen

continued to steal from investors.  In their papers, the parties expend much effort arguing about the

significance of a history of suspicious transactions, Citibank's internal reports detailing concerns of

fraud, Citibank's processing of "atypical" banking transactions, and Citibank's employees' attempts

to evade and stall their own colleagues from closing the accounts.  Both parties largely ignore what

is, in the Court's view, the key allegation in the complaint:  that a Citibank employee made an

intentional misrepresentation to a victim of the fraud, at the express request of the fraudster.  This

allegation, together with the other facts pleaded in the complaint, suffices to plead that Citibank

aided and abetted the fraud, and therefore the Court denies in part Defendant's motion to dismiss.

## II.     BACKGROUND

### A.  Factual Background

#### 1.   The Parties and the Underlying Fraud

Plaintiff Kenneth P. Silverman (the "Trustee") is the Chapter 7 trustee of National Events Holding, LLC, National Events Intermediate, LLC, National Event Company II, LLC, National Event Company III, LLC, World Events Group, LLC, National Events of America, Inc. ("NEA"), and New World Events Group, Inc. (collectively, the "Company").[1]  Dkt. No. 1-21 ("Complaint") ¶ 9.  Jason Nissen formed the Company in 2006.[2]  *Id.* ¶ 18.  Historically, the Company operated as a "relatively small" legitimate business, primarily selling and brokering tickets to concerts, sporting competitions, and other events.  *Id.* ¶¶ 1, 19.  The Company purchased tickets in the secondary market for resale or in bulk directly from sports teams and sports leagues, funding the purchases with investments from "friends and family."  *Id.* ¶¶ 21, 23.  In April 2015, the Company entered into an agreement with Falcon Strategic Partners IV, LP and FMP Agency Services, LLC (together, "Falcon") through which Falcon would provide up to $60 million to the Company, in exchange for a significant interest in the Company.  *Id.* ¶¶ 24–26.

Nissen and the Company began to work with Citibank as their primary banking institution during the summer of 2015.  *Id.* ¶ 69.  At the time, Nissen and the Company each already had one Citibank account.  *Id.* ¶¶ 67–68.  From the summer of 2015 onwards, Josh Santana, a small business banker and relationship manager with Citibank Global Consumer Banking, and Jack Crowley, a senior vice president at Citi Commercial Bank, served as Nissen's and the Company's relationship managers.  *Id.* ¶ 70–73.  In those roles, Santana and Crowley were responsible for "retaining and/or expanding Citibank's relationship with Nissen and the Company."  *Id.*  Nissen's and the Company's

---

[1] The Court refers to the companies as one collective entity, tracking the allegations in the Complaint.  The Complaint pleads most allegations regarding the several companies that are defined to comprise the "Company" collectively.
[2] The Company initially consisted of NEA and National Event Company II, LLC.  Complaint ¶ 18.

accounts represented a "significant" portion of Crowley's book of business.  *Id.* ¶ 74.  At some point during their professional relationship, Santana and Nissen also developed a personal relationship: Nissen sent Beyoncé concert tickets to Santana's personal email address and Santana forwarded a job applicant's resume for Nissen's review.  *Id.* ¶ 70

Between 2015 and 2017, Taly USA Holdings Inc. and SLL USA Holdings, LLC (together, "Taly"), Falcon, and Hutton Ventures LLC ("Hutton") (together, the "Investors") each invested millions of dollars in the Company.  *Id.* ¶¶ 33–63.  Nissen represented to the Investors and others that he would use the money to purchase tickets to premium events in bulk.  *Id.* ¶ 32.  In reality, Nissen was operating a Ponzi scheme, using the money "in large part" to repay other lenders and enrich himself.  *Id.* ¶ 32.

### 2. Citibank Flags Nissen's and the Company's Accounts for Suspicious Activities and Recommends Closure

Shortly after the Company opened its new accounts at Citibank, Citibank employees began flagging the accounts for "suspicious" activities and seeking explanations from Santana and Crowley. *Id.* ¶ 75.  In October 2015, a Citibank branch services support unit employee contacted Santana about multiple "suspicious, round-number transactions."  *Id.* ¶ 76.  In May 2016, a Citibank anti-money laundering ("AML") compliance analyst contacted Crowley about another set of large, round-number transactions, warning him that Citibank would need to close the accounts if it did not receive an adequate explanation.  *Id.* ¶ 84.  In November 2016, a branch services unit employee emailed Nissen's Citibank wealth management relationship manager, who forwarded the email to Crowley, with inquiries about Nissen's large cash deposits and about why he was transacting with counterparties not in the ticket industry.  *Id.* ¶ 101.  To these inquiries, Santana and Crowley responded that Nissen purchased large amounts of tickets in cash and that Nissen "wrote a lot of checks" and made large deposits to cover them.  *Id.* ¶¶ 75, 101.

During this time period, Nissen's and the Company's accounts "consistently maintained low,

zero, or negative balances." *Id.* ¶ 140.  Santana and others from Citibank requested overdraft allowances for accounts with insufficient funds to cover frequent outgoing wire transfers and checks "on a near-daily basis, if not multiple times a day." *Id.* ¶ 142.  Santana also frequently requested that Citibank allow Nissen and the Company to access incoming funds without regard to Citibank's standard multi-day holds on deposits.  *Id.* ¶ 143.  In response to these requests, Santana's colleagues in the Online Overdraft ("OLOD") and credit departments issued multiple complaints and warnings, at points describing the overdraft requests as "excessive" and "abusive" and recommending that Santana educate Nissen on properly funding the accounts.  *Id.* ¶¶ 147, 150, 155.

In July 2016, Citibank received inquiries from the United States Federal Bureau of Investigations (the "FBI") related to an investigation of Nissen for financial crimes.  *Id.* ¶¶ 89–90.  In response, multiple Citibank Fraud Investigation Unit ("FIU") employees examined Nissen's and the Company's accounts in detail.  *Id.* ¶¶ 90–92, 109.  They discovered that Nissen frequently transacted with parties "involved in corruption scandals" and observed "layering"[3] and "structuring"[4] among the accounts.  *Id.* ¶¶ 92, 112, 97, 117, 95, 114.  They concluded that transactions with one particular party were "highly suspect, if not fraudulent," that Nissen and the Company "could be engaged in money laundering," and that "there was no lawful, business, or economic purpose for [] hundreds of transactions exceeding hundreds of millions of dollars."  *Id.* ¶¶ 96, 109, 112.  Some of their reports explicitly identified the Investors as Nissen's counterparties.  *Id.* ¶ 116.  In November 2016, FIU formally recommended that Crowley close Nissen's and the Company's accounts due to the suspicious activities.  *Id.* ¶ 103.  Over the next several months, through March 2017, FIU would produce additional reports analyzing Nissen's and the Company's

---

[3] "Layering is the process of making the source of illegal money as difficult to detect as possible by progressively adding legitimacy to it, and involves moving funds around in the financial system in order to conceal the origin of the funds."  *Id.* ¶ 97 n. 4.

[4] "Structuring is a strategy whereby one hides large amounts of cash, by depositing smaller amounts of cash to avoid automatic reporting by a bank to the government."  *Id.* ¶ 93 n. 3.

accounts, all making similar observations and coming to similar conclusions. *Id.* ¶¶ 114, 121, 124, 117, 122.

### 3. Crowley and Santana Dispute the Closure Recommendation While Continuing to Service the Accounts

In December 2016, Crowley formally disputed the closure of Nissen's and the Company's accounts and was provided with a summary of FIU's findings of suspicious activities and concerns of potential money laundering. *Id.* ¶ 108. In January 2017, Santana and Crowley received instructions from colleagues that to dispute the closure, they would need to "gain a better understanding of Nissen's and the Company's cash flows and to obtain invoices to and from third parties to substantiate suspicious, atypical banking transactions." *Id.* ¶ 168. They met with Nissen two days later, after which they emailed their Citibank colleagues that Nissen had provided them "a very comprehensive explanation." *Id.* ¶ 172. The same day, Santana made another overdraft request for the Company. *Id.* ¶ 175. When OLOD reminded him that the accounts were under review and had many outstanding overdrafts, Santana repeated the claim that Nissen had "cleared up a lot of things" at the meeting that day. *Id.* ¶ 175.

That January, Crowley also relayed information and materials from Nissen to Citibank that purported to explain the accounts' suspicious activity, none of which satisfactorily responded to Citibank's concerns. For instance, Crowley forwarded invoices that Nissen claimed to show purchase orders related to the recent overdraft request, but which instead showed movement of funds between the Company's accounts. *Id.* ¶ 182. Before sending the materials to his colleague, Crowley wrote to Nissen, "This is not an invoice from the company the check is made out to. I am confused." *Id.* Later, Crowley forwarded additional invoices that purported to reflect payments to third parties, but which instead showed the Company's billing of third parties. *Id.* ¶ 186. He also forwarded two other set of invoices, stating that they demonstrated that the Company had purchased event packages, sold them, then distributed them internally among the Company

accounts; these invoices again reflected only transfers between Company accounts.  *Id.* ¶¶ 185, 187.

In February 2017, Crowley notified Nissen of Citibank's investigation of him, which was a violation of Citibank's policy.  *Id.* ¶ 194.

On March 17, 2017, Nissen sent Crowley and Santana documents that he claimed were purchase order reports for the U.S. Open, in which he said Hutton, one of the Investors, had invested.  *Id.* ¶ 200.  The documents consisted of "lists of purported invoice numbers," were not printed on any company's letterhead, and were attached to other purchase orders between different Company entities.  *Id.*  Crowley and Santana apparently did not forward these materials to their colleagues.

Later that month, FIU requested a meeting with Crowley, reminding him that the matter had remained pending for three months.  *Id.* ¶ 202.  Crowley scheduled a call a week later.  *Id.* ¶ 206.  During the eventual meeting, FIU reiterated "grave concerns" about the accounts' suspicious activities.  *Id.* ¶ 207.  Crowley told his colleagues he would provide supporting documentation to allay their concerns.  *Id.* ¶ 207.  On two occasions shortly after the meeting, other Citibank employees emailed Crowley and others asking for an update.  *Id.* ¶ 212.  Crowley responded that he would have information from Nissen soon and informed his colleagues—falsely, according to the complaint—that Nissen had been away.  *Id.* ¶ 212.  Crowley and Santana never provided additional documentation from Nissen.

In April 2017, Nissen sent Crowley and Santana an Excel spreadsheet purporting to show dates, types, and amounts of transactions between Nissen's and the Company's accounts and third parties.  *Id.* ¶ 213.  The transactions were accompanied by notes that included, "Supposed to be for Olympics," "Cannot Find This Transaction," and "bank check to replace bounced check [] for same amount."  *Id.*  Crowley responded, "Are this [sic] the cash transactions.  If so I like how you are explaining."  *Id.* ¶ 214.

Meanwhile, from January through May 2017, Santana and Crowley continued to press their colleagues to fulfill overdraft requests on behalf of Nissen's and the Company's accounts. For instance, Santana expressed that failure to pay the overdrafts "could expose Citibank to legal liability." *Id.* ¶ 180. The two also repeatedly followed up with different entities within Citibank about clearing the requests. *Id.* ¶¶ 178, 184, 218. Eventually, OLOD asked Crowley and Santana to stop sending requests. *Id.* ¶ 197. While he was out of the office in May, Santana requested that another colleague "help pay Nissen's items." *Id.* ¶ 221.

### 4. Citibank's Santana Lies to an Investor at Nissen's Request

In April 2017, Taly, one of the Investors, confronted Nissen about why it had only received one of two anticipated wire transfers. *Id.* ¶ 215. Nissen falsely told Taly that Citibank had accidentally sent one of the wires to the wrong account. *Id.* In fact, Nissen had never sent the second wire. *Id.* When Taly demanded documentation from Citibank confirming this story, Nissen forged a letter from Citibank to verify his account. *Id.* ¶ 216. After reviewing the letter, Taly demanded to meet in-person with a Citibank representative to confirm that Citibank had indeed sent the wire to the wrong account. *Id.* ¶ 216. Nissen arranged a meeting between Santana, a Taly executive, and himself. *Id.* ¶ 217. At that meeting, Santana, at Nissen's request, corroborated Nissen's false explanation about the wire. *Id.*

### 5. Nissen Admits to and Is Prosecuted for Fraud, and Citibank Closes the Accounts

On May 7, 2017, having exhausted his funding sources, Nissen admitted to Taly that he had been running a Ponzi scheme. *Id.* ¶ 222. The next day, he met with Taly executives and associates and made a more detailed confession. *Id.* ¶ 223.

The same day, FIU again requested information about the account closures from Santana and Crowley. *Id.* ¶ 224. Crowley emailed Santana and Nissen, "Do you have the info you were going to send over. I cant [sic] stall them anymore." *Id.* ¶ 225.

On May 10, 2017, Nissen confessed the fraud to Falcon.  The next day, when Santana contacted the Company to try to speak with Nissen, he learned that the Company had terminated Nissen.  *Id.* ¶ 227.

On May 15, 2017, Crowley finally consented to the closure of the Company's and Nissen's accounts.  *Id.* ¶ 228.  Nearly six months had passed since FIU had recommended closing the accounts, even though Citibank policy dictated that AML-generated closures be resolved within 30 days.  *Id.* ¶ 201.

In September 2017, Citibank issued another report retroactively analyzing Nissen's and the Company's account activities since March 2017.  *Id.* ¶ 133.  Based on a detailed analysis of account activity, the report concluded that Nissen "appeared to have been conducting a traditional Ponzi scheme."  *Id.* ¶ 134.  The report named Falcon and Taly as victims of the fraud.  *Id.* ¶ 136.

On May 31, 2017, Nissen was arrested and charged with allegedly defrauding investors of at least $70,000,000 through his Ponzi scheme.  *Id.* ¶ 229.  A year later, he pleaded guilty to wire fraud in connection with the charges.  *Id.* ¶ 238.  Six months after that, he was sentenced to 27 months in prison.  *Id.* ¶ 239.

### 6.  The Company Declares Bankruptcy

On June 1, 2017, victims of Nissen's Ponzi scheme filed state court litigation against NEA and New World Events Group, resulting in the appointment of a receiver on June 5, 2017.  *Id.* ¶ 230.

On June 5, 2017, the remaining Company entities filed petitions for relief under Chapter 11. *Id.* ¶ 231.  On June 13, 2017, the bankruptcy court established the joint administration of these entities' estates.  *Id.* ¶ 232.  On June 28, the receiver in the litigation against NEA and New World Events Group filed petitions for relief under Chapter 11.  *Id.* ¶ 223.  Thereafter, the bankruptcy court converted all the Chapter 11 cases to Chapter 7 liquidation cases and directed the joint

administration of all the Company entities' Chapter 7 cases.  *Id.* ¶ 237.

### B. Procedural History

On June 3, 2021, the bankruptcy court authorized the Trustee to retain special litigation counsel to pursue and prosecute claims against the financial institutions used by Nissen and the Company.  *Id.* ¶ 240.  The Trustee thereafter filed an application with the bankruptcy court pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure seeking discovery from Citibank.  *Id.* ¶ 241.  The bankruptcy court granted the application, and the Trustee issued subpoenas to Citibank on September 10, 2021.  *Id.* ¶ 241–242.  The Investors assigned their claims against Citibank to the Trustee.  *Id.* ¶ 258.

On June 1, 2022, Plaintiff filed this action against Citibank in New York Supreme Court, alleging, on of behalf of the Company's estates and, separately, on behalf of the Investors, that Citibank aided and abetted Nissen's Ponzi scheme.  Plaintiff asserts that Nissen's and the Company's "atypical" transactions and FIU's suspicions of fraud demonstrate that Citibank had actual knowledge of Nissen's Ponzi scheme.  He further asserts that Santana, Crowley, and others provided substantial assistance by processing suspicious transactions, "stalling" their Citibank colleagues from closing the accounts, and allowing Nissen to use the accounts to operate his fraud.

On June 21, 2022, Defendant removed the action to this Court.  Dkt. No. 1.  On July 20, 2022, Plaintiff filed a motion to remand, which the Court denied on March 31, 2023.  Dkt. No. 60.  On August 23, 2022, Defendant filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 9(b), asserting the affirmative defense of *in pari delicto* against Plaintiff's claim on behalf of the Company and arguing that Plaintiff failed to adequately plead that Citibank actually knew about Nissen's fraud or that Citibank substantially assisted in it.  Dkt. No. 46 ("Def's Br.").  On September 20, 2022, Plaintiff filed its opposition.  Dkt. No. 49 ("Pl's Br.").  On October 4, 2022, Defendant filed its reply brief.  Dkt. No. 54 ("Reply").

## IV.    LEGAL STANDARD

A complaint need only contain "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a claim that does not meet this pleading standard for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  On a motion to dismiss, the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are inadequate.  *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  And "[t]he tenet that a court must accept as true" a complaint's factual allegations does not apply "to legal conclusions."  *Iqbal*, 556 U.S. at 678 (alterations omitted).

To survive dismissal under 12(b)(6), a complaint must allege sufficient facts to state a plausible claim.  *Twombly*, 550 U.S. at 570.  A claim is plausible when the plaintiff pleads facts to support the reasonable inference that the defendant has acted unlawfully.  *Iqbal,* 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  The plaintiff's claim must be more than merely "speculative." *Twombly*, 550 U.S. at 545.  And a reviewing court must "draw on its judicial experience and common sense" to determine plausibility.  *Iqbal*, 556 U.S. at 679 (citation omitted).

In addition to considering the facts alleged in the complaint, the court may consider, "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  As the Second Circuit stated in *Lynch*, "[i]t is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Circ. 2020) (citations omitted).  "The term 'written instrument' generally refers to a legal document that defines rights, duties, entitlements, or liabilities, such as a

statute, contract, will, promissory note, or share certificate." *Id.* (cleaned up) (citations omitted). However, "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citation omitted). Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).

A court may also consider documents that are "integral to" the complaint. *Id.* For a document to meet this exception to the general principle that a court may not consider documents outside of the pleadings without converting the motion to one for summary judgment, the complaint must rely heavily upon its terms and effects. *See DiFolco*, 622 F.3d at 111 ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effects, thereby rendering the document integral to the complaint." (internal quotation marks omitted)). "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (internal quotation marks omitted) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.* "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason . . . was not attached to the complaint." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

Citibank's motion to dismiss is accompanied by the Declaration of John Gueli, which attaches 12 exhibits. Dkt. No. 45 ("Gueli Decl."). The Court may consider 11 of the 12 exhibits in its analysis, as each of them is either integral to the Complaint or subject to judicial notice.

Exhibits 1 through 4 are integral to the Complaint. Each is a memo detailing a Citibank

investigation of suspected fraud by Nissen and the Company and containing recommendations to close Nissen's and the Company's accounts. The Complaint extensively paraphrases and directly quotes each of these memos. *See* Complaint ¶¶ 95–97, 108–112, 114–117, 121–130. Plaintiff also argues in its brief that these memos demonstrate Citibank's knowledge of Nissen's fraud. Pl's Br. at 10. These documents are therefore integral to the Complaint, and the Court may consider them in its analysis. *See DiFolco*, 622 F.3d at 111 (citations omitted). In a declaration submitted in opposition to the exhibits, Plaintiff argues that these documents "cannot be authenticated nor can the relevance of the statements . . . be assessed" without conducting depositions of their authors. Dkt. No. 52 ¶ 27. This argument is unpersuasive. Defendant asserts, and Plaintiff does not dispute, that these documents are identical to those produced to Plaintiff. *See* Gueli Decl. ¶¶ 2–5. Plaintiff does not assert any facts that would call into question the authenticity or accuracy of the documents. Furthermore, the Court notes the irony of Plaintiff disputing the accuracy, authenticity, and relevance of documents he heavily relied upon to draft his complaint and support his claims. Therefore, the Court considers these materials in its analysis.

Exhibits 5 through 11 are documents that were publicly filed in the Company's bankruptcy proceedings and Nissen's criminal proceeding. "[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). Therefore, the Court takes judicial notice of the existence of these filings but does not consider any statements asserted therein for their truth. *See also Actava TV, Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*, No. 18-CV-06626 (ALC), 2023 WL 2529115, at *3 (S.D.N.Y. Mar. 15, 2023) ("Judicial notice may encompass the status of other lawsuits in other courts and the substance of papers filed in those actions . . . when a court takes judicial notice of documents filed in other courts, it is not for the truth of the matters asserted in the other litigation, but rather to

establish the fact of such litigation and related filings.") (quotations omitted).

Exhibit 12 is an excerpted transcript of a deposition Plaintiff took in the Company's consolidated bankruptcy case. Because the Complaint references the deposition only in passing, it is not integral to the Complaint. Additionally, the transcript has not been publicly filed in the bankruptcy litigation, so the Court may not take judicial notice of it. Therefore, the Court disregards this exhibit.

Claims of fraud, including aiding and abetting fraud, are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) ("Rule 9(b)"). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Rule 9(b). Therefore, "while the actual . . . fraud alleged must be stated with particularity, we apply general pleading standards to scienter." *Heinert v. Bank of Am. N.A.*, 835 F. App'x 627, 629 (2d Cir. 2020) (citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000)) (internal quotations omitted).

## V.    DISCUSSION

Plaintiff alleges aiding and abetting fraud as two separate causes of action, once on behalf of the Company, and once on behalf of the Investors. The Court will address each of the two claims in turn.

### A.  Plaintiff's Claim on Behalf of the Company

Plaintiff's claim on behalf of the Company is barred by the doctrine of *in pari delicto*.[5] "The

---

[5] Defendant also asserts that the Wagoner rule "independently foreclose[s]" this claim. Def's Br at 23. The Second Circuit first articulated the Wagoner rule in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir. 1991). "The rationale underlying the Wagoner rule derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation. Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the Wagoner rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86–87 (2d Cir. 2000) (citations and quotations omitted). The Second Circuit treats the Wagoner rule as a standing rule. *See e.g., id*; *In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 97 (2d Cir. 2003). Courts in this circuit have sometimes treated the *in pari delicto* doctrine and the Wagoner rule as interchangeable. *See In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 424 (Bankr. S.D.N.Y. 2005) (collecting cases); *see also In re 1031 Tax Grp., LLC*, 420 B.R. 178, 184 (Bankr. S.D.N.Y. 2009) (describing the *in pari delicto* doctrine as the "state-court corollary" of the Wagoner rule). However, the two are distinct. *In re Grumman*, 329 B.R. 411 at 424 n.5 ("The Wagoner Rule is one of standing. *In pari delicto* is an

doctrine of *in pari delicto* mandates that the courts will not intercede to resolve a dispute between two wrongdoers." *Kirschner v. KPMG LLP*, 912 N.Y.S.2d 508, 517 (2010) (emphasis not in original).[6] The doctrine of *in pari delicto* serves two public policy purposes.  "First, denying judicial relief to an admitted wrongdoer deters illegality.  Second, the doctrine of *in pari delicto* avoids entangling courts in disputes between wrongdoers." *Id.*

> [N]o court should be required to serve as paymaster of the wages of crime, or referee between thieves.  Therefore, the law will not extend its aid to either of the parties or listen to their complaints against each other, but will leave them where their own acts have placed them.

*Id.* (quoting *Stone v. Freeman*, 298 N.Y. 268, 271 (1948)).

"The doctrine of *in pari delicto* bars a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault contributed to the loss." *Rosenbach v. Diversified Grp., Inc.*, 926 N.Y.S.2d 49, 51 (1st Dep't 2011). It "requires intentional conduct on the part of the plaintiff or its agents." *Sacher v. Beacon Assocs. Mgmt. Corp.*, 980 N.Y.S.2d 121, 124 (2014) (citing *Kirschner*, 912 N.Y.S.2d at 524).

"Traditional agency principles play an important role in an *in pari delicto* analysis . . . namely, the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principles." *Kirschner*, 912 N.Y.S.2d at 517 (citing *Henry v. Allen*, 151 N.Y. 1, 9 (1896)).  Acts of an agent are presumed to be imputed to its principal "even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud." *Id.* (citing *Price*

---

equitable defense analogous to unclean hands rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct.) (quotations omitted).  The New York Court of Appeals has clarified that that Wagoner rule "derives in significant part from federal bankruptcy law, and is a prudential limitation on standing under federal law . . . Thus, the *Wagoner* rule is not part of New York law except as it reflects the in pari delicto principle, and in New York, *in pari delicto* is an affirmative defense, not a matter of standing." *Kirschner v. KPMG LLP*, 912 N.Y.S.2d at 517.  As an affirmative defense, *in pari delicto* is analyzed under Fed. R. Civ. P. 12(b)(6).  As a jurisdictional matter, the Wagoner rule is analyzed under Fed. R. Civ. P. 12(b)(1).  Because New York law governs this case, the Court analyzes the question posed as the application of the *in pari delicto* doctrine under Fed. R. Civ. P. 12(b)(6) and not the Wagoner rule.  The distinction notes no difference in this case.

[6] Federal jurisdiction for this case arises under diversity.  The Court does not address choice of law, because both parties apply New York State law in their briefs.

*v. Keyes*, 62 N.Y. 378, 384–85 (1875)).  "Like a natural person, a corporation must bear the consequences when it commits fraud." *Id.* (citing *Wight*, 219 F.3d at 86–87).  The presumption of imputation to the principal "fosters an incentive for a principal to select honest agents and delegate duties with care." *Id.* at 518.

In the context of litigation by a bankruptcy trustee, "[t]he debtor's misconduct is imputed to the trustee because, innocent as he may be, he acts as the debtor's representative." *In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54, 63 (2d Cir. 2013).  In other words, "a trustee stands in the shoes of the corporation," and the doctrine of *in pari delicto* bars him from "recover[ing] for a wrong that he himself essentially took part in." *Id.* (citations omitted).

Under New York law, the doctrine of *in pari delicto* is an affirmative defense.  *See, e.g.*, *Kirschner* 912 N.Y.S.2d at 522.  Under federal law, Rule 12(b)(6) allows a defendant to raise an affirmative defense on a pre-answer motion to dismiss "without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 436 (S.D.N.Y. 2022) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).

Plaintiff does not dispute that Nissen's fraud, imputed to the Company, is clear on the face of the pleadings, but instead unpersuasively argues that the so-called "adverse interest exception" to the doctrine of *in pari delicto* applies to the claim.  "This most narrow of exceptions" is reserved for cases of "outright theft or looting or embezzlement." *Kirschner*, 912 N.Y.S.2d at 519.  "To come within the exception, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes.  It cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal." *Id.* (quoting *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784–785 (1985)).  Thus, the adverse interest exception is applicable only "where the fraud is committed *against* a corporation rather than on its behalf." *Id.*  If the

"fraudulent conduct enables the business to survive . . . this test is not met," regardless of whether the conduct is against the "long-term interests" of the business. *Id.* at 520. "Even where the insiders' fraud can be said to have caused the company's ultimate bankruptcy, it does not follow that the insiders 'totally abandoned' the company . . . it is immaterial that it has turned out that it would have been better for the agent to have acted differently." *Id.* (internal citations and quotations omitted). In fact, "any harm from the discovery of the fraud—rather than from the fraud itself— does not bear on whether the adverse interest exception applies." *Id.*

Because it is plain on the face of the pleadings that Nissen did not "totally abandon" the interests of the Company in perpetrating the Ponzi scheme, the adverse interest exception does not apply. *Hampton Affiliates*, 66 N.Y.2d at 784. To the contrary, Plaintiff alleges that the Company benefitted from Nissen's fraud: as a result of the scheme, the Company, a "relatively small ticket brokerage business," attracted at least $70,000,000 in investments, including from Investors—some of which paid legitimate business expenses, given Plaintiff's allegation that Nissen used the money "in large part" to repay investors and enrich himself—and Plaintiff admits that the scheme "prolonged" the Company's existence. Complaint ¶¶ 1, 32, 229, 252. *See, e.g.*, *New Greenwich Litig. Tr., LLC v. Citco Fund Servs. (Eur.) B.V.*, N.Y.S.3d 1, 10 (2016) (granting motion to dismiss) ("Application of [the adverse interest] exception is not warranted since the funds' management was not acting entirely for its own interest; rather, its conduct enabled the funds to continue to survive and to attract investors."); *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 446 (S.D.N.Y. 2019) (granting motion to dismiss) ("The PPCO Funds benefited somewhat from the alleged overvaluations, which helped maintain the façade of financial viability in the eyes of their creditors and investors and thereby attracted additional capital from investors."); *In re ICP Strategic Credit Income Fund, Ltd.*, 568 B.R. 596, 611–12 (S.D.N.Y. 2017) (finding the exception did not apply where the fraudulent conduct kept the business "temporarily afloat," even though it ultimately harmed the

business, and granting motion to dismiss), *aff'd*, 730 F. App'x 78 (2d Cir. 2018).[7]  Accordingly, the adverse interest exception is inapplicable, and the Court must dismiss Plaintiff's first cause of action pursuant to the *in pari delicto* doctrine.

### B.  Plaintiff's Claim on Behalf of the Investors

Plaintiff adequately pleads a claim for aiding and abetting fraud on behalf of the Investors, because, among other things, Plaintiff alleges that a Citibank employee lied to a victim of the fraud which assisted in the perpetuation of the fraud.

#### a.  Aiding and Abetting Fraud Legal Standard

"Under New York law, to establish liability for aiding and abetting fraud, a plaintiff must show:  (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission."  *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (quoting *Lerner, N.A.*, 459 F.3d at 292).  "[A]ctual knowledge is required to impose liability on an aider and abettor under New York law."  *Id.* (quoting *Lerner, N.A.*, 459 F.3d at 292).  Courts must view the facts alleging fraud "in their totality, not in isolation."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015).

Allegations of constructive knowledge, defined as "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person" are insufficient to plead the claim.  *Id.* (quotations omitted).  "A failure to allege sufficient facts to support the inference that the alleged aider and abettor had actual knowledge of the fraudulent scheme warrants dismissal of the aiding and abetting claim at the pleading stage."  *Id.*.  However, New York law permits a plaintiff to plead the the knowledge element of an aiding and abetting claim by alleging "actual knowledge of the fraud as discerned from the surrounding circumstances."  *Id.*

---

[7] The Court disregards the Complaint's conclusory allegations such as that the Company "was harmed, not benefitted" by Nissen's actions.  Complaint ¶ 252.

(quoting *Oster v. Kirschner*, 905 N.Y.S.2d 169, 72 (1st Dep't 2010)).  The defendant's actual knowledge must be of the "primary violation"—that is, the fraud that harmed the plaintiff, and not some other wrong, against some other victim.  *Lerner*, 459 F.3d 273 at 294.  *See e.g.*, *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 545 (S.D.N.Y. 2009) (plaintiff "must offer facts sufficient to demonstrate that the defendants had actual knowledge of wrongful conduct that harmed the FX customers—the alleged fraudulent siphoning of their funds—not actual knowledge of different wrongful conduct that might have harmed others, such as Refco's shareholders.").

"There must also be a 'nexus between the primary fraud, [the alleged aider and abettor's] knowledge of the fraud[,] and what [the alleged aider and abettor] did with the intention of advancing the fraud's commission . . . .'"  *Krys*, 749 F.3d at 128 (quoting *Franco v. English*, 620 N.Y.S.2d 156, 259 (3d Dep't 1994)) (alterations in the original).  "The nexus between the aider and abettor and the primary fraud is made out by allegations as to the proposed aider's knowledge of the fraud, and what he, therefore, can be said to have done with the intention of advancing the fraud's commission.  It is not made out simply by allegations which would be sufficient to state a claim against the principal participants in the fraud."  *Id.* (quoting *Nat'l Westminster Bank USA v. Weksel*, 511 N.Y.S.2d 626, 630 (1987)).

A plaintiff faces a high bar for pleading an aiding and abetting fraud claim against a bank.  "New York courts overwhelmingly recognize" that a plaintiff does not adequately plead actual knowledge by alleging merely "the bank's suspicions or ignorance of obvious 'red flags' or warning signs indicating the fraud's existence."  *Rosner v. Bank of China*, No. 06 CV 13562, 2008 WL 5416380, at *6 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F. App'x 637 (2d Cir. 2009).  Likewise, allegations that a bank flagged an account or referred it to an internal fraud investigation unit based on suspicions of fraud have been held to be insufficient to plead actual knowledge of the fraud.  *See, e.g.*, *Ryan v. Hunton & Williams*, No. 99-CV-5938 (JG), 2000 WL 1375265, at *10 (E.D.N.Y. Sept. 20, 2000)

(holding that a allegations of a bank's referral of an account to its internal fraud unit upon suspicion of fraud does not constitute actual knowledge of fraud); *Heinert*, 835 F. App'x at 630 (holding that allegations that a bank flagged an account for suspicious activities did not adequately plead actual knowledge of fraud. Even allegations that a bank's investigation concluded that an entity "appear[ed]" to be engaging in fraud have been held not to satisfy the requirement to plead actual knowledge. *See Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 414 (S.D.N.Y. 2021) (a bank's observation that an operation "'appeared to be' a Ponzi scheme and that entities and individuals associated with OneCoin-related transfers 'appeared to be engaged in layering'" amounted to mere suspicions of fraud).

Furthermore, courts have found that allegations that a bank merely failed to act on suspicions or knowledge of fraud does not constitute substantial assistance. *See Rosner*, 2008 WL 5416380, at *14 ("inaction is substantial assistance only when the defendant owes a fiduciary duty directly to the plaintiff."). For instance, a number of courts have found that a bank does not aid and abet and fraud when it maintains accounts for individuals known or suspected to be committing fraud. *See, e.g.*, *Ryan*, 2000 WL 1375265, at *10 ("failing to shut down the accounts sooner or to inform the plaintiffs about the suspected fraud [ ] do not rise to the level of substantial assistance."). Courts have also found that "routine" banking transactions for such individuals to not constitute substantial assistance. *See, e.g.*, *Heinert*, 410 F. Supp. 3d 544, 552 (W.D.N.Y. 2019), *aff'd*, 835 F. App'x 627 (2d Cir. 2020) ("Even assuming arguendo that plaintiffs had sufficiently alleged actual knowledge" of the scheme, "routine matters, even where they are performed with atypical frequency" do not amount to substantial assistance) (quotations omitted); *see also*, *Rosner v. Bank of China*, 2008 WL 5416380, at *12 ("Rosner alleges no participation by BoC other than that it allowed IFS Inc. and Siu Lap to create accounts, transfer funds among accounts, and make withdrawals from accounts . . . 'the mere fact that participants in a fraudulent scheme use accounts at a bank to

perpetrate it, without more, does not in and of itself rise to the level of substantial assistance.'"

(quoting *Mazzaro de Abreu v. Bank of Am. Corp.,* 525 F. Supp. 2d 381, 390 (S.D.N.Y. 2007) (other

quotations omitted))

### C. Application

#### 1. Plaintiff Adequately Pleads the Existence of a Fraud

Plaintiff adequately pleads the existence of a fraud by alleging that Nissen criminally

defrauded the Investors and others through his Ponzi scheme.  Defendant does not dispute that

Plaintiff has adequately pleaded this element.

#### 2. Plaintiff Adequately Pleads that Citibank Had Actual Knowledge

Plaintiff adequately pleads that Citibank had knowledge of the primary violation—that is,

Nissen's defrauding of the Investors.  The Complaint contains substantial allegations regarding the

"surrounding circumstances" from which an inference of knowledge may be drawn.  *Krys*, 749 F.3d

at 127.  According to the Complaint, Citibank employees extensively documented and voiced

concerns about suspicious activity in Nissen's and the Company's accounts, beginning almost

immediately after Nissen switched to Citibank as his primary banking institution.  The Complaint

goes on to allege that Citibank's concerns grew so strong that it recommended closure of Nissen's

and the Company's accounts.  It alleges that for six months after Citibank recommended closing the

accounts, Santana and Crowley formally contested the closure recommendations and pressured their

colleagues to continue processing transactions for Nissen, even when doing so required bending

Citibank's rules and even after their colleagues told them to stop.  It also alleges that Santana and

Nissen had a personal relationship and that Nissen's and the Company's accounts represented a

substantial portion of Crowley's book of business.

Moreover, significantly, the Complaint contains allegations that a bank employee directly

aided in the fraud.  The Complaint alleges that Santana lied to Taly, one of the victims of the

primary violation, at Nissen's request, about the whereabouts of funds Nissen had stolen from it. "[I]n their totality," these allegations give rise a sufficient inference that Citibank had actual knowledge of the primary violation—Nissen's fraud against investors, particularly Taly. *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 171.

Defendant makes a number of arguments that Plaintiff has failed to adequately plead actual knowledge. All are unpersuasive. Among other things, Defendant argues that Plaintiff's allegations regarding the documented suspicions of Citibank's compliance professionals do not adequately plead actual knowledge of fraud, that Plaintiff's allegations regarding Santana's and Crowley's behavior do not adequately plead actual knowledge of fraud, and that Plaintiff does not allege that Citibank knew the details of Nissen's fraud. The Court will address each of these arguments in turn.

First, Defendant asserts that "Citibank compliance professionals deemed certain transactions to be 'suspicious' or 'unusual,' not 'fraudulent' or evidence of a Ponzi scheme," and that "[f]lagging certain transactions as 'suspicious' or 'unusual' is . . . of no legal significance." Def's Br. 8, 15. This is incorrect. Allegations that compliance professionals were merely suspicious of Nissen's and the Company's accounts—while inadequate to plead Citibank's actual knowledge of fraud on their own—comprise one of many allegations of "surrounding circumstances" that together give rise to a sufficient inference of actual knowledge of fraud. *Krys*, 749 F.3d at 127.

Defendant's papers also elide over the Complaint's specific allegations regarding Santana's lie to an Investor. Defendants assert, "the Complaint contains no allegations — none — that Citibank was aware of any fraudulent statements Nissen made to investors." Def's Br. at 15. But as described above, the Complaint alleges that Santana knew that Nissen lied to Taly about the money he owed it and that Santana lied to corroborate Nissen's account. Defendant also claims that "Citibank never referred Nissen to its fraud investigative unit." Def's Br. at 15. This characterization is misleading. The Complaint alleges that FIU conducted multiple investigations

21

and issued multiple reports on Nissen's and the Company's accounts after receiving inquiries from the FBI. In fact, according to the Complaint, it was FIU that recommended closing the account. At the pleadings stage, the Court must accept those allegations as true.

Second, Defendant asserts that "the only facts alleged respecting Crowley and Santana give rise to a strong inference of nothing more than ordinary-course client service motivated by a reasonable belief that Nissen was operating a legitimate business." Def's Br. at 18. But Plaintiff alleges that Santana lied to an Investor, at Nissen's request, about a Citibank wire. The Court does not accept that a banker corroborating a client's lie to an investor is "ordinary-course client service."[8] In fact, this allegation describes behavior that is so out of the ordinary that it, along with the other allegations in the Complaint, gives rise to a strong inference that Santana knew Nissen was committing fraud.

Third, Defendant claims that to adequately plead actual knowledge of fraud, Plaintiff must allege "knowledge of the specific statements or inducements made to Debtors' lenders and investors or the terms of [their] agreements." Reply at 4. But this is incorrect.[9] Plaintiff need only plead that

---

[8] The Court hopes that Citibank does not believe that it is either.

[9] None of the cases Defendant cites to the contrary stand for that proposition. In *Krys*, while the Second Circuit held that the complaint failed to allege that the defendants knew certain "key facts" about the fraud, the effect of those missing allegations was to render the existing allegations of knowledge of and an agreement to participate in the scheme "conclusory." 749 F.3d at 130. In *Carbon Investment Partners, LLC v. Bressler*, contrary to Defendant's characterization, the court did not hold that alleging actual knowledge required "allegations of knowledge of the specific financial circumstances at issue in the alleged fraud," but rather that such allegations were sufficient. 2021 WL 3913526, at *7 (S.D.N.Y. Sept. 1, 2021). In other cases cited by Defendant, the plaintiffs alleged that the defendants had actual knowledge—or, in some cases, only suspicion—of other wrongdoing, against other victims. *See, e.g., Kirschner v. Bennett*, 648 F. Supp. 2d 525, 545 (S.D.N.Y. 2009) (plaintiff "must offer facts sufficient to demonstrate that the defendants had actual knowledge of wrongful conduct that harmed the FX customers—the alleged fraudulent siphoning of their funds—*not actual knowledge of different wrongful conduct that might have harmed others*, such as Refco's shareholders.") (emphasis added); *Filler v. Hanvit Bank*, 339 F. Supp. 2d 553, 560 (S.D.N.Y. 2004), *aff'd*, 156 F. App'x 413 (2d Cir. 2005) ("the underlying fraud of which defendants were allegedly aware and which they assisted is not the defrauding of *these plaintiffs*.") (emphasis added);

 *Lerner* is the closest case. In *Lerner*, the plaintiff alleged that the defendant bank had actual knowledge that a lawyer was using his accounts to commingle funds and failed to report the misconduct as required by its fiduciary duty. *Lerner*, 459 F.3d at 281. The Second Circuit held that the allegations of actual knowledge of commingling client funds to cover overdrafts were insufficient to plead actual knowledge of the lawyer's theft from those same clients' funds. *Id.* at 293. In the Court's view, actual knowledge of commingling of funds is analogous to actual knowledge of a mere "red flag" of *theft* of those funds—just as here, the suspicious activities documented by Citibank, identifying the Investors as counterparties, constitute actual knowledge of mere "red flags" of a Ponzi scheme involving those parties. Indeed, the

Citibank had actual knowledge of the "primary violation"—here, Nissen's defrauding of the Investors. *Lerner*, 459 F.3d 273 at 294. Again, Plaintiff alleges a plethora of circumstances giving rise to an inference of Citibank's actual knowledge that Nissen was committing fraud against the Investors, and in particular Taly; most significantly, Plaintiff alleges that a Citibank employee lied to Taly, at Nissen's request, about the whereabouts of funds Nissen had stolen from it.

### 3. Plaintiff Adequately Pleads that A Citibank Employee Substantially Assisted the Fraud

Third, Plaintiff adequately pleads that Santana substantially assisted Nissen's fraud. Plaintiff alleges that Santana intentionally misrepresented to Taly, at Nissen's request, that Nissen's payment was delayed by a Citibank wire error. Plaintiff alleges upon information and belief that Santana knew that his statement to Taly was false. He also offers additional facts that support this allegation. Plaintiff alleges that Santana was a relationship manager for Nissen's and the Company's accounts who took an active role in processing wire transfers. He alleges that by the time of the meeting with Taly, Santana's colleagues had communicated their serious concerns about suspicious activity in Nissen's and the Company's accounts and recommended closure of the accounts. He also alleges that Nissen's business was important to Santana and that the two men had a personal relationship. All of these allegations collectively give rise to an inference that Santana would have been aware that Citibank had not made a wire error and that his misrepresentation was intentional.

The Court notes that neither Plaintiff nor Defendant addresses the allegation of Santana's intentional misrepresentation in detail in its briefs.[10] Instead, they focus on whether Citibank's

---

cases the Second Circuit cites to support its conclusion in *Lerner* all address the insufficiency of *suspicions* of fraudulent activity. *Id.*

[10] In a footnote in its brief, Defendant urges the Court to disregard this allegation for two reasons. Both are unpersuasive. First, Defendant incorrectly characterizes the allegations as "conclusory." Def's Br. at 19 n. 10. Second, Defendant points to a transcript of a recorded call between Taly and Nissen during which Nissen "explained . . . what Taly was told about the wire was because 'I [Nissen] had a different wire go out and come back that wasn't for you [Taly]. Just a different wire.'" *Id.* (quoting Dkt. No. 46-6). As described, though the Court may consider the existence of the transcript in its analysis, it cannot consider this statement for its truth. *See Staehr*, 547 F.3d at 425; *see also Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (finding that it was an abuse of discretion for a district court ruling on a motion to dismiss to take judicial notice of public filings for "the truth of the facts asserted"

execution of frequent overdrafts and suspicious transfers, as well as the significant delay in closure of Nissen's accounts, by themselves alone, would adequately plead substantial assistance. On their own, the Court might conclude that they do not. But given the totality of the allegations, including Santana's alleged lie to an Investor, Plaintiff adequately pleads substantial assistance.

### 4. Plaintiff Adequately Pleads a "Nexus" between the Fraud, Knowledge, and Substantial Assistance

Finally, Plaintiff adequately pleads a "nexus" between Nissen's Ponzi scheme, Citibank's actual knowledge of the fraud, and Santana's substantial assistance. As described, Plaintiff adequately pleads that Citibank—and Santana in particular—had actual knowledge of Nissen's defrauding of the Investors. Plaintiff also alleges that Santana corroborated Nissen's forged letter from Citibank lying about the whereabouts of money Nissen owed to Taly, and that he did so at Nissen's express request. These allegations raise a sufficiently strong inference that Santana told this lie "with the intention of advancing [Nissen's] fraud's commission." *Krys*, 749 F.3d at 128. Moreover, Plaintiff alleges that this lie effectively concealed the fraud, at least temporarily: according to the Complaint, Taly—which was suspicious enough prior to meeting with Santana to have demanded an in-person meeting with Citibank—did not discover the fraud until Nissen confessed to it more than a month later.

### D. Leave to Replead

The Court grants Plaintiff leave to replead the dismissed claim. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). While leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," those circumstances do

---

therein). Defendant's suggestion that the Court consider this statement for its truth is particularly galling considering that it is a representation by Nissen, a convicted fraudster, speaking about his fraud to one of his victims.

not apply in this case. *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (citation omitted). Any amended complaint must be filed no later than fourteen days from the date of this order.

### E. Conclusion

For the reasons stated above, Defendant's motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's claim on behalf of the Company is dismissed without prejudice. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 42.

SO ORDERED.

Dated: November 6, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge